ELLEN F. ROSENBLUM
Attorney General
HEATHER J. VAN METER  #983625
ANDREW D. CAMPBELL #022647
Senior Assistant Attorneys General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
Telephone: (503) 947-4700
Fax: (503) 947-4791
Email:  Heather.J.VanMeter@doj.state.or.us
        Andrew.D.Campbell@doj.state.or.us

Attorneys for Defendants Robert Wayne Edwards and State of Oregon


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


| | |
|---|---|
| **JUSTIN MICHAEL WILKENS**, | Case No.  6:14-cv-00907-MC |
| Plaintiff, | DECLARATION OF HEATHER J. VAN METER |
| v. | |
| **ROBERT WAYNE EDWARDS**, in his individual capacity; **THE STATE OF OREGON**, | |
| Defendants. | |

I, Heather J. Van Meter, hereby declare:

1.      I am a Senior Assistant Attorney General for the Oregon Department of Justice, and represent defendants in the above-captioned case.  I have personal knowledge of the following and am competent to testify to the same.

2.      Attached as **Exhibit A** is a true and correct copy of relevant excerpts of Defendant Captain Edwards' deposition taken on April 29, 2015.


Page 1 -   DECLARATION OF HEATHER J. VAN METER
HJV/6554023-v1

3.       Attached as **Exhibit B** is a true and correct copy of relevant excerpts of Plaintiff Wilkens' deposition taken on April 15, 2015.

4.       Attached as **Exhibit C** is a true and correct copy of the various citations issued to plaintiff as a result of plaintiff's actions on August 3, 2012, all issued by Lane County Sheriff's Office.

5.       Attached as **Exhibit D** is a true and correct copy of the DVD with the August 3, 2012 digital recording which was captured onboard the police vehicle with Captain Edwards.  A true and correct DVD copy of the digital recording is simultaneously being mailed to the court and plaintiff's counsel.

6.       Attached as **Exhibit E** is a true and correct copy of the readily accessible CAD reports regarding the armed bank robbery incident that precipitated the events in question.

7.       Attached as **Exhibit F** is a true and correct copy of the report of the Independent Medical Examination conducted by Dr. Scott Kitchel on June 3, 2015.

8.       Attached as **Exhibit G** is a true and correct copy of the Oregon State Police policy relating to halting vehicles in high-risk stops.

**I declare under penalty of perjury that the foregoing is true and correct.**

EXECUTED on June __22__, 2015.


_____*s/ Heather J. Van Meter*_____
HEATHER J. VAN METER
Senior Assistant Attorney General

Page 2 -    DECLARATION OF HEATHER J. VAN METER
HJV/6554023-v1

*Robert Edwards*

*Wilkens v Edwards and State of Oregon*

*April 29th, 2015*





**CC REPORTING AND VIDEOCONFERENCING**
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JUSTIN WILKENS,                  )
                                 )
              Plaintiff,         )
                                 )
      v.                         )   No. 14-CV-00907
                                 )
ROBERT EDWARDS, in his           )   Volume I of II
individual capacity;             )
THE STATE OF OREGON;             )   Pages 1 to 101
                                 )
              Defendants.        )

DEPOSITION OF CAPTAIN ROBERT EDWARDS

April 29, 2015

Wednesday

11:56 A.M.

THE DEPOSITION OF CAPTAIN ROBERT

EDWARDS, was taken at the Department of Justice,

1162 Court St. NE, Salem, Oregon, before Jan R.

Duiven, CSR, FCRR, CCP, Certified Shorthand

Reporter in and for the State of Oregon.

APPEARANCES

For the Plaintiff:

      MS. LAUREN C. REGAN

      259 E. 5th Avenue, Suite 300-A

      Eugene, Oregon 97401

      541/687-9180

      lregan@justicelaworegon.com

For the Defendants:

      DEPARTMENT OF JUSTICE

      Trial Division

      1162 Court Street NE

      Salem, Oregon 97301

      503/947-4700

      BY:  MR. ANDREW D. CAMPBELL

      andrew.d.campbell@doj.state.or.us

Also Present:

      MS. LOREE FOGLEMAN

      MR. JUSTIN WILKENS

Reported by:

      JAN R. DUIVEN, CSR, FCRR, CCP

4

```
 1              CAPTAIN ROBERT EDWARDS,

 2    having been first duly sworn to testify the truth,

 3    the whole truth, and nothing but the truth, was

 4    examined and testified as follows:

 5

 6                    EXAMINATION

 7    BY MS. REGAN:

 8         Q.    All right.  Good morning.

 9         A.    Good morning.

10         Q.    Let's start by having you state your

11    name for the record, and if you wouldn't mind

12    spelling it.

13         A.    Robert Edwards.  R-O-B-E-R-T,

14    E-D-W-A-R-D-S.

15         Q.    All right.  And have you ever been

16    known by any different names other than that name?

17         A.    Rob.

18         Q.    Okay.  And is your date of birth

19    ████████████████████

20         A.    Yes, ma'am.

21         Q.    Okay.  And today's deposition is

22    focusing on an incident that occurred on

23    August 30th of 2012.

24         A.    August 3rd, I believe.

25         Q.    I'm sorry.  August 3rd of 2012.  That
```

38

1    respect you back.  So if you respect them, they'll

2    respect you back.

3         Q.    Okay.  And how -- what is your

4    personal style or how do you interact with people

5    when you believe they are not doing what you're

6    asking them to do or they're not complying with

7    your instructions?

8         A.    You have to get the point across that,

9    you know, me as a law enforcement officer is

10   taking control of the situation.

11        Q.    And how do you do that?

12        A.    Through red and blue lights, through a

13   uniform, through verbal commands, verbal cues.

14   Then if it continues, then you start going up the

15   use of force continuum until you gain compliance.

16        Q.    Okay.  Have you ever lost your cool or

17   lost your patience with a citizen that you've

18   detained for a traffic stop?

19        A.    Not that I'm aware of, no.

20        Q.    Here's a fun question.  If you had to

21   put an approximate number on the number of traffic

22   stops that you've done in your 18 years as a

23   police officer, what would you approximate?

24        A.    Ten -- between -- this is a total

25   guess, 15,000.

48

1    portion.

2        Q.    Okay.  And was there anything else?

3        A.    There was.  I'm trying to remember

4    what it was.  Failed to notify the pointing of the

5    firearm, and I think failed to notify of the use

6    of -- a portion of the use of force, I believe.  I

7    may be mistaken on that.

8        Q.    Okay.

9        A.    But, again, this was two years ago.

10        Q.    And both of those, to your

11    knowledge -- to your recollection, resulted in a

12    written reprimand?

13        A.    I believe so.

14        Q.    Okay.  And that goes in your permanent

15    disciplinary file?

16        A.    It goes into my personnel file, yes.

17    I don't know how permanent it is.

18        Q.    Okay.  Are there any other

19    consequences of a written reprimand?

20        A.    No.

21        Q.    Okay.  So as captain -- my

22    recollection from reading the documents when you

23    were a lieutenant, you were head of the

24    Springfield command.  Is that correct?

25        A.    Yes, ma'am.

55

1          Q.     Okay.

2          A.     Drove my personal vehicle to work that

3    day I'm assuming because I had a meeting or had to

4    do something or pick my girl up from school or

5    something.

6          Q.     Okay.

7          A.     So I did not have my assigned car.

8          Q.     Okay.  So how did you end up driving

9    the Camaro that day?

10         A.     Something occurred.  I decided I need

11   to go look for some bank robbery suspects, and I

12   grabbed the keys to that car to drive -- two

13   reasons.  It was easily available.  The keys are

14   in the box, in the assigned ADEP box.

15                Two, the location I was going to go to

16   look for these bank robbery suspects was very

17   rural and I wanted to blend in in the parking lot

18   to watch an intersection.  I didn't want to be in

19   a marked unit.

20                (Reporter inquiry.)

21                THE WITNESS:  A -- aggressive

22   driving enforcement program.  ADEP.

23   BY MS. REGAN:

24         Q.     Had you ever driven the Camaro prior

25   to August 3rd?

58

1    better.

2              They do handle a little bit different.

3    They -- you know, power-wise, they're not nearly

4    as powerful as our Chargers.  The Camaro has a V6

5    versus the powerful V8s that our Chargers have.

6         Q.    Okay.  Are there any mod -- other

7    modifications to the Camaro that are used for

8    police work?

9         A.    Typically just a radio, a roll bar,

10   and a bunch of red and blue lights on it.  And a

11   siren.

12        Q.    Okay.  So the tires on the Camaro, are

13   they standard tires for a Camaro?

14        A.    Speed-rated tires, yes.

15        Q.    Okay.  Is there anything modified with

16   regard to the braking system?

17        A.    I don't believe so.

18        Q.    So there's no button inside the

19   vehicle that you press to assist with brake fade

20   or anything like that?

21        A.    No.

22        Q.    Okay.  And do you recall where the

23   lights are located on the Camaro?

24        A.    I believe they are down on the center

25   console.  It's a toggle switch or buttons, but

1    down on the center console.

2         Q.    So kind of where the shift would be?

3         A.    Just forward of that, yes.

4         Q.    And there is -- I think you said a

5    switch or a button that you hit to make them

6    function?

7         A.    That's correct.

8         Q.    Okay.  And what about the siren?

9    Where would the siren button be located?

10        A.    Same location.

11        Q.    Okay.  And where are the actual lights

12   physically located on the outside of the vehicle?

13        A.    In the grille, in the front

14   windshield, and on the outside near the

15   headlights.

16        Q.    Okay.  So the grille, I assume you

17   mean one on each side, sort of near where the

18   headlights would be located?

19        A.    I'd have to look at your pictures to

20   tell exactly where they're at.

21        Q.    You're welcome to.

22        A.    So you've got a red and blue light in

23   the top of the windshield.  You've got red and

24   blue lights in the grille.  You also have red and

25   blue lights down near the spoiler.

60

1      Q.    And can you be more specific?  Is

2  there one red light and one blue light on each

3  side or how -- can you give me a little more

4  detail if you recall?

5      A.    I don't recall.

6      Q.    Okay.

7      A.    Based on the photos and based on my

8  memory, I -- I haven't seen the front of this car

9  with its lights on in a long time.  So I know you

10 got a red and blue light for sure on the top of

11 the windshield.  I believe you got a -- I think

12 you might have red and blue lights on both sides

13 of the grille, both sides of the Chevy emblem.

14 You also --

15     Q.    Meaning near the center, like on

16 either side of the license plate?

17     A.    No.  On the outside.

18     Q.    Oh, I see.  Okay.

19     A.    Near the headlights.

20     Q.    Okay.

21     A.    You're also going to have headlights,

22 called a wig-wag.  Your headlights are going to be

23 fluctuating on and off also.

24     Q.    Your headlights themselves?

25     A.    The headlights themselves.

61

```
1            Q.    Okay.  So just -- just to be clear,
2     let's start at the ones that are up on top of the
3     windshield.  They are centered, it looks like, on
4     either side of where the rearview mirror would be
5     located.  Is that accurate?
6            A.    I would say --
7            Q.    That --
8            A.    -- sitting in the driver's seat to the
9     right of the rearview mirror.
10           Q.    Okay.  To the right.  But not to the
11    left?
12           A.    No.
13           Q.    So there's only one light?
14           A.    That would block the operator's --
15    that would obscure an operator's view.  So it
16    would be on the right side of the rearview mirror.
17           Q.    Okay.  Just one light, though?
18           A.    One red, one blue.
19           Q.    Meaning there are actually two lights
20    there or it rotates from red to blue?
21           A.    I think there's two.  Based on that
22    red light, it is more closer to the center.  Based
23    on that blue light, it looks like it's over to the
24    right further.
25           Q.    Okay.  So there are two actual lights,
```

62

1    one is red, one is blue.  They are to the right of

2    the rearview mirror if you're driving the car, and

3    those toggle back and forth between red and blue?

4         A.    Yes.

5         Q.    Okay.  And that is -- is that an

6    accurate picture of what they look like in broad

7    daylight?

8         A.    No.

9         Q.    How -- how would you correct that?

10        A.    You have a small video, which would

11   give you an accurate -- an accurate depiction of

12   how fast -- this is just a still shot of -- all

13   you see is one red.

14             So if you play it over the -- over the

15   course of several seconds, you will get a much

16   better accurate depiction of the lighting system.

17        Q.    Okay.  And what -- what do you think

18   would be more accurate?  Like describe what you

19   think would look different or how would it look

20   different.

21        A.    You would get a better visual

22   observation of the rapid succession of the red and

23   blue lights flickering on and off.

24        Q.    Okay.  So the flashing of the lights

25   or the flickering of the lights.  But other than

```
 1    that is the brightness accurately depicted?
 2          A.    Personal opinion, no.
 3          Q.    Okay.  And how would you explain why
 4    not?
 5          A.    Can't tell you.
 6          Q.    Okay.
 7          A.    I know when I was standing in front of
 8    the car they look brighter than what the photos
 9    are depicting.
10          Q.    Okay.  And how about the color?
11    Are -- is the blue and the red accurately
12    depicted?
13          A.    I guess.
14          Q.    Okay.  So then moving to the set of
15    lights that are to the left and right of the upper
16    headlights on either side of the Chevy --
17          A.    Here and here?
18          Q.    Yes.
19          A.    Okay.
20          Q.    Are those lights -- are those police
21    lights?
22          A.    Yes.
23          Q.    Okay.  And they are mounted to the
24    right and left, respectively, of the headlights?
25          A.    I believe so, yes.
```

64

1          Q.     Okay.  And is one of those blue and

2     one red?

3          A.     I don't recall.  I don't know if

4     you've got a red and blue on each side or if

5     you've got a blue on this side and a red on that

6     side.  I don't recall.

7          Q.     Okay.

8          A.     And the pictures I have are not

9     helping me out.

10          Q.     Okay.  Do they toggle back and forth?

11          A.     Yes.

12          Q.     Okay.  So the one on the left appears

13     to be blue.  Is that correct?

14          A.     On the right side -- if you're facing

15     the car, yes.

16          Q.     Okay.

17          A.     On the left.

18          Q.     So yes.  If you were the driver of the

19     car, the light adjacent to the right headlight

20     would be blue and always blue?

21               MR. CAMPBELL:  Maybe you could just

22     say "passenger's side" and "driver's side."

23               MS. REGAN:  Okay.  That's good.

24     BY MS. REGAN:

25          Q.     So passenger side near the headlight,

65

1   that light is blue?

2        A.    It is blue.  But I'm not sure if

3   there's a red one next to it or not.

4        Q.    Okay.  But there is another light

5   similar to that on the driver's side near the

6   headlight?

7        A.    I believe so, yes.

8        Q.    Okay.  And are there any other lights

9   at that level of the headlights?

10       A.    Looks like we have some smaller LED

11  lights on the interior side of the -- on the inner

12  side, if you will, by the Chevy emblem itself too.

13  Probably one on each side.

14       Q.    Okay.  And can you explain -- so this

15  is a light that's much smaller than the other

16  lights you've previously described, or what is the

17  distinction with an LED light?

18       A.    I'm just going based on the photo.  It

19  appears to be an LED light.  I may be -- maybe I'm

20  speaking out of turn.  I don't know if it's an LED

21  light.  But it appears to be based on the photo.

22  But regardless, you do have a red -- blue light

23  here.

24       Q.    Uh-huh.

25       A.    So I can only assume next to the blue

66

1  light or adjacent to the blue light you're going

2  to have a red light also.

3          Q.    Okay.

4          A.    And I don't know if it's on the same

5  side or opposite side.

6          Q.    Okay.  And then at the level of the

7  license plate -- I'm sorry.  I forget what you

8  called that area of the car.

9          A.    I forgot what I called it also.

10          Q.    Okay.  We'll call it the license plate

11  level.

12                  MR. CAMPBELL:  We can call it the

13  fairing.

14                  MS. REGAN:  The fairing?

15                  MR. CAMPBELL:  Uh-huh.

16                  MS. REGAN:  All right.

17  BY MS. REGAN:

18          Q.    So at the fairing level of the

19  vehicle, there appears to be another set of

20  lights.  Is that correct?

21          A.    Yes.

22          Q.    And can you describe those lights?

23          A.    Ah, those would be -- typically what

24  would be referred to as your fog lights.  But I

25  believe we have red and blue lights in lieu of

67

1    your standard white light.

2         Q.    Okay.  And do you know whether those

3    toggle back and forth?

4         A.    I believe they do.

5         Q.    Okay.  And is it accurate to say that

6    the lights on the driver's side of the vehicle are

7    all red, and the lights on the passenger's side

8    are all blue?

9         A.    From this still photo it appears so,

10   but I -- I'm not sure.

11        Q.    Okay.

12        A.    I'd have to watch the -- I would

13   imagine somewhere on the left side or the driver's

14   side there should -- there would be some blue

15   lights also, but I'm not 100 percent sure.

16        Q.    Okay.  And so that's not something

17   standard in police vehicles where one side's all

18   red and one side's blue?

19        A.    No.

20        Q.    Okay.  Displaying my ignorance there.

21              Okay.  And so are there any other

22   lights on the front of the vehicle that -- apart

23   from normal headlights or turn signals?

24        A.    We have -- on the sides, we have a

25   little -- bubble LEDs.  You can't see it.  Well,

68

```
1    that one there.   (Indicating.)

2         Q.    Okay.  So that is below the turn

3    signal light?

4         A.    Yes.

5         Q.    So below the turn signal light at the

6    fairing level is an LED light?

7         A.    I believe.

8         Q.    Is it colored?

9         A.    Yes.

10         Q.    And would it be blue and red again?

11         A.    Yes.

12         Q.    Okay.  And is -- is that light -- it's

13    a little difficult to see because of the damage to

14    that part of the vehicle, but is that visible from

15    the front or is that something that you see if

16    you're on the side of the vehicle?

17         A.    It's designed more for the side of the

18    vehicle.

19         Q.    Okay.  All right.  Any other lights?

20         A.    Not that I'm aware of.

21         Q.    Okay.  Do you happen to know the

22    mechanics of how the siren operates, like where is

23    the siren actually located?

24         A.    Somewhere in that area.  (Indicating.)

25         Q.    In --
```

84

1          Q.     Was it --

2          A.     There were a lot of motorcycle

3   training, riding techniques, riding ability, lots

4   of training with the riding.

5          Q.     Okay.

6          A.     I don't know what -- how many hours or

7   what type.

8          Q.     Okay.  And you were never exposed to

9   any of that --

10         A.     No.

11         Q.     -- in your employment?  Okay.

12                So what is the protocol for stopping

13  someone you believe has committed a traffic

14  violation in 2012, in August of 2012?

15         A.     Okay.  Assure you got probable cause

16  to believe that the individual committed the

17  violation.  Catch up to the violator.  Find a safe

18  spot alongside the roadway to stop that person.

19  Preferably before, call out the location to your

20  dispatch center, vehicle plate and location.  And

21  provide the license plate and then activate your

22  red and blue lights.

23         Q.     Okay.

24         A.     And then they pull over.  You pull in

25  behind them.  You have a discussion about the

85

1    violation.  You ask for driver's license,

2    registration, insurance.  Make a determination if

3    you want to issue that person a citation and/or

4    verbal warning.  Make your determination.

5              And sometimes check them through LEDS

6    and NCIC for their driving status and wants check.

7    Sometimes not.  And then make your determination

8    to issue the citation or the warning and allow

9    them to be on their way.

10        Q.    Okay.  And so is there a procedure

11   that you radio in to dispatch prior to turning on

12   your lights as you had just described?

13        A.    In a perfect world, yes.  Sometimes

14   you turn your lights on first, get them to slow

15   down, so you can get close enough to see the

16   license plate, and then you can call out the

17   license plate at the same time that they're

18   yielding to the side of the road.

19        Q.    Okay.

20        A.    But either way is fine.

21        Q.    Okay.  And what about the use of a

22   siren in that scenario?  You didn't really mention

23   turning on the siren or using the siren.  Is there

24   any rule or training or policy regarding the use

25   of the siren?

1      A.    On a standard traffic stop?

2      Q.    Yes.

3      A.    No need.

4      Q.    No need to use a siren?

5      A.    No.

6      Q.    Okay.  And is there anything -- as

7  you're engaging in a traffic stop, is there any

8  time where a siren would be required?

9      A.    Not that I can think of.

10      Q.    Okay.

11      A.    I'm sure there's a million scenarios

12  maybe, but I can't think of one right now.  For

13  your standard run-of-the-mill traffic stop there's

14  no need to engage your siren.

15      Q.    Okay.  And would that change if you

16  were engaging in a high-speed chase?

17      A.    Yes.

18      Q.    And how would it change?

19      A.    Department policy says you got to have

20  your siren on.

21      Q.    And when would it be -- when would you

22  be required to utilize the siren?

23      A.    When you've made a determination that

24  you're in pursuit of and/or feel that the person

25  is failing to yield, you might be getting -- you

87

```
1    might get behind a little old lady who doesn't see

2    you.  Might be trying to activate your siren a

3    time or two to get their attention.  They may then

4    pull over, shut your siren off.  Or if they don't

5    stop, continue to fail to yield, and/or attempt to

6    elude, you keep your siren on.

7         Q.    Okay.  So just to make sure that I'm

8    understanding, you are allowed to use high speed

9    yourself in trying to catch up to a speeder

10   without turning on -- without activating the

11   siren?

12        A.    That's correct.

13        Q.    Okay.  And the use of the siren would

14   only be required if you needed a non-suspect

15   vehicle to yield to you, like the old lady

16   scenario you explained, so you would utilize your

17   siren in that circumstance?

18        A.    You could, yes.

19        Q.    Would it be required or it's

20   discretionary?

21        A.    Discretionary.

22        Q.    Okay.  And I believe your testimony

23   also was that if the speeder -- if the target

24   suspect failed to pull over after utilizing the

25   lights, then you would activate the siren.  Is
```

88

1    that correct?

2        A.    You've got to draw the line in the

3    sand.  Is it someone who's just failing to yield

4    or they're maybe not hearing you, maybe not seeing

5    you, maybe they're not paying attention, and

6    they're continuing to drive at or near the speed

7    limit, or they're -- the speed at which you're

8    trying to stop them.  If they're not yielding, you

9    can hit your siren a time or two and attempt to

10   get their attention.

11       Q.    Okay.  Is that a requirement or just a

12   practice?

13       A.    A discretion.  A trooper does not have

14   to use it.  He can stay behind them with their

15   lights and -- with just their lights on.  They can

16   get out next to them with their lights on.  Weave

17   back and forth to try to get that person's

18   attention.

19       Q.    Okay.  From your training and

20   experience, do you know -- is there a distance in

21   which a siren can be heard?

22       A.    I don't know.

23       Q.    Okay.  And -- well, I'm going to wait

24   to turn to the incident, and we'll cover the

25   August 3rd incident all at one time.  So I'll hold

99

1       A.      No.

2   BY MS. REGAN:

3       Q.      No.   Okay.   So I thought I had seen in

4   the training materials that there can be an

5   occasion where a police vehicle would physically

6   ram a vehicle to get it to stop or to get it to

7   pull over or something like that?

8       A.      I guess we're instructed -- we're not

9   trained -- maybe I'm splitting hairs.   I've never

10  been in a car with an instructor showing us how to

11  ram a car.

12      Q.      Okay.

13      A.      Okay.   In our policy, under very

14  limited certain circumstances, we have the

15  authority to ram the car.

16      Q.      Okay.

17      A.      Or vehicle.

18      Q.      And have you ever had the -- prior to

19  August of 2012, had you ever had the experience of

20  ramming a vehicle?

21      A.      I have not.

22      Q.      Okay.   Now, I guess just to kind of

23  cross this line of questioning off, on August 3rd

24  of 2012, would it be fair to say that you did not

25  intentionally ram Mr. Wilkens's motorcycle?

100

```
 1        A.    I wouldn't call it a ram, but I did

 2   not intentionally make contact with his

 3   motorcycle.

 4        Q.    Okay.  You were not using a ramming

 5   tactic as described in the police training

 6   materials?

 7        A.    Absolutely not.

 8        Q.    Okay.  That skips over a whole lot of

 9   questions.

10             What is -- what time -- should we

11   pause?

12             MR. CAMPBELL:  It's about five to

13   noon right now so --

14             MS. REGAN:  Okay.

15             MR. CAMPBELL:  I'm fine with pausing

16   or I don't know what everyone else's comfort level

17   is like.

18             THE WITNESS:  I could use the

19   bathroom.

20             MS. REGAN:  Well, let's pause.  This

21   is a good breaking point.

22             MR. CAMPBELL:  Okay.

23             MS. REGAN:  So we'll pause there and

24   grab lunch.

25             MR. CAMPBELL:  Come back at one.
```

106

```
1          Q.    Okay.  And explain to me what the

2     difference is between a routine traffic stop and a

3     high-risk traffic stop?

4          A.    A routine traffic stop is the most

5     common.  Someone commits a traffic violation, get

6     behind them, turn the red and blue lights on, they

7     pull over to the shoulder of the road.  You have a

8     discussion about the violation.  You issue a

9     citation and/or a warning, and you allow them to

10    be on their way.  That's your standard,

11    run-of-the-mill traffic stop.

12              Now, during the course of that, should

13    they reach into the center console quickly without

14    warning, I may pull my firearm.  If they throw

15    their hand underneath the seat as if they're

16    trying to retrieve a weapon and they get their --

17    I may draw my firearm.  So that's your standard

18    traffic stop.

19              A high-risk traffic stop would be if I

20    knew the car was stolen.  I knew the occupants or

21    the occupants within the vehicle were armed and

22    dangerous following a high-speed pursuit,

23    something of that sort.  That's when, at the

24    conclusion of the stop or the pursuit, we are

25    authorized and encouraged to pull our firearms to
```

```
 1    BY MS. REGAN:

 2         Q.   Well, so, in general, I just wondered

 3    if there were policies and/or training

 4    requirements regarding high-speed chases, and I

 5    guess if it makes more sense to break it down into

 6    two parts we can do that.

 7              Maybe what are the training and

 8    policies regarding initiating a high-speed chase?

 9         A.   Okay.  Initiating a chase or a

10    pursuit, it just happens.  You stop the car for

11    whatever reason and -- either at low speeds, high

12    speeds, or medium speeds, if they know you're

13    behind them and they fail to yield, that -- that

14    automatically becomes a pursuit.  Even if it's at

15    20 miles an hour and they don't yield, that's a

16    pursuit.  So lights are on, sirens are on.

17              And during the course of that pursuit,

18    depending on the crime or potential crime, or

19    depending on information on the suspects, the

20    involved officer must constantly be using common

21    sense and taking factors into consideration such

22    as time of day, traffic flow, the speeds, the

23    potential suspect's driving capability, the

24    trooper's driving capability.  You factor those in

25    and you're constantly weighing risk versus reward.
```

113

1    have a tactical vehicle intervention, which is

2    where a patrol vehicle, as long as they're not by

3    themselves and it's a safe area to do it, and the

4    speeds are within policy you come up, and you kind

5    of spin them out, if you will.  You can't do that

6    with a motorcycle.  Only four-wheeled vehicles; D,

7    depending on the level of the crime, if deadly

8    physical force is authorized, you can ram the

9    vehicle.

10                There's other pursuit techniques

11   such as slack pursuit, but as far as terminating a

12   pursuit, those are the -- those are the standard

13   authorized techniques.

14   BY MS. REGAN:

15        Q.    Okay.  So -- so just to make sure I

16   understand, with regard to motorcycles, it seems

17   like a number of the options are impermissible?

18        A.    That's correct.

19        Q.    So what are the permissible tactics to

20   stop a motorcycle during a high-speed pursuit?

21        A.    Hope they run out of gas.  Hope they

22   stop.  Or if it gets dangerous enough, you let

23   them go.

24        Q.    Okay.  If you were to give me a best

25   estimate of how many traffic stops you've been

120

```
1    stop?

2         A.    That number would -- that number would

3    increase drastically if we went into that

4    direction.

5         Q.    Yes.  Okay.  Understood.

6               At the time of the incident that we're

7    talking about today, August 3rd, 2012, were you

8    familiar with Crow Road, the road that you were

9    driving on when pursuing Mr. Wilkens?

10        A.    Yes.

11        Q.    Was that a -- I mean, I know you

12   weren't doing a lot of patrol work at that time,

13   but was that an area that you had patrolled in the

14   past?

15        A.    Yes, ma'am.

16        Q.    With some amount of frequency?

17        A.    I would say I was quite -- I was

18   familiar with the area.  I didn't know the road

19   like -- you know, I know some other roads, but I

20   was familiar with the roads.

21        Q.    Okay.  Were you familiar, for

22   instance, of the curves in the road?

23        A.    Yes.

24        Q.    And were you familiar that it came to

25   a T at some point?
```

121

```
 1        A.    Yes.
 2        Q.    Had you -- now, on August 3rd --
 3   you're in the ADEP vehicle, but you're not serving
 4   as an ADEP patrol officer, are you?
 5        A.    Not -- I mean, was my main focus that
 6   day to go out and enforce aggressive driving?  No.
 7   That wasn't my main purpose that day.  My main
 8   purpose at that time was to look for a couple of
 9   armed bank robbers.
10        Q.    Okay.  And so I think somewhere in the
11   report it mentioned that you were actually heading
12   to a particular location.  Is that right?
13        A.    Yes.
14        Q.    Do you recall what the location was?
15        A.    Yes.  The intersection of -- basically
16   Lorane.  Lorane.  The intersection of Cottage
17   Grove/Lorane Highway and -- I don't remember the
18   other name of the road.  Smith Creek.  It's a back
19   way from Florence.
20        Q.    Okay.
21        A.    From Mapleton.
22        Q.    Okay.
23        A.    So the bank robbery took place in
24   Mapleton.  I figured other officers had the other
25   avenues back to Eugene covered, so I went to the
```

130

```
 1                    THE WITNESS:  Yeah.
 2                    MR. CAMPBELL:  All right.  So listen
 3      to the question she's asked and answer it.
 4      BY MS. REGAN:
 5           Q.    Okay.  Do you remember what
 6      Mr. Wilkens's motorcycle looked like?
 7           A.    Yes.
 8           Q.    Can you describe what you recall?
 9           A.    It was a sports bike.  Reddish-orange
10      and white.
11           Q.    Do you remember whether it had
12      rearview mirrors?
13           A.    I don't recall.
14           Q.    Okay.  And was your initial decision
15      to pursue Mr. Wilkens based on him passing your
16      vehicle at what appeared to be above the speed
17      limit?
18           A.    Yes.  My initial reason for contacting
19      him or attempting to contact him was for a speed
20      violation.
21           Q.    Okay.  Do you remember what
22      Mr. Wilkens was wearing?
23           A.    Yes.
24           Q.    Can you describe what you recall?
25           A.    A full-faced black-and-white helmet, a
```

1    black protective riding jacket, black protective

2    riding gloves.  I believe blue jeans.

3          Q.    Okay.  And did you form an opinion

4    about his skill level in riding the motorcycle?

5          A.    I did.

6          Q.    And what was your opinion?

7          A.    He knew how to ride a motorcycle well.

8          Q.    Okay.  And were you able to visually

9    see him and the motorcycle during your entire

10   pursuit of him?

11         A.    I believe so.  There may have been one

12   corner where I may have lost sight of him briefly.

13         Q.    Okay.  And so in terms of trying to

14   put an approximate distance -- and I know there

15   was a range of distance -- but if you were to give

16   me an approximate range of distances between you

17   and the motorcycle during this pursuit, could you

18   estimate that?

19         A.    At times, throughout the whole

20   pursuit?

21         Q.    Yes.

22         A.    At times we were touching.  At other

23   times I was several hundred yards behind him.

24         Q.    Okay.  And touching, other than when

25   you collided with him, where -- were there other

133

```
 1   quarter mile, maybe a little more.  Maybe up to --
 2   trying to catch up to him, trying to get a pace,
 3   quarter mile, maybe a little more than that.  Half
 4   mile.
 5        Q.   Okay.  So between a quarter mile and a
 6   half mile, at the time that you turned on your
 7   lights, do you have an approximate distance that
 8   you could provide between you and the motorcycle?
 9        A.   I don't.  I'd have to watch the
10   videotape.  I don't recall how far ahead he was at
11   the time I activated my lights.
12        Q.   Okay.  And what was your reason for
13   activating your lights at that time?
14        A.   Trying to initiate a traffic stop on
15   him for passing in a no-passing zone and speeding.
16        Q.   Okay.  And your vehicle didn't have
17   radar in it.  Correct?
18        A.   I believe it did.  I believe it does.
19        Q.   Okay.  Did you utilize the radar on
20   August 3rd?
21        A.   I did not.
22        Q.   Why?
23        A.   The type of radar we had at that time
24   would have been useless.  I -- it only would catch
25   vehicles coming towards me.
```

134

```
 1          Q.    I see.   Okay.   How about was there a
 2   VASCAR unit in the vehicle?
 3          A.    No.
 4          Q.    Okay.   And what about a LIDAR system?
 5          A.    No.
 6          Q.    And so was your method for determining
 7   excessive speed pacing?
 8          A.    Yes.
 9          Q.    Okay.   And when you mentioned that
10   there was about a quarter mile to a half mile
11   before you turned on your lights, were you
12   attempting or did you actually pace Mr. Wilkens's
13   motorcycle during that time period?
14          A.    I did.   I was attempting to get an
15   accurate pace.
16          Q.    Okay.   And what was your estimate at
17   that time?
18          A.    I never got an accurate pace.   I know
19   I got to 80 miles per hour and he was still
20   pulling away from me.   So if I'm going 80, and
21   he's going -- increasing the distance, common
22   sense tells me he's going in excess of 80.
23          Q.    Okay.   There was a time period where
24   he came upon a vehicle that was like a
25   dark-colored Honda.   Do you recall that vehicle?
```

135

1    We'll watch the video.

2         A.    Let's watch the video.  I don't recall

3    if there was a dark-colored Honda.  We -- we end

4    up passing two cars.

5         Q.    Okay.

6         A.    A pickup -- or a small pickup truck, I

7    believe, and then a passenger vehicle.

8         Q.    Do you recall either of those vehicles

9    making some kind of signal to Mr. Wilkens to go

10   around them?

11        A.    I wasn't watching the drivers of the

12   other vehicles at that time, no.

13        Q.    Okay.  And at the time that

14   Mr. Wilkens passed the first vehicle, do you

15   recall whether or not there were any other

16   vehicles coming toward him or, you know, was

17   the -- the pass done in a safe manner despite the

18   fact that it may have been a double yellow?

19        A.    I have difficulty saying it was in a

20   safe manner when it's in a no-passing zone, so

21   it's my opinion it was unsafe.

22        Q.    Okay.  But there was no oncoming

23   traffic.  Correct?

24        A.    That's correct.

25        Q.    And do you recall whether or not the

136

1    motorcycle slowed before passing the first

2    vehicle?

3        A.    I believe it did.  We were also into

4    the curves, so I don't know if he slowed to pass

5    it or slowed because we were in curves, but he did

6    slow.

7        Q.    Okay.  And with the second vehicle, do

8    you recall him slowing down quite a bit before

9    passing that vehicle?

10        A.    Yes.

11        Q.    Would -- would it be accurate to say

12    that he slowed down between 45 and 55 miles per

13    hour?

14        A.    I believe that would be accurate, yes.

15        Q.    And during that time period, were you

16    able to close the distance between yourself and

17    him?

18        A.    I was.

19        Q.    And were you able to read the license

20    plate number?

21        A.    No.

22        Q.    And why was that?

23        A.    I don't believe I got close enough to

24    read the license plate.  And I also believe the

25    license plate was kind of canted upwards, which

137

1    would have made it that much more difficult to

2    read it.

3         Q.    Okay.  Were there any issues with the

4    Camaro's dashboard -- not dashboard -- windshield

5    in terms of your ability to see the license plate?

6         A.    No.

7         Q.    And did you activate your lights prior

8    to Mr. Wilkens passing either of those two

9    vehicles?

10        A.    I'd have to watch the video for sure,

11   but I believe I activated my lights shortly after

12   he passed the first pickup truck.  Because I think

13   I had to turn my lights on to help get the pickup

14   truck out of my way so I could get around him.

15        Q.    Okay.  And do you recall when in the

16   pursuit you then activated your siren?

17        A.    Approximately shortly before or

18   shortly after going around the second vehicle.

19        Q.    Okay.  And the video that we have of

20   this incident doesn't create -- doesn't have any

21   audio.  Is that correct?

22        A.    That's correct.

23        Q.    Do you know why?

24        A.    Because the system at that time, for

25   lack of a better word, was a piece of junk.

142

1    we have received in discovery is the front camera.

2    Is the back camera also filming out the back of

3    the vehicle as you're driving down the road?

4         A.    Yes.

5         Q.    And so is there back camera footage

6    that is available that would be picking up audio?

7         A.    I believe there would be.

8         Q.    Okay?

9              MR. CAMPBELL:  You should have that.

10   If you don't, let me know.  But we have it.  I've

11   watched it.

12   BY MS. REGAN:

13        Q.    Okay.  And then I'm sorry if I asked

14   this.  I think that your testimony was that you

15   believe you turned the siren on either right

16   before or right after Mr. Wilkens passed the

17   second vehicle.  Is that right?

18        A.    Yes, ma'am.

19        Q.    Okay.  And what do you -- do you have

20   any recollection about that second vehicle?  You

21   know, was it pulling over?  Do you recall a

22   description of it?

23        A.    I don't.

24        Q.    Okay.  And I'm sorry if I asked this,

25   but what was your reason for turning on your siren

1    at that particular time period?

2         A.    It was abundantly clear to me that he

3    was attempting to elude me so --

4         Q.    Okay.  All right.

5         A.    So I was transitioning from a traffic

6    stop into a pursuit of a vehicle.

7         Q.    Okay.  And what was your -- explain to

8    me why you believe that he was attempting to elude

9    you at that time.

10        A.    I had had my -- I had had my lights on

11    for a little while.  He already made one bad pass.

12    He passes another vehicle at a high rate of speed.

13    And I believed that was a no-passing zone also.

14    And then accelerating away from me at a very high

15    rate of speed.

16        Q.    Okay.  And that demonstrated that he

17    was eluding you?

18        A.    In my eyes, yes.

19        Q.    Did you make any observation of him

20    looking at you or turning to look at you as -- in

21    your vehicle?

22        A.    It's my opinion, yes.

23        Q.    And what -- what did you observe?

24        A.    I observed what appeared to me glances

25    over his left shoulder.

145

1        Q.    Okay.  And I think you testified

2    earlier that you have driven a motorcycle while

3    wearing a helmet.  Correct?

4        A.    I have.

5        Q.    Okay.  Do you recall ever trying to

6    look behind you while driving a motorcycle?

7        A.    It was 25 years ago.  I don't

8    remember, ma'am.

9        Q.    Okay.

10        A.    If I'm not mistaken, they're trained

11    to.  I mean, that's what -- you're supposed to

12    check your blind spots like anybody else.  So

13    you've got to check your blind spots, no different

14    than checking here versus checking what's right

15    behind you.

16        Q.    Okay.  Based on your perception that

17    Mr. Wilkens -- well, let me ask you this.

18              Was there anything else that made you

19    come to the determination that Mr. Wilkens was

20    intentionally eluding you?

21        A.    Just based on my experience, ma'am.

22        Q.    Okay.

23        A.    You've got red and blue lights on,

24    I've got a siren on, I've got a motorcycle pulling

25    away from me at 100, 110, upwards -- sometimes

1    upwards to 120 miles per hour.

2         Q.    Okay.  Couldn't he have been joyriding

3    and enjoying driving fast, and possibly illegally,

4    but just driving fast on the curvy country road?

5         A.    I have no idea what he could have been

6    doing.  I'm basing that on my observations and my

7    training and experience.

8         Q.    Okay.

9         A.    So --

10         Q.    Do you recall making a statement into

11    your cell phone along the lines of -- that he knew

12    how to ride, and if he had wanted to lose you, he

13    could have, something to that effect?

14         A.    Probably.  But -- after the fact I

15    figured out it was a 1,000 cc motorcycle.  And

16    based on the riding observations I observed, he

17    potentially could have got away, especially if he

18    would have got into traffic.

19         Q.    So the fact that he was driving really

20    fast and I think you testified that he appeared to

21    know how to ride fast, isn't it likely that if he

22    had actually wanted to elude you he would have

23    been successful at it?

24         A.    I don't know, ma'am.  I just -- my

25    experience chasing motorcycles, sometimes they get

147

```
1    away, sometimes they don't.  Sometimes they pull

2    over, sometimes they don't.

3         Q.    Okay.

4         A.    In this case, I don't know if he could

5    have got away.  I would like -- based on the

6    mention of the phone call, I just made a statement

7    that if he wanted to get away, he probably could

8    have.

9         Q.    Okay.  And when you start to approach

10   the T -- I'm sorry.  I forget the crossroad.  I

11   think it's Beltline, isn't it?  It's been called

12   different words.

13        A.    We can call it as Highway 126.  It's

14   also called Beltline at that location.

15        Q.    Okay.

16             MR. CAMPBELL:  Isn't it also called

17   11th?  West 11th?

18             THE WITNESS:  West 11th.  Yes, it

19   is.  It's also West 11th.

20             MR. CAMPBELL:  I love Eugene.

21   BY MS. REGAN:

22        Q.    Yes.  Okay.  So as that approach is

23   happening, do you recall Mr. Wilkens looking in

24   his rearview mirror and then making some head

25   gesture that in my mind seems to say, oh shit, or
```

148

```
1    shit, or some -- he makes something like this

2    after he looks into his rearview mirror.

3    (Indicating.)

4              Do you recall that?

5              MR. CAMPBELL:  Shall we turn the

6    camera around so you can do that head bob?

7         A.    I didn't perceive it that way.  I

8    perceived it looked like he was looking left and

9    right as if he was getting ready to --

10   BY MS. REGAN:

11        Q.    Okay.

12        A.    -- continue to make a left-hand turn

13   or a right-hand turn.  Looking for cross-traffic.

14   That's how I perceived those head nods.

15        Q.    Okay.  And so did you see him put on

16   his blinker, his right blinker?

17        A.    I don't recall.

18        Q.    Okay.  And I believe you -- in one of

19   your reports, you said that as he was slowing down

20   and in his mind coming to a stop, that part of the

21   reason that you struck his motorcycle was because

22   you were focused on trying to read his license

23   plate.  Is that correct?

24        A.    Yes, ma'am.

25        Q.    Okay.  And were you pretty adrenalized
```

149

1    at that time?

2         A.    I'm not going to tell you I didn't

3    have adrenaline.  But I wasn't adrenalized.  I

4    mean, you know, they teach us how to breathe

5    through that thing and control it, so I wasn't

6    overly amped up by any means.

7         Q.    Okay.

8         A.    I was trying -- I was focusing on his

9    license plate.  And, again, the license plate was

10   kind of tilted up.  So I had to get close to it

11   to, you know, read it out and get it on -- get it

12   to my dispatch center so they could have that

13   license plate.

14        Q.    And did you -- and I'm sorry if you

15   testified already to this, but as you're focusing

16   on the license plate, you do not notice that he

17   has a blinker on?

18        A.    I did not.

19        Q.    Okay.

20        A.    I was focused on the license plate.

21        Q.    Even though the turn signal would have

22   been right next to the license plate?

23        A.    I didn't recognize if he had a

24   license -- a turn signal on or not.  I don't

25   recall.

152

1      A.   I have no idea.  I really don't.

2      Q.   Okay.  Would it be easier to

3  approximate how many seconds or how many -- how

4  many minutes you would have been slowing down?

5      A.   As we came down the hill at well over

6  100 miles per hour, so obviously I had to get on

7  my brakes fairly early to get some of that speed

8  scrubbed off, I would -- total ball -- you want a

9  ballpark estimate?

10     Q.   Your best estimate.

11     A.   My best estimate.

12          MR. CAMPBELL:  If you don't know, "I

13  don't know" is a fair answer.

14     A.   Yeah.  I don't know.

15  BY MS. REGAN:

16     Q.   Okay.

17     A.   I really don't.  I couldn't tell you.

18     Q.   And I think you just testified, but I

19  want to make sure, at the time that you were

20  approaching the stop, I guess your testimony is

21  that there was a downhill right prior to that --

22  that intersection or that T.

23     A.   Yes, ma'am.

24     Q.   And was your testimony that you --

25  you, you're in the Camaro, were going about

153

```
1    100 miles an hour or what was your approximate

2    speed at that time prior to the stop?

3         A.    Over 100 miles an hour as we're coming

4    down through a slight curve down a hill prior to

5    the intersection.

6         Q.    Okay.  And can you describe what you

7    were doing as you were approaching the T?  And as

8    Mr. Wilkens was stopping his motorcycle, are you,

9    you know, standing up on the brake at this point,

10   is the brake squealing, are you riding the brakes?

11        A.    I'm on the brakes trying to slow down

12   trying to match his speed.  I'm on the radio

13   telling my location to my dispatch center where

14   I'm at.  Then once -- once I'm able to get close

15   enough I'm fixated on trying to get the license

16   plate.  That was my number one goal at that point.

17   I wanted to get the license plate.

18             I had made up my mind prior to this if

19   he makes a right-hand turn, I'm going to terminate

20   the pursuit, because there was just too much

21   traffic, and then that risk-reward thing would

22   have came in.  So I really wanted to get that

23   license plate.

24        Q.    Okay.  And the camera in your vehicle

25   would have captured the license plate.  Correct?
```

154

1    You could have reviewed the video footage and

2    ascertained the license plate.  Is that correct?

3         A.    If it was working.  I didn't know the

4    thing was working.

5         Q.    Okay.  So in some of the reports that

6    I've read regarding this incident, there seems to

7    be some implication that one theory of why you

8    collided with Mr. Wilkens was as a result of brake

9    fade.  But that wasn't your understanding of why

10   the collision happened.  Right?

11        A.    No.  That's part of my theory.

12        Q.    Okay.  I thought it was that you were

13   really focused on the license plate?

14        A.    Well, that's a portion of it too.

15        Q.    Okay.  So explain to me the portion

16   regarding brake fade.

17        A.    We're fixated on the license plate

18   trying to get the -- read out the license plate.

19   When I make the mental -- it clicks in my brain

20   that he's coming to a stop or stopped, I hammer

21   the brake.  I slam on the brakes as hard as I can.

22   And it doesn't respond as quickly and -- as -- as

23   quickly as I would have hoped.  And I contributed

24   that to the hard driving from the previous five to

25   six miles on my brakes, off the brake, on the

155

1    brake, and the brake fade.

2         Q.    Okay.   Have you ever had a previous

3    experience in the Camaro using the brakes in that

4    way?

5         A.    In which way?   Where I've experienced

6    brake fade?

7         Q.    As you just described.   No.   Where you

8    are driving fast and I think hammering the brakes

9    or hitting the brakes.

10        A.    Yes.   I've had -- I've driven

11   Camaros -- other Camaros, not that particular

12   Camaro -- where it doesn't matter what the patrol

13   car, Crown Vic, Dodge Charger.   When you're in a

14   pursuit and you're using your brakes a lot, they

15   heat up.   And when the brakes heat up they lose

16   their ability to work as well as a set of cool

17   brakes.

18        Q.    Okay.   And is there any mechanism or

19   training to ensure that you don't collide with

20   another vehicle under those circumstances?   How do

21   police vehicles overcome brake fade?

22        A.    Be aware of the situation.   Be aware

23   of the phenomenon known as brake fade and increase

24   your stopping distances.

25        Q.    Okay.   So it's not that the vehicle

159

1    mechanic -- a mechanic?

2        A.    Again, I don't know if we -- well,

3    ultimately, the vehicle did go to an auto body

4    shop to get repaired. So, yes.

5        Q.    Okay.  Were you aware that the brakes

6    had been looked at or adjusted by a mechanic a

7    couple of weeks before this incident occurred?

8        A.    I was not.

9        Q.    Okay.  Did you ever have a mechanic

10   tell you or did you ever see a report that

11   indicated that there was a problem with the brakes

12   on the Camaro?

13       A.    Not that -- not that I'm aware of, no.

14       Q.    Okay.  Okay.  So I think that you

15   testified -- or I'm sorry.  In one of your

16   reports, I think you said that you hit the

17   motorcycle at approximately three to five miles an

18   hour.  Does that sound accurate to you today?

19       A.    Yes, ma'am.

20       Q.    Okay.  And do you recall did you hit

21   the motorcycle straight on?  Did -- did it seem

22   like you hit the vehicle in the center of your --

23   your -- of the Camaro?

24       A.    No.  Very apparent from the picture I

25   hit him on the right headlight area.

161

1    struck Mr. Wilkens, did you actually feel the

2    impact of the hit?

3         A.    Lightly, yes.

4         Q.    Okay.  Were you watching him and the

5    motorcycle at the time that you made impact with

6    him?

7         A.    Yes.

8         Q.    And so do you -- what do you recall

9    seeing in terms of him and the bike going down?

10        A.    I recall the pushing the bike forward,

11   and it appeared that he was attempting to stay

12   balanced on the bike, but ultimately fell off the

13   bike.

14        Q.    Okay.  And did the motorcycle remain

15   running?

16        A.    I don't recall.

17        Q.    Okay.  And I think you indicated that

18   you were concerned that you were actually going to

19   run over him because of the direction -- he fell

20   in the path of your vehicle.  Is that right?

21        A.    He did.

22        Q.    And do you recall how close you were

23   to actually hitting him with the wheels of the

24   vehicle?

25        A.    Yeah.  It wasn't nearly as close as it

162

1    appeared, based on me sitting, and the hood, and

2    me losing sight of him.  But 10 -- you know,

3    15 feet in front of my patrol vehicle.

4        Q.    Okay.

5        A.    Would be an estimation.

6        Q.    Okay.  And then what do you recall

7    happening after he fell to the ground?

8        A.    I exited my vehicle as quickly as

9    possible, drew my sidearm.

10        Q.    And why did you draw your sidearm at

11    that time?

12        A.    Because this was a high-risk stop.

13        Q.    You had just knocked him off of his

14    bike.  What were -- what were -- what was the

15    concern for your safety at that time?

16        A.    It's unknown.  He's -- he's -- in my

17    opinion, he's demonstrated an extreme attempt to

18    elude my -- elude me.  Why he's eluding me, I

19    don't know.  Maybe he didn't just rob the bank in

20    Mapleton, but maybe he just committed a robbery.

21    Maybe the bike is stolen.  Maybe he's a drug

22    dealer.  Maybe he's high on methamphetamine.

23    Maybe -- there's multiple reasons why people run

24    from the police so --

25        Q.    But didn't he just stop on his own

163

1    volition prior to you colliding with him?

2            MR. CAMPBELL:  Objection.

3    Argumentative.  You can answer.

4    BY MS. REGAN:

5        Q.    You can answer.

6        A.    Sorry.  He did.

7        Q.    Okay.  And -- and you've just knocked

8    him to the ground after colliding with his

9    motorcycle and he is on the ground.  So under

10   those circumstances, what would be the serious

11   safety threat to you?  He hasn't pulled a weapon.

12   He hasn't taken an aggressive stance.  What was

13   your rationale for pulling your weapon on him at

14   that time?

15           MR. CAMPBELL:  Object to the form of

16   the question.  You can answer if you can.

17       A.    He was a threat to me.  He's a threat,

18   because he's attempted to elude me over the course

19   of five miles that -- at well over 100 miles per

20   hour so --

21   BY MS. REGAN:

22       Q.    And now he's stopped?

23       A.    So, in my opinion, obviously he's done

24   some type of criminal activity, which he's trying

25   to avoid me, let alone he's committed the class C

164

1      felony of attempt to elude a police officer.  So I

2      can't take the risk of hoping he gets up and gives

3      me a hug.

4                    I don't know why he's running, but my

5      experience where -- people run because they're

6      afraid of going to jail or being incarcerated.

7      So, my opinion, he's running for a reason.  I

8      don't know that reason.

9           Q.    Weren't you concerned that you had

10     injured him in the collision?

11          A.    Sure, I was.

12          Q.    And so he stands up on his own.

13     Correct?

14          A.    Yes, ma'am.

15          Q.    And he holds his hands like this.

16     Right?  He's showing you his hands.  Correct?

17     (Indicating.)

18          A.    Correct.

19          Q.    And did you take that as any kind of

20     violent gesture?

21          A.    I did not.

22          Q.    Okay.  And you, I guess -- I mean,

23     you're welcome to testify to this too, but I guess

24     at some point you're telling him to get down on

25     the ground.  Is that right?

165

```
 1          A.     Multiple times, yes.
 2          Q.     And why were you asking him to get
 3     down on the ground?
 4          A.     That's my way of keeping myself, him,
 5     and the surrounding people safe.  I want to get
 6     him on the ground in a pair of handcuffs as
 7     quickly as possible.
 8          Q.     And would you agree that you had some
 9     adrenaline coursing through your body at this
10     time?
11          A.     A heightened level of awareness,
12     little bit of adrenaline.  I'm not going to say I
13     don't have any, but yes.  I was -- my awareness
14     level was definitely increased.
15          Q.     Okay.  And then on the video, it shows
16     him starting to go down on the ground when you
17     appear to kick him in the sternum.  Would you
18     agree that that is what the video illustrates?
19          A.     Yes.
20          Q.     And so why were you -- why did you
21     deploy the kick as he was complying with your
22     request?
23          A.     At the time that I had formulated the
24     mental plan to take a step forward and to deliver
25     a front push kick, it takes anywhere from a second
```

166

```
 1    to a second and a half to make the determination,
 2    get the neurons going to get the body in motion,
 3    and at that time is when he begins to lower
 4    himself, and I had already put that motion into
 5    action.
 6         Q.    Did you hear him say anything to you
 7    prior to you delivering the kick?
 8         A.    I did not.
 9         Q.    Were you aware that -- I mean, I
10    assume you were aware that he was wearing a
11    motorcycle helmet.  Correct?
12         A.    Full-faced, yes.
13         Q.    And would you agree that his hearing
14    is going to be limited as a result of the helmet?
15         A.    I would sure like to think if he's
16    standing from me to the door and I'm yelling at
17    him, he would -- and he's got a state trooper with
18    a gun pointed at him pointing to the ground and
19    yelling at him, he would comply.
20         Q.    Okay.  And, in fact, he was complying
21    at the time that you kicked him.  Correct?
22         A.    He was beginning to at the time the
23    kick was delivered, yes.
24         Q.    Okay.  And then after you kick him, he
25    does get down on the ground.  Correct?  He
```

167

1   complies with your requests and he gets down on

2   the ground.  Right?

3       A.    Partially, yes.

4       Q.    Why do you say partially?

5       A.    He didn't go all the way down onto his

6   belly.  He was on his knees and on his forearms.

7       Q.    Okay.

8       A.    He wasn't -- his belly wasn't all the

9   way on the ground.

10      Q.    And was that because of the gear that

11  he had on?

12      A.    I wouldn't think.  So I wouldn't think

13  the riding jacket and blue jeans would affect his

14  ability to lay on the ground.

15      Q.    Okay.  And once he is down on the

16  ground, the video camera no longer captures video.

17  Correct?

18      A.    No.  It continues to capture video.

19      Q.    But you can't see what -- what

20  Mr. Wilkens is doing on the ground from the angle

21  of the video camera.  Right?

22      A.    It's obscured from the vehicle, but

23  the video was still running.

24      Q.    Okay.  And does your uniform -- well,

25  your uniform at that time, did you have audio?

168

1    Like are you able to be -- are you picking up from

2    radio?  You know, is your radio able to capture

3    audio?

4         A.    No, ma'am.

5         Q.    Okay.  And is that because you're --

6    you did not have a radio on your uniform at that

7    time?

8         A.    A radio or a mic for the camera?

9         Q.    A mic.  Yeah.

10        A.    I did not have a mic.

11        Q.    Okay.

12        A.    Again, I didn't even think the camera

13   system worked.

14        Q.    Okay.  Once Mr. Wilkens is down on the

15   ground, what do you do next?

16        A.    Yell at him to put his hands behind

17   his back.  Retrieve his right arm.  Struggle with

18   his protective riding gloves and jacket in

19   attempts to get him handcuffed.

20        Q.    Okay.  And do you utilize your knee in

21   his back at some point?

22        A.    I put my weight on his back.  Yes,

23   ma'am.

24        Q.    And did you put some knee -- the video

25   sort of depicts you bouncing up and down a little

169

```
 1    bit on him.  Are you using your knee to push his

 2    body further into the ground?

 3         A.    Very initial --

 4               MR. CAMPBELL:  I object to the form

 5    of the question.  I don't think the video shows

 6    that but --

 7               (Reporter inquiry.)

 8               MR. CAMPBELL:  I don't think the

 9    video shows that.  You can answer.

10         A.    Yeah.  When I first make contact with

11    him, I grab his -- his right arm.  I do.  I put

12    both my knees in the middle of his back or on the

13    right side of his back to help shove him the rest

14    of the way onto the ground.  Then I begin to

15    struggle with the gloves and the riding gear to

16    get him handcuffed.

17    BY MS. REGAN:

18         Q.    Okay.  And did you perceive him as

19    resisting your efforts to handcuff him?

20         A.    No.

21         Q.    Okay.  Why didn't you just remove the

22    gloves before handcuffing him?

23         A.    I did.

24         Q.    Okay.  So when you say you struggled

25    to handcuff him, what do you mean by that?
```

170

1        A.    The right hand, I believe, if you

2    watch the video, I -- I sit there in this position

3    with my knees on his back.  You can't see him, but

4    my knees are on his back.  I'm on -- most of my

5    weight is on the balls of my feet and I am taking

6    his gloves off.

7        Q.    Okay.

8        A.    Off his right hand.

9        Q.    Okay.

10        A.    Then I'm able to get a handcuff on his

11    right wrist.  Then I believe somehow I'm either

12    able to pull his jacket sleeve up and I'm able to

13    get him handcuffed with his left hand still --

14    with his glove on.

15        Q.    Okay.  And would you agree that you

16    apply the handcuffs in a manner that did not allow

17    for a pinkie distance between his skin and the

18    cuffs?  Did you apply the handcuffs tightly?

19        A.    I applied my handcuffs as I've been

20    trained.

21        Q.    Okay.

22        A.    They -- I did not cinch those

23    handcuffs down any tighter than anybody else.

24        Q.    Okay.  And then at some point you

25    assist him to his feet by grabbing one of his

171

1   armpits, I believe.  Is that right?

2        A.    I read him his Miranda rights and

3   decided to stand him up.  Told him to extend his

4   right leg out.  Bring his left leg into the --

5   into the inner thigh of his right leg.  Then I

6   helped the forward upward motion with his left

7   arm, helped him to his feet.

8        Q.    So where were your arm -- where were

9   your hands located on his body as you were

10  assisting him to his feet?

11       A.    I would imagine one in the midback and

12  probably one under his arm.

13       Q.    Okay.  And do you recall how much

14  effort you needed in order to assist him to his

15  feet?  Was he deadweight or was he --

16       A.    Oh, absolutely not.

17       Q.    -- on his own getting up?

18       A.    The purpose for having them put their

19  right leg out and bringing their left leg in, it's

20  more of a push onto their knee, and then they're

21  able to help stand themselves up.

22       Q.    Okay.  And when he is laying on the

23  ground -- well, let me ask you this.

24             How long is he laying on the ground

25  before you assist him to his feet?

172

```
1        A.    I would have to watch the video, but
2   an estimation, a few minutes.
3        Q.    Okay.  And from the time you handcuff
4   him -- and we'll watch the video in a minute --
5   but you leave the video vantage point for several
6   minutes.  What are you doing during that time
7   period?
8        A.    I'm telling my dispatch center that I
9   was just involved in a crash.  Telling my dispatch
10  center that I'm code 4.  I've got one detained.
11       Q.    Tell me what code 4 means.
12       A.    Everything's okay.
13       Q.    Okay.
14       A.    I'm safe.  Suspect is safe.
15  Everybody's okay.  Asking -- telling other units
16  where I'm at.  Other responding units that are
17  coming to try to assist, telling them where I'm
18  at.  And asking for sheriff's office to come and,
19  you know, investigate things.
20       Q.    Okay.  And did you make the decision
21  on your own to ask Lane County sheriff to do an
22  outside investigation?
23       A.    I did.
24       Q.    Okay.  So your supervisor did not
25  instruct you to do that?
```

173

```
1            A.    No.   I did that on my own.

2            Q.    Okay.   And why did you leave, if there

3    is a reason -- why did his helmet remain on his

4    head during this time -- this entire time period?

5            A.    Don't know.

6            Q.    Okay.

7            A.    What entire time period?   Eventually

8    it was taken off.   So what does --

9            Q.    By Lane County Sheriff's officers,

10   though.   Right?

11               Why -- I guess is there any reason why

12   you didn't remove his helmet?

13           A.    No.   I lifted his face mask for him

14   and don't know why I left his helmet on.

15           Q.    Okay.   Are you trained to kick people

16   when you have your gun drawn?

17           A.    Yes.

18           Q.    Okay.   And what was the purpose of

19   utilizing the kick?

20           A.    In this incident?

21           Q.    Yes.

22           A.    So -- excuse me.   It wasn't -- at that

23   point in time he was not complying with my verbal

24   commands.   He wasn't complying with the -- having

25   a firearm pointed at him.   He wasn't complying
```

174

1    with me in uniform and my -- my presence.  He

2    wasn't complying with the -- you know, the hand

3    gestures of, you know, pointing, telling him to

4    get on the ground.

5              So I -- my next level available to me

6    in the force continuum was strikes and kicks.  I

7    didn't feel comfortable going hands-on with him,

8    putting my gun away and trying to grab him based

9    on full-faced helmet, protective riding gear, and

10   he's a larger -- he's a large man.

11             My next step would have been pepper

12   spray.  It would have been ineffective.  He had a

13   full-face helmet on.

14             My next step would have been a Taser

15   if I had one.  I didn't have a Taser at that time.

16   I wasn't issued one.

17             So the next step in available steps to

18   me would be strikes or kicks.  I wasn't going to

19   punch him.  That would mean getting too close

20   where he could grab me and, you know, potentially

21   harm me.

22             So the next step, in my opinion, at

23   that time available to me was a front push-kick to

24   snap him into listening and following my commands.

25        Q.    And were you aiming for his

```
1    sternum/chest area?

2         A.    I was aiming for his midsection.

3         Q.    Okay.  And was that what you have been

4    trained to do with regard to that strike?

5         A.    Yes.

6         Q.    Okay.  How many seconds do you think

7    you were telling Mr. Wilkens to get on the ground

8    before he began to comply?

9         A.    Approximately six.  Five, six seconds.

10        Q.    And did you think that that was an

11   unreasonable delay?

12        A.    Not from my experience.

13        Q.    Okay.  Just to repeat my question.  Do

14   you think that six seconds was too long for him to

15   be complying with your request?

16        A.    I did, yes.

17        Q.    And did you take into consideration

18   that you had just knocked him to the ground from a

19   rear collision, that may have confused him?

20        A.    I really didn't take that into

21   consideration.  He jumped up.  He's standing

22   there.  I'm yelling verbal commands and he

23   wouldn't get down.  So I really didn't take the

24   fact that he got knocked off his bike into

25   account.
```

177

1    recall?

2        A.    I don't recall who showed up first.

3        Q.    Okay.  There was the Lane County

4    sheriff officers, Holiman and Ware.  Correct?

5        A.    Correct.

6        Q.    And then I think you mentioned there

7    was an OSP Fish & Wildlife person.

8        A.    Trooper Ed Imholt.

9        Q.    Imholt.  And then I think you

10    mentioned there was one other OSP.

11        A.    Senior Trooper Gale Kotchell.

12        Q.    Okay.  And you don't recall in what

13    order they arrived?

14        A.    I don't.

15        Q.    Okay.  Do you -- and I believe your

16    testimony was that you had radioed for backup or

17    for assistance at some point prior to the

18    collision.  Is that right?  Or were they

19    responding base --

20        A.    They were responding to the pursuit.

21    You don't have to ask for backup.  Based on the

22    radio traffic -- when I'm on the radio saying I'm

23    in pursuit of a motorcycle.  We're here, we're

24    there, we're at these speeds.  Everybody's coming

25    to try to help.

178

1      Q.    Okay.  So it wasn't in response to

2    your use of the radio after Mr. Wilkens is on the

3    ground?  They're not responding -- you mentioned

4    that you go back to the vehicle and you're, you

5    know, saying code 4 and all of that.

6      A.    Right.

7      Q.    They're not responding in response to

8    that radio traffic.  They were responding while

9    you were in pursuit?

10     A.    That's correct.

11     Q.    Okay.  Do you recall which of those

12   officers you spoke to first about what took place?

13     A.    I don't.  I do know I gave a statement

14   to Deputy Ware, but I don't know if I talked to

15   Deputy Holiman prior to that or not.

16     Q.    Okay.  Why did you have the Lane

17   County sheriff officers issue the citations to

18   Mr. Wilkens?  Why didn't you just issue them?

19     A.    I asked them to take over the full --

20   since there was a crash, I asked them to take over

21   the investigation from that point forward.

22     Q.    And is there a policy or a training

23   protocol?

24     A.    It's just best practice.  If

25   Springfield PD crashes, we -- we investigate them.

202

```
1    video is at this point you have both knees in his

2    back and you are removing one of his gloves.  Is

3    that correct?

4         A.    Yes, ma'am.

5         Q.    And at this point are you saying

6    something along the lines of, you saw me or

7    something to that effect?

8         A.    Not yet.

9         Q.    At this point has he said anything

10   like, "I didn't know you were a cop," or, "I

11   didn't know you were a police officer," or

12   something along those lines?

13        A.    I don't recall any verbalization

14   between the two of us at that point in time.

15        Q.    Okay.  And these jerking motions,

16   what -- what is going on here that we can't see on

17   the camera?

18        A.    I'm trying to pull his gloves off and

19   move his sleeves up.

20        Q.    Okay.

21        A.    That's a glove.  I just finally got it

22   off.

23        Q.    Okay.  Would you agree that your kick

24   landed on or about his collarbone/right shoulder

25   area?
```

203

```
1        A.    No.
2        Q.    Where do you believe that your kick
3   landed?
4        A.    I believe my kick landed in the upper
5   chest, and actually probably scraped the bottom of
6   his helmet near his chin.
7        Q.    Did you feel your boot catch his chin?
8        A.    No.
9        Q.    That's about as close as I've been
10  able to get with the stop.  So -- so are you using
11  the ball of your foot or the flat of your foot?
12       A.    The flat.
13       Q.    Okay.
14       A.    It's a push kick.
15       Q.    And is your foot turned sideways?
16       A.    No, ma'am.
17       Q.    It's turned vertically up and your
18  toes are at the top and your heel is at the
19  bottom?
20       A.    That's correct.  Vertically.
21       Q.    Okay.  And -- and you don't believe
22  that the impact -- that your foot makes contact
23  with his collarbone?
24       A.    I do not.  It appears that it's the
25  middle of his chest and at the bottom of his chin.
```

```
 1    seconds," which basically is a continuation of the

 2    prior video.

 3               And during this time period, I believe

 4    you testified that you are making cell phone calls

 5    to dispatch and I think you said your supervisor.

 6         A.    Just radio --

 7         Q.    Okay.

 8         A.    -- right now.

 9         Q.    Just radio calls?

10         A.    I haven't called my supervisor yet.

11         Q.    Okay.  So right now you're just making

12    radio calls saying code 4?

13         A.    Where I'm at.  Shutting my siren off.

14         Q.    You haven't asked him yet if he's been

15    injured in the collision or anything like that.

16    Correct?

17         A.    I don't believe so.  Not yet.

18         Q.    So do you recall what you're saying to

19    Mr. Wilkens at this time?

20         A.    I'm informing him of his -- of his

21    Miranda rights.

22         Q.    And what's his response to you reading

23    his Miranda rights?

24         A.    Asked him if he understood.  And if I

25    recall right, he said, "Yeah."
```

207

1       Q.    Now, do you recall what -- is there

2   anything else that you're saying, or is this still

3   all the rights?

4       A.    I asked him if he's okay.  Does he

5   need medics.  Stuff like that.  Starting my --

6       Q.    What else?

7       A.    Starting my interrogation on, "Why are

8   you running?  Why are you running from me?"

9             I look at the -- he says basically, "I

10  didn't know you were a cop."

11            I was pointing out all my red and blue

12  lights, saying, "How could you not know I'm a

13  cop?"

14      Q.    Okay.  What was his answer to whether

15  he needed medics or whether he was injured?

16      A.    At that time he said he did not need

17  medics.  He was just a bit shaken up.

18      Q.    Okay.  Would you agree that it is a

19  very clear, sunny day?

20      A.    Yeah.  It was a nice day.

21      Q.    And are you -- do you recall whether

22  you are driving into the sun or away from the sun?

23  Do you remember what direction this road is --

24      A.    The majority of that road runs

25  northbound, so the sun would be one o'clock,

208

1    pretty much overhead.

2        Q.    Now, at this time does he tell you

3    that he thought you were the Honda that he had

4    passed?

5        A.    At some point in time, he does.   I

6    don't recall if it's at this point in time or when

7    we continue our conversation while he's sitting on

8    the hood of the car.

9        Q.    Okay.

10       A.    But that does take place.

11       Q.    And he -- do you recall him telling

12   you that he thought that the car was wanting to

13   race him and so he was trying to put some distance

14   between him and that -- and what he thought was

15   that car wanting to race, something to that

16   effect?

17       A.    Something to that effect.   That he

18   passed a Honda car near the high school, which

19   would be approximately milepost 1, and that they

20   were racing or something to that effect.

21       Q.    Okay.   Would you agree that your

22   unmarked vehicle is of similar color to that Honda

23   that he passed?

24       A.    I've never seen the Honda that he

25   passed.   He says it was gray.   If it was gray, it

212

1    fractured that, and some paint transfer.

2         Q.    Do you know what part of the

3    motorcycle caused that damage?

4         A.    I'm assuming the back tire and the

5    back fender portion that I impacted.

6         Q.    And did you see damage done to the

7    motorcycle?

8         A.    Yes.

9         Q.    And how would you describe that?

10        A.    Some scratches on the left side, the

11   side it fell onto.  The license plate was torn

12   from the vehicle.  That's about it, that I can

13   recall.

14        Q.    Okay.  And so you are out of the frame

15   right now.  Do you recall what you're doing?

16        A.    Picking up his motorcycle.

17        Q.    Okay.  And why are you doing that?

18        A.    The right thing to do.  It's not good

19   for them to lay on their side like that.  And

20   trying to take care of his -- his stuff.

21        Q.    Do you recall when you picked it up,

22   was it still running?

23        A.    I don't recall.

24        Q.    You don't recall.  Do you -- would it

25   be important to leave the motorcycle where it was

213

```
1    for the crash investigation?

2         A.    I guess I weighed the options of

3    taking care of his stuff versus leaving his

4    motorcycle on the side where it can continue to be

5    damaged.  I chose to take -- I'd take care of his

6    property.

7         Q.    And what was your understanding of the

8    damage that could be perpetuated if it was left on

9    its side?

10        A.    Just my understanding it's not good

11   for a -- it's not good for motors like that to

12   continue to run if it is running in a situation

13   like that on its side.

14        Q.    Okay.  So is it your testimony that

15   the concern regarding continued damage was to the

16   motor because it was running and on its side or is

17   there some kind of damage that you're aware of

18   that would occur if the motor was off and it's

19   just on its side?

20        A.    I don't recall if the motor was

21   running.  I -- it could have been.  I don't recall

22   if it was or wasn't.  I'm trying to take care of

23   that man's equipment.  Trying to take care of his

24   bike.

25        Q.    Okay.  So whether the motor was on or
```

214

1   not, it was your understanding that damage would

2   be done to the bike by it being on its side?

3        A.   It's my understanding it's not good

4   for them.

5        Q.   All right.  I think that's probably

6   all for the video I need.

7             The fan will turn off automatically in

8   a second.

9             THE REPORTER:  Thanks.

10  BY MS. REGAN:

11       Q.   From the time that Mr. Wilkens is

12  knocked off the motorcycle to the time that you

13  place handcuffs on him, you can see his hands at

14  all times.  Is that correct?  He makes his hands

15  visible to you at all times?

16       A.   Well, technically, no.  He's laying --

17  he's on his belly.  His hands are here.  Until

18  they're behind his back is when I can see them

19  completely at all times.

20       Q.   Okay.  So Lane County Sheriff's

21  Office, Deputy Ware, issues the citations to

22  Mr. Wilkens, but you would still be the witness if

23  the case had gone to trial.  I don't know if

24  you're technically called the complainant in that

25  situation.  Do you know?

223

1    mention that we provided her a report to review

2    during the course of this incident.

3         Q.    Okay.  Do you remember was this in

4    close time to the incident or recently?

5         A.    Way close time.  So whenever --

6    whenever the review was completed.

7         Q.    Uh-huh.

8         A.    It would have been shortly thereafter.

9         Q.    Okay.  At the time that Mr. Wilkens

10   passed the Camaro that you were driving, do you

11   recall whether or not that was just north of

12   Erickson Road?

13        A.    Just north?  I would have to look at

14   the video.  It was either just north of it, just

15   south of it, right in that area.

16        Q.    Okay.

17        A.    I don't recall exactly where on

18   Coburg -- correction, Crow Road that he passed me.

19        Q.    Okay.

20        A.    Without reviewing some reports.

21        Q.    Were you aware of the reputation that

22   Crow Road has for motorcycle riding or racing,

23   anything along those lines?

24        A.    No.

25        Q.    Okay.

1    that in the bright lights -- or the bright

2    sunshine -- you know, look at these photos -- if

3    someone has a single rearview mirror, and they're

4    driving a motorcycle, so they're very focused on

5    the road in front of them, isn't it possible that

6    these lights on an unmarked Camaro, which is a

7    pretty unusual unmarked police car, isn't it

8    possible that at -- at least it's a reasonable

9    assumption, that a person would not see those

10   lights?  I mean, they seem pretty bleached out

11   even in this photo.

12        A.    If I was trying to stop him for

13   80 miles an hour, and he continued at 75, 80 miles

14   an hour while I was behind him, I could understand

15   that.  But when I got my red and blue lights on

16   and the siren going and we drastically increase

17   our speed, my opinion, based on those

18   circumstances, and we're passing cars in

19   no-passing zones, that's an attempt to elude.

20             So I think, my opinion, he knew I was

21   a police officer and he knew I was trying to catch

22   him.

23        Q.    Then why would he then put on his

24   blinker and voluntarily pull over and stop?

25        A.    I have no idea.  Maybe he decided it

228

1    wasn't worth the risk.  We're getting into heavy

2    traffic and it wasn't worth crashing into somebody

3    and hurting himself or hurting somebody else.

4    It's not the first person that's done that.

5         Q.    But didn't you even say yourself that

6    if he had wanted to elude, he would have been able

7    to?

8         A.    I don't remember my exact wording, but

9    based on the 1,000 cc sports bike he was riding

10   and the demonstrated ability to ride, he

11   potentially could have.

12        Q.    Very likely could have?

13        A.    I don't know.  Potentially.  Very

14   likely.  Possibly.

15             MS. REGAN:  Let me just confer with

16   my client for a second and we might be done.

17             (Recess:  3:57 p.m. to 4:01 p.m.)

18             MS. REGAN:  All right.  We're back

19   on the record at about a minute before four p.m.

20   And plaintiffs have concluded their questioning of

21   Captain Edwards, and Captain Edwards would like to

22   clarify an answer he gave to one of my earlier

23   questions.

24             THE WITNESS:  Yes, ma'am.  So you

25   asked why he would -- if he was actively eluding,

229

1    then why would he pull over to the side, use his

2    turn signal and actually stop.  I can tell you

3    from my experience that's not uncommon for people

4    to stop in an attempt to gain time and distance.

5                    They'll stop.  The trooper will get

6    out of their car.  Walk up.  And then they'll take

7    off again.

8                    They'll also -- very commonly

9    they'll stop and then immediately flee on foot.

10   They'll stop in a neighborhood and flee on foot

11   into a neighborhood.

12                   So you asked why would he do that.

13   I don't know what his intentions are.  I don't

14   know if he was turning his turn signal on to make

15   it look like he's pulling over so then I'd let my

16   guard down to approach him, or he takes off again,

17   or, you know, if he's going to flee on foot or if

18   he's going to turn around and attack me, if that

19   makes sense.

20   BY MS. REGAN:

21        Q.   Well, I guess the reason it doesn't

22   make sense is -- is your training and experience,

23   has that taught you to always think the worst of

24   every citizen that you're encountering?

25        A.   While I'm in high-speed pursuit, yes.

230

1          Q.     Okay.  So you believe that anyone that
2     is speeding at a high rate of speed is a dangerous
3     person?
4          A.     You're not getting the point.
5     High-speed pursuit.  If I get a speeder at
6     100 miles an hour, and I catch up to him and turn
7     my lights on, and I pull him over immediately,
8     yeah, I'm going to be obviously cautious with him.
9     But I'm not automatically thinking that they're,
10    you know, driving a stolen car or high on meth.
11         Q.     Uh-huh.
12         A.     Or doing something crazy.
13                When I'm chasing somebody in a pursuit
14    over the course of multiple miles at 110,
15    115 miles an hour, that, to me -- in my
16    experience -- the only people that do that in my
17    experience are people that have committed some
18    type of crime and they're fleeing me to get away
19    to avoid incarceration.
20         Q.     So did this incident change your
21    experience?
22         A.     I don't know that.  I -- he wasn't
23    wanted.  He didn't appear to be high.  And the
24    bike wasn't stolen.  But I don't know his
25    intentions for running from me.

233

```
1    State of Oregon          )
                              )   ss.
2    County of Lane           )

3

4              I, Jan R. Duiven, CSR, FCRR, CCP, a

5    Certified Shorthand Reporter for the State of

6    Oregon, certify that the witness was sworn and the

7    transcript is a true record of the testimony given

8    by the witness; that at said time and place I

9    reported all testimony and other oral proceedings

10   in the matter; that the foregoing transcript

11   consisting of 232 pages, contains a full, true and

12   correct transcript of the proceedings reported by

13   me to the best of my ability on said date.

14             If any of the parties or the witness

15   requested review of the transcript at the time of

16   the proceedings, correction pages have been

17   inserted.

18             IN WITNESS WHEREOF, I have set my

19   hand and CSR seal this 13th day of May, 2015, in

20   the City of Eugene, County of Lane, State of

21   Oregon.

22

23   Jan R. Duiven, CSR, FCRR, CCP

24   CSR No. 96-0327

25   Expiration Date:   September 30, 2017
```

Justin Wilkens

*Wilkens v Edwards and State of Oregon*

*April 15th, 2015*

ORIGINAL



CC REPORTING AND VIDEOCONFERENCING
172 East 8th Ave
Eugene, OR 97401
541-485-0111
www.ccreporting.com

Justin Wilkens

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JUSTIN WILKENS,                    )
                                   )
            Plaintiff,             )
                                   )
       v.                          )   No. 14-CV-00907
                                   )
ROBERT EDWARDS, in his             )
individual capacity;               )
THE STATE OF OREGON;               )
                                   )
            Defendants.            )

DEPOSITION OF JUSTIN WILKENS

April 15, 2015

Wednesday

9:08 A.M.

        THE DEPOSITION OF JUSTIN WILKENS, was

taken at the Department of Justice,

975 Oak Street, Suite 200, Eugene, Oregon, before

Jan R. Duiven, CSR, FCRR, CCP, Certified Shorthand

Reporter in and for the State of Oregon.

Justin Wilkens

2

APPEARANCES

For the Plaintiff:

      MS. LAUREN C. REGAN

      259 E. 5th Avenue, Suite 300-A

      Eugene, Oregon 97401

      541/687-9180

      lregan@justicelaworegon.com

For the Defendants:

      DEPARTMENT OF JUSTICE

      Trial Division

      1162 Court Street NE

      Salem, Oregon 97301

      503/947-4700

      BY:  MS. HEATHER J. VAN METER

      heather.j.vanmeter@doj.state.or.us

Also Present:

      MS. HAYLEY PERCY

      MS. LOREE FOGLEMAN

Reported by:

      JAN R. DUIVEN, CSR, FCRR, CCP

Justin Wilkens

155

1    was no cars coming.  The second car -- the third

2    car I passed, I thought that car had car problems

3    or they wanted to follow me.  They were going well

4    below the posted speed limit.

5            And they were waving me forward, like

6    anyone would do if their car is stalled or

7    coasting and they don't have control of their

8    vehicle, telling me to go past them, just like

9    anybody else on that road does.  If they're

10   driving a tractor.  If they're --

11           MS. VAN METER:  Can you read my

12   question back, please?

13           (The question was read back

14           as follows:)

15           "QUESTION:  The vehicles that you

16       passed on August 3rd, 2012, on Crow Road,

17       was it all in places where it was legal to

18       pass?"

19   BY MS. VAN METER:

20       Q.    Yes or no, Mr. Wilkens.

21       A.    All the vehicles?  I passed one car on

22   a yellow line.  I guess --

23       Q.    On a double yellow line.  Correct?

24       A.    That -- I believe it was a double

25   yellow line, but I could see far ahead before

Justin Wilkens

156

1    entering that first corner when I passed the

2    Camaro.

3                As I said, I've driven that road many,

4    many, many, many, many times.  And it was a

5    beautiful day.  I had clear visibility.

6                MS. VAN METER:  Counsel, I'm trying

7    to finish up.  It's getting --

8                MS. REGAN:  Well, yeah.  I mean,

9    we've been at it for hours and he, you know, is on

10   medication for exactly this reason.  So it's not

11   surprising to me that he's starting to fade.

12               MS. VAN METER:  Okay.

13               MS. REGAN:  Do you want to take

14   another break?

15               THE WITNESS:  No.  Just -- like I

16   want to move through this.  I'm just trying to

17   like --

18               MS. VAN METER:  If Mr. Wilkens is

19   starting to fade, I'm then concerned that if he's

20   supposed to be on medication, and he's not taking

21   the medication, and he's starting to fade, that

22   I'm going to have a problem with this being either

23   completed or being a valid deposition.  So do we

24   need to take a break and depose him another day?

25               THE WITNESS:  I don't need a break.

Justin Wilkens

161

```
1          A.    They have Velcro straps on them.
2          Q.    And were those Velcro straps tightened
3    down?
4          A.    Of course.
5          Q.    Did you have a full helmet on?
6          A.    Yes.
7          Q.    And a full-face shield?
8          A.    Yep.
9          Q.    And the face shield is dark tinted?
10         A.    I can't remember.  There's -- you
11   can -- they're interchangeable.
12         Q.    Have you seen the video of the pursuit
13   on August 3rd, 2012?
14         A.    Yes.
15         Q.    How many times?
16         A.    Probably at least five to ten.
17         Q.    When was the last time you saw it?
18         A.    Last week.
19         Q.    Do you agree when you have your
20   jacket, your gloves, your helmet, and the
21   full-face shield down, that a person cannot tell
22   who you are or what you look like or what you're
23   doing?
24         A.    You mean somebody else in a vehicle?
25         Q.    Yeah.
```

Justin Wilkens

164

1   dimensions off the top of my head, but --

2        Q.   What's your best estimate of the

3   dimensions?

4        A.   Hmm.  I'd guess 7, 8 inches wide by

5   4 to 5 inches tall.  (Indicating.)

6        Q.   That's a different size than on cars?

7        A.   Yeah.

8        Q.   It's smaller?

9        A.   Yeah.  The motorcycle's smaller.

10       Q.   At the time Captain Edwards pulled you

11  over, was there any way for him to know whether

12  you were a convicted felon or a bank robber?

13       A.   No.

14       Q.   Would you agree that if a police

15  officer is pulling somebody over, and they don't

16  know if the person is armed or dangerous or why

17  they may have been driving and passing a double

18  yellow line, and not pulling over for a police

19  officer, that a police officer should be cautious

20  in that circumstance?

21       A.   I think police officers always have to

22  be cautious.  But they also have to have control

23  of their vehicle too.

24       Q.   Do you think Captain Edwards did wrong

25  on August 3rd, 2012?

Justin Wilkens

184

```
 1          Q.    Did you -- did you have a valid
 2    license at the time?
 3          A.    Yes.
 4          Q.    But no insurance?
 5          A.    No.
 6          Q.    You agree you didn't have any
 7    insurance?
 8          A.    I did not have insurance.
 9          Q.    Has any doctor told you you need
10    future treatment for your shoulder?
11          A.    I inquired with Dr. Boespflug about
12    it, and he set up an appointment for me to go to
13    Slocum, but I couldn't afford to go.  I asked him
14    if the potential of having prolonged problems down
15    the road was a potential and he couldn't answer
16    that.
17          Q.    He didn't know one way or the other?
18          A.    He wasn't a specialist.
19          Q.    What vehicle are you driving
20    currently?
21          A.    It's an old Chevy pickup.
22          Q.    What year?
23          A.    2001.
24          Q.    How long have you had it?
25          A.    Probably since 2003.
```

ccreporting.com 541-485-0111

Justin Wilkens

196

```
1    State of Oregon        )
                            )  ss.
2    County of Lane         )

3

4              I, Jan R. Duiven, CSR, FCRR, CCP, a

5    Certified Shorthand Reporter for the State of

6    Oregon, certify that the witness was sworn and the

7    transcript is a true record of the testimony given

8    by the witness; that at said time and place I

9    reported all testimony and other oral proceedings

10   in the matter; that the foregoing transcript

11   consisting of 195 pages, contains a full, true and

12   correct transcript of the proceedings reported by

13   me to the best of my ability on said date.

14             If any of the parties or the witness

15   requested review of the transcript at the time of

16   the proceedings, correction pages have been

17   inserted.

18             IN WITNESS WHEREOF, I have set my

19   hand and CSR seal this 20th day of April, 2015, in

20   the City of Eugene, County of Lane, State of

21   Oregon.

22   

23   Jan R. Duiven, CSR, FCRR, CCP

24   CSR No. 96-0327

25   Expiration Date:  September 30, 2017
```

# OREGON UNIFORM CITATION AND COMPLAINT

Use for All Violations or Crimes Where Separate Complaint Will Not be
Filed/ORS 153.045 or 133.069

**DMV Use Only**

DD1200093

☒ CRIME(S) OR ☐ VIOLATION(S) Type:
(see A below) (Not Both) (see B below)   TRAFFIC

STATE OF OREGON
CITY/OTHER PUBLIC BODY: EUGENE
COUNTY OF: LANE COUNTY
Case No.: 12-5393
Court: LANE CO CIRCUIT COURT

RECORD AND: ☐ CIRCUIT COURT REGISTER ☐ JUSTICE COURT DOCKET
 ☐ MUNICIPAL COURT DOCKET
HANDLED BY: ☐ VIOLATIONS BUREAU ☐ COURT
BASED ON: ☐ WRITTEN SUBMISSION ☐ APPEARANCE
DATE          EVENT/NOTES          INITIAL

**DEFENDANT** The undersigned certifies and says that the following person:
ID Type:                    ID No: 9105112         State:OR Ph.:
Name: Last:WILKENS
First:JUSTIN          MI: MICHAEL
Address: 25429 WOLF CREEK RD
City: EUGENE          State:OR  Zip: 97405   Passenger: ☐
Sex:M  Race: W   DOB:03/14/1974   Hgt: 6'4"  Wgt:200  Hair: BRO
Eyes:BRO  Lic. Exp.: 2014   Juv:☐  Lic.Class: c   Emp.to Drive:☐

**TIME/PLACE**
At the following time and place in the above-mentioned state and county:
On or About Date/Time: 08/03/2012          01:57 PM
At or Near                          City
CROW RD & MP 4
                                    EUGENE
NB: ☒  SB: ☐  EB: ☐  WB: ☐
Highway: ☐ Premise Open to Public: ☐ Other: ☐

**VEHICLE** involving the following:
Year: 2006    Make: APRI          Model:1000
Color: ONG    Type: MC
Regis/Vin/ID#: M654339              State:OR
Accident: ☐  Prop. Damage: ☐  Injury: ☐  Endanger Other: ☐
Com'l Veh: ☐  Haz Mat: ☐  Driver Not Reg. Owner: ☐
Other:                          Com'l Pass: ☐

**OFFENSE(S)** Did then and there commit the following offense(s):
HWY Work Zone: ☐  School Zone: ☐  VBR: ☐  Safety Corridor: ☐
Radar: ☐  Pace: ☐  Laser: ☐  Other: ☐
Alleged Speed:      Designated Speed:      Posted Limit: ☐
Offense #:  811.540
Warning: ☐          ATTEMPT TO ELUDEFLEEING (VEHICLE)
Presumptive Fine1: MUST APPEAR
 Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine2:
 Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine3:
 Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐

**OTHER**

Expl.:

**SIGNATURE**
I certify under ORS 153.045 and 153.990 and under other applicable law and under
penalties for false swearing, do swear/affirm that I have sufficient grounds to and do
believe that the above-mentioned defendant/person committed the above offense(s)
and I have served the defendant/person with this complaint.

Signature of Officer:
Officer name1: TIM WARE          Officer ID: 32127
Officer name2:                    Officer ID:
Agency Name: LANE COUNTY SHERIFFS OFFICE
Issue Date: 08/03/2012

**YOUR COURT APPEARANCE DATE, TIME AND LOCATION ARE**
08/28/2012          08:30 AM
Location: LANE CO CIRCUIT COURT
125 E 8TH AVE
EUGENE          OR  97401

COMPLAINT FILED
WRITTEN RESPONSE RECEIVED
ARRAIGNED   ☐ MISD.   ☐ 161.566 OR
            ☐ VIOL.   ☐ 161.568 (REDUCTION)
SECURITY RELEASE AT: $          RECEIPT NO.
COURT/JURY TRIAL                    (☐ WAIVED)
CRIMINAL RIGHTS GIVEN
ATTORNEY:          OSB#:          (☐ WAIVED)
WARRANT ORDERED          ISSUED:
DIVERSION AGREEMENT
CONTINUED TO          REASON:
☐ ORS 135.355 CONDITIONAL PLEA

THE ATTACHED ADDITIONS TO THIS RECORD/REGISTER ARE INCORPORATED
BY REFERENCE, SEE PAGE(S): ☐ 1 (BY_____) ☐ 2 (BY_____);

JUDGMENT OF THE COURT  (SUBMIT ABSTRACT COPY UNDER ORS 153.11)

| OFF | RESPONSE/ PLEA | CHANGE PLEA | FINDING | DETERMINATION | OFFENSE SITE | TYPE | CLASS |
|---|---|---|---|---|---|---|---|
| 1 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |
| 2 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |
| 3 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |

DISPOSITION: ☐ 137.533 DEFERRED SENTENCE ☐ SENT IMP, SUS.
☐ DR. PRIV. SUSP._____ (TIME) CONV.SPD._____
JAIL:
PROBATION/OTHER:

THE ATTACHED ADDITIONS TO THIS JUDGMENT ARE INCORPORATED BY
REFERENCE, SEE PAGE(S): ☐1 (BY_____); ☐ 2 (BY_____); ☐ 3 (BY_____);

| MONEY JUDGMENT MONEY OBLIGATION | OFFENSE 1 IMPOSE SUSPEND | OFFENSE 2 IMPOSE SUSPEND | OFFENSE 3 IMPOSE SUSPEND |
|---|---|---|---|
| FINE | | | |
| COSTS | | | |
| RESTITUTION | | | |
| TOTAL ▷ | | | |

TOTAL AMOUNT TO PAY THAT IS NOT SUSPENDED
(FROM OFFENSES 1,2 and 3) $
TERMS OF PAYMENT:

☐ ALL MONEYS, INCLUDING SUSPENDED MONEYS, BECOME DUE IMMEDIATELY
UNDER ORS 153.090(4) IF NONSUSPENDED MONEYS NOT PAID IN
ACCORDANCE WITH TERMS OF PAYMENT.
THE ATTACHED ADDITIONS TO THIS MONEY JUDGMENT ARE INCORPORATED
BY REFERENCE, SEE PAGE(S): ☐ 1 (BY_____); ☐ 2 (BY_____);
JUDGMENT CREDITOR: ☐STATE OF OREGON ☐ OTHER_____
JUDGMENT DEBTOR: ☐DEFENDANT ☐ OTHER
DATE:          SIGNATURE OF: ☐ JUDGE (☐ VIOLATIONS CLERK, WHERE ALLOWED)

WIL000018
WIL - OSP - 0020

EXHIBIT C, Page 1 of 8

Citation #: DD1200093

Traffic Type: TRAFFIC/STANDARD

Date: 08/03/2012                    Time: 01:57 PM

Location:
CROW RD & MP 4                EUGENE

Latitude:                Longitude:
Tactical Zone:                Beat: 531

NB: ☒  SB: ☐  EB: ☐  WB: ☐

Highway: ☐  Premise Open to Public: ☐  Other: ☐

Radar: ☐ Serial #:

Laser: ☐ Serial #:

Pace: ☐  Tested: ☐  Other: ☐

Defendant Last Name: WILKENS

Defendant First Name: JUSTIN

Vehicle Plate #: M854339

VIN: ZD4RRTT097S000026

Traffic: N/A

At Intersection: N/A

Visibility: N/A

Road Surface: N/A

Area: N/A

Fish and Wildlife Unit/Stream Code:

Juvenile Information

Parent Last Name:

Parent First Name:

Parent Address:

Parent Phone #:

Template:

Officer Notes:

000019

WIL - OSP - 0021

EXHIBIT C, Page 2 of 8

## OREGON UNIFORM CITATION AND COMPLAINT

Use for All Violations or Crimes Where Separate Complaint Will Not be Filed/ORS 153.045 or 133.069

DD120094

| ☒ CRIME(S) (see A below) | OR (Not Both) | ☐ VIOLATION(S) (see B below) | Type: TRAFFIC |

STATE OF OREGON
CITY/OTHER PUBLIC BODY: EUGENE
COUNTY OF: LANE COUNTY
Case No.: 12-5393
Court: LANE CO CIRCUIT COURT

### DEFENDANT The undersigned certifies and says that the following person:

ID Type:                    ID No: 9105112        State:OR  Ph.:
Name: Last: WILKENS
First: JUSTIN                             MI: MICHAEL
Address: 25429 WOLF CREEK RD
City: EUGENE            State:OR   Zip: 97405       Passenger: ☐
Sex: M  Race: W   DOB: 03/14/1974  Hgt: 6'4"  Wgt: 200  Hair: BRO
Eyes: BRO  Lic. Exp.: 2014  Juv.: ☐  Lic.Class: c  Emp.to Drive: ☐

### TIME/PLACE

At the following time and place in the above-mentioned state and county:
On or About Date/Time: 08/03/2012        02:00 PM
At or Near                           City
CROW RD & MP 4
NB: ☒  SB: ☐  EB: ☐  WB: ☐           EUGENE
Highway: ☐  Premise Open to Public: ☐  Other: ☐

### VEHICLE Involving the following:

Year: 2006      Make: APRI          Model: 1000
Color: ONG          Type: MC
Regis/Vin/ID#: M854339                    State: OR
Accident: ☐  Prop. Damage: ☐  Injury: ☐  Endanger Other: ☐
Com'l Veh: ☐   Haz Mat: ☐   Driver Not Reg. Owner: ☐
Other:                             Com'l Pass: ☐

### OFFENSE(S)  Did then and there commit the following offense(s):

HWY Work Zone: ☐  School Zone: ☐  VBR: ☐  Safety Corridor: ☐
Radar: ☐  Pace: ☐  Laser: ☐  Other: ☐
Alleged Speed:        Designated Speed:        Posted Limit: ☐
Offense #: 811.140
Warning: ☐
    RECKLESS DRIVING
Presumptive Fine1: MUST APPEAR
    Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine2:
    Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine3:
    Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐

### OTHER

Expl.:

### SIGNATURE

I certify under ORS 153.045 and 153.990 and under other applicable law and under penalties for false swearing, do swear/affirm that I have sufficient grounds to and do believe that the above-mentioned defendant/person committed the above offense(s) and I have served the defendant/person with this complaint.

Signature of Officer:  _____
Officer name1: TIM WARE          Officer ID: 32127
Officer name2:                   Officer ID:
Agency Name: LANE COUNTY SHERIFFS OFFICE
Issue Date: 08/03/2012

### YOUR COURT APPEARANCE DATE,TIME AND LOCATION ARE

08/28/2012        08:30 AM
Location: LANE CO CIRCUIT COURT
    125 E 8TH AVE
    EUGENE           OR   97401
    541 682 4020

---

COMPLAINT/SUMMONS DD120094

Reserved for D.A. Use

### DMV Use Only     DD120094

RECORD AND: ☐ CIRCUIT COURT REGISTER  ☐ JUSTICE COURT DOCKET
            ☐ MUNICIPAL COURT DOCKET
HANDLED BY: ☐ VIOLATIONS BUREAU   ☐ COURT
BASED ON:   ☐ WRITTEN SUBMISSION  ☐ APPEARANCE

| DATE | EVENT/NOTES | INITIAL |
|---|---|---|
| | COMPLAINT FILED | |
| | WRITTEN RESPONSE RECEIVED | |
| | ARRAIGNED  ☐ MISD.  ☐ 161.566 OR | |
| |             ☐ VIOL.  ☐ 161.568 (REDUCTION) | |
| | SECURITY RELEASE AT: $        RECEIPT NO. | |
| | COURT/JURY TRIAL        (☐ WAIVED) | |
| | CRIMINAL RIGHTS GIVEN | |
| | ATTORNEY:      OSB#:     (☐ WAIVED) | |
| | WARRANT ORDERED     ISSUED: | |
| | DIVERSION AGREEMENT | |
| | CONTINUED TO      REASON: | |
| | ☐ ORS 135.355 CONDITIONAL PLEA | |

Reserved for Court Use

THE ATTACHED ADDITIONS TO THIS RECORD/REGISTER ARE INCORPORATED BY REFERENCE, SEE PAGE(S): ☐ 1 (BY_____); ☐ 2 (BY_____);

JUDGMENT OF THE COURT  (SUBMIT ABSTRACT COPY UNDER ORS 153.11)

| OFF | RESPONSE | CHANGE PLEA | FINDING | DETERMINATION | OFFENSE SITE | TYPE | CLASS |
|---|---|---|---|---|---|---|---|
| | PLEA | PLEA | | | | | |
| 1 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |
| 2 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |
| 3 | G NG NC FTA | G NG | C A DISM | | | V M | A B C D OTH |

DISPOSITION: ☐ 137.533 DEFERRED SENTENCE  ☐ SENT IMP. SUS.
    ☐ DR. PRIV. SUSP. _____ (TIME) CONV.SPD. _____
JAIL: _____
PROBATION/OTHER: _____

THE ATTACHED ADDITIONS TO THIS JUDGMENT ARE INCORPORATED BY REFERENCE, SEE PAGE(S): ☐ 1 (BY____); ☐ 2 (BY____); ☐ 3 (BY____);

| MONEY JUDGMENT MONEY OBLIGATION | OFFENSE 1 | | OFFENSE 2 | | OFFENSE 3 | |
|---|---|---|---|---|---|---|
| | IMPOSE | SUSPEND | IMPOSE | SUSPEND | IMPOSE | SUSPEND |
| FINE | | | | | | |
| COSTS | | | | | | |
| RESTITUTION | | | | | | |
| TOTAL ▶ | | | | | | |

TOTAL AMOUNT TO PAY THAT IS NOT SUSPENDED
(FROM OFFENSES 1,2 AND 3) $
TERMS OF PAYMENT:

☐ ALL MONEYS, INCLUDING SUSPENDED MONEYS, BECOME DUE IMMEDIATELY UNDER ORS 153.990(4) IF NONSUSPENDED MONEYS NOT PAID IN ACCORDANCE WITH TERMS OF PAYMENT.
THE ATTACHED ADDITIONS TO THIS MONEY JUDGMENT ARE INCORPORATED BY REFERENCE, SEE PAGE(S): ☐ 1 (BY____); ☐ 2 (BY____);
JUDGMENT CREDITOR: ☐ STATE OF OREGON  ☐ OTHER _____
JUDGMENT DEBTOR: ☐ DEFENDANT     ☐ OTHER _____

| DATE | SIGNATURE OF: ☐ JUDGE (☐ VIOLATIONS CLERK, WHERE ALLOWED ) |
|---|---|
| | |

AUG 12 '12 PM 1000020

WIL - OSP - 0022

EXHIBIT C, Page 3 of 8

Citation #: DD1200094

Traffic Type: TRAFFIC/STANDARD

Date: 08/03/2012                    Time: 02:00 PM

Location:
CROW RD & MP 4                    EUGENE

Latitude:                    Longitude:
Tactical Zone:                    Beat: 531
NB: ☒   SB: ☐   EB: ☐   WB: ☐
Highway: ☐   Premise Open to Public: ☐   Other: ☐
Radar: ☐ Serial #:
Laser: ☐ Serial #:
Pace: ☐   Tested: ☐   Other: ☐

Defendant Last Name: WILKENS
Defendant First Name: JUSTIN
Vehicle Plate #: M654339
VIN: ZD4RRT987S000026

Traffic: N/A
At Intersection: N/A
Visibility: N/A
Road Surface: N/A
Area: N/A
Fish and Wildlife Unit/Stream Code:

Juvenile Information
Parent Last Name:
Parent First Name:
Parent Address:
Parent Phone #:

Template:
Officer Notes:
12-5393

# OREGON UNIFORM CITATION AND COMPLAINT

Use for All Violations or Crimes Where Separate Complaint Will not be
Filed/ORS 153.045 or 133.069

DD1200095

COMPLAINT/SUMMONS DD1200095

☐ CRIME(S)  OR  ☐ VIOLATION(S) Type:
(see A below) (Not Both) (see B below)  TRAFFIC

STATE OF OREGON
CITY/OTHER PUBLIC BODY: EUGENE
COUNTY OF: LANE COUNTY
Case No.: 12-5393
Court: LANE CO CIRCUIT COURT

Reserved for D.A. Use

**DEFENDANT** The undersigned certifies and says that the following person:
ID Type:                  ID No: 9105112          State: OR  Ph.:
Name: Last: WILKENS
First: JUSTIN                        MI: MICHAEL
Address: 25429 WOLF CREEK RD
City: EUGENE       State: OR   Zip: 97405        Passenger: ☐
Sex: M Race: W   DOB: 03/14/1974   Hgt: 6'4"  Wgt: 200  Hair: BRO
Eyes: BRO  Lic. Exp.: 2014   Juv.: ☐ Lic.Class: c   Emp.to Drive: ☐

**TIME/PLACE**
At the following time and place in the above-mentioned state and county:
On or About Date/Time: 09/03/2012        02:02 PM
At or Near                        City
CROW RD & MP 4
                        EUGENE
NB: ☒  SB: ☐  EB: ☐  WB: ☐
Highway: ☐  Premise Open to Public: ☐  Other: ☐

**VEHICLE** Involving the following:
Year: 2006    Make: APRI        Model: 1000
Color: ONG    Type: MC
Regis/Vin/ID#: M654339             State: OR
Accident: ☐  Prop. Damage: ☐  Injury: ☐  Endanger Other: ☐
Com'l Veh: ☐  Haz Mat: ☐  Driver Not Reg. Owner: ☐
Other: ☐                          Com'l Pass: ☐

Reserved for Court Use

**OFFENSE(S)** Did then and there commit the following offense(s):
HWY Work Zone: ☐  School Zone: ☐  VBR: ☐  Safety Corridor: ☐
Radar: ☐  Pace: ☐  Laser: ☐  Other: ☐
Alleged Speed:        Designated Speed:        Posted Limit: ☐
Offense #:  163.195
        RECKLESS ENDANGERING PERSON
Warning: ☐
Presumptive Fine1: MUST APPEAR
        Intentional: ☐  Knowing: ☐  Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine2:
        Intentional: ☐  Knowing: ☐  Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐
Offense #:
Warning: ☐
Presumptive Fine3:
        Intentional: ☐  Knowing: ☐  Reckless: ☐
Criminal Negligence: ☐  No Culpable Mental State: ☐

**OTHER**

Expl.:

**SIGNATURE**
I certify under ORS 153.045 and 153.990 and under other applicable law and under
penalties for false swearing, do swear/affirm that I have sufficient grounds to and do
believe that the above-mentioned defendant/person committed the above offense(s)
and I have served the defendant/person with this complaint.

Signature of Officer:          _Tim Ware_
Officer name1: TIM WARE          Officer ID: 32127
Officer name2:                   Officer ID:
Agency Name: LANE COUNTY SHERIFF'S OFFICE
        Issue Date: 08/03/2012

**YOUR COURT APPEARANCE DATE, TIME AND LOCATION ARE**
08/28/2012        08:30 AM
Location: LANE CO CIRCUIT COURT
        125 E 8TH AVE
        EUGENE            OR   97401
        541-682-4020

---

**DMV Use Only**

DD1200095

| RECORD AND: | ☐ CIRCUIT COURT REGISTER | ☐ JUSTICE COURT DOCKET |
|---|---|---|
| | ☐ MUNICIPAL COURT DOCKET | |
| HANDLED BY: | ☐ VIOLATIONS BUREAU | ☐ COURT |
| BASED ON: | ☐ WRITTEN SUBMISSION | ☐ APPEARANCE |

| DATE | EVENT/NOTES | INITIAL |
|---|---|---|
| | COMPLAINT FILED | |
| | WRITTEN RESPONSE RECEIVED | |
| | ARRAIGNED   ☐ MISD.   ☐ 161.566 OR | |
| | ☐ VIOL.   ☐ 161.566 (REDUCTION) | |
| | SECURITY RELEASE AT: $   RECEIPT NO. | |
| | COURT/JURY TRIAL      (☐ WAIVED) | |
| | CRIMINAL RIGHTS GIVEN | |
| | ATTORNEY:   OSB#:   (☐ WAIVED) | |
| | WARRANT ORDERED   ISSUED: | |
| | DIVERSION AGREEMENT | |
| | CONTINUED TO   REASON: | |
| | ☐ ORS 135.335 CONDITIONAL PLEA | |

THE ATTACHED ADDITIONS TO THIS RECORD/REGISTER ARE INCORPORATED
BY REFERENCE, SEE PAGE(S): ☐ 1 (BY_____); ☐ 2 (BY_____);

**JUDGMENT OF THE COURT** (SUBMIT ABSTRACT COPY UNDER ORS 153.11)

| # | OFF RESPONSE/ PLEA | CHANGE PLEA | FINDING DETERMINATION | OFFENSE SITE | TYPE | CLASS |
|---|---|---|---|---|---|---|
| 1 | G NG NC FTA | G NG | C A DISM | | V M | A B C D OTH |
| 2 | G NG NC FTA | G NG | C A DISM | | V M | A B C D OTH |
| 3 | G NG NC FTA | G NG | C A DISM | | V M | A B C D OTH |

DISPOSITION: ☐ 137.533 DEFERRED SENTENCE  ☐ SENT IMP. SUS.
☐ DR. PRIV. SUSP._____ (TIME) CONV. SPD.:_____
JAIL:_____
PROBATION/OTHER:_____

THE ATTACHED ADDITIONS TO THIS JUDGMENT ARE INCORPORATED BY
REFERENCE, SEE PAGE(S): ☐1 (BY_____); ☐2 (BY_____); ☐3 (BY_____);

| MONEY JUDGMENT MONEY OBLIGATION | OFFENSE 1 IMPOSE SUSPEND | OFFENSE 2 IMPOSE SUSPEND | OFFENSE 3 IMPOSE SUSPEND |
|---|---|---|---|
| FINE | | | |
| COSTS | | | |
| RESTITUTION | | | |
| TOTAL ▶ | | | |

TOTAL AMOUNT TO PAY THAT IS NOT SUSPENDED
(FROM OFFENSES 1,2 AND 3) $_____
TERMS OF PAYMENT:

☐ ALL MONEYS, INCLUDING SUSPENDED MONEYS, BECOME DUE IMMEDIATELY
UNDER ORS 153.990(4) IF NONSUSPENDED MONEYS NOT PAID IN
ACCORDANCE WITH TERMS OF PAYMENT.
THE ATTACHED ADDITIONS TO THIS MONEY JUDGMENT ARE INCORPORATED
BY REFERENCE, SEE PAGE(S): ☐1 (BY_____); ☐2 (BY_____);
JUDGMENT CREDITOR: ☐ STATE OF OREGON  ☐ OTHER_____
JUDGMENT DEBTOR: ☐ DEFENDANT  ☐ OTHER_____

| DATE: | SIGNATURE OF: ☐ JUDGE (☐ VIOLATIONS CLERK, WHERE ALLOWED) |
|---|---|

000022

WIL - OSP - 0024

**EXHIBIT C, Page 5 of 8**

Citation #: DD1200095

Traffic Type: TRAFFIC/STANDARD

Date: 08/03/2012                     Time: 02:02 PM

Location:
CROW RD & MP 4                  EUGENE

Latitude:                            Longitude:

Tactical Zone:                       Beat: 531

NB: ☒  SB: ☐  EB: ☐  WB: ☐

Highway: ☐  Premise Open to Public: ☐  Other: ☐

Radar: ☐ Serial #:

Laser: ☐ Serial #:

Pace: ☐  Tested: ☐  Other: ☐

Defendant Last Name: WILKENS

Defendant First Name: JUSTIN

Vehicle Plate #: M654339

VIN: ZD4RRTT097S090028

Traffic: N/A

At Intersection: N/A

Visibility: N/A

Road Surface: N/A

Area: N/A

Fish and Wildlife Unit/Stream Code:

Juvenile Information

Parent Last Name:

Parent First Name:

Parent Address:

Parent Phone #:

Template: 026

Officer Notes:
COMPLAINT INFORMATION:(NAME) RECKLESSLY ENGAGED IN
CONDUCT BY (DESCRIBE) WHICH CREATED A SUBSTANTIAL
RISK OF SERIOUS PHYSICAL INJURY TO (NAME).

000023

WIL - OSP - 0025

EXHIBIT C, Page 6 of 8

# OREGON UNIFORM CITATION AND COMPLAINT

Use for All Violations or Crimes Where Separate Complaint Will Not be Filed/ORS 153.045 or 133.069

COMPLAINT/SUMMONS DD1200096   Reserved for D.A. Use

☐ CRIME(S) (see A below) (Not Both)   OR   ☒ VIOLATION(S) (see B below)   Type: TRAFFIC

STATE OF OREGON
CITY/OTHER PUBLIC BODY: EUGENE
COUNTY OF: LANE COUNTY
Case No.: 12-5393
Court: LANE CO CIRCUIT COURT

## DEFENDANT The undersigned certifies and says that the following person:
ID Type:   No:9105112   State:OR   Ph.:
Name: Last:WILKENS
First:JUSTIN   MI: MICHAEL
Address:25429 WOLF CREEK RD
City: EUGENE   State:OR   Zip: 97405   Passenger:
Sex:M   Race:W   DOB:03/14/1974   Hgt: 6'1"   Wgt:200   Hair: BRO
Eyes:BRO   Lic. Exp.: 2014   Juv.:   Lic.Class: C   Emp.to Drive:

## TIME/PLACE
At the following time and place in the above-mentioned state and county:
On or About Date/Time: 08/03/2012   02:03 PM
At or Near   City
CROW RD & MP 4
          EUGENE
NB: ☒   SB: ☐   EB: ☐   WB: ☐
Highway: ☐   Premise Open to Public: ☐   Other: ☐

## VEHICLE Involving the following:
Year: 2006   Make: APRI   Model:1000
Color: ONG   Type:MC   State:OR
Regis/Vin/ID#:M654339
Accident: ☐   Prop. Damage: ☐   Injury: ☐   Endanger Other: ☐
Com'l Veh: ☐   Haz Mat: ☐   Driver Not Reg. Owner: ☐
Other:   Com'l Pass: ☐

## OFFENSE(S) Did then and there commit the following offense(s):
HWY Work Zone: ☐   School Zone: ☐   VBR: ☐   Safety Corridor: ☐
Radar: ☐   Pace: ☐   Laser: ☐   Other: ☐
Alleged Speed:120   Designated Speed: 55   Posted Limit: ☐
Offense #:   811.100
          VBR 100+
Warning: ☐

Presumptive Fine1: $1150.00
Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐   No Culpable Mental State: ☐
Offense #:   806.010
Warning: ☐   DRIVING UNINSURED

Presumptive Fine2: $260.00
Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐   No Culpable Mental State: ☐
Offense #:   811.420
Warning: ☐   PASSING IN NO PASSING ZONE

Presumptive Fine3: $260.00
Intentional: ☐   Knowing: ☐   Reckless: ☐
Criminal Negligence: ☐   No Culpable Mental State: ☐

## OTHER

Expl.:

## SIGNATURE
I certify under ORS 153.045 and 153.990 and under other applicable law and under penalties for false swearing, do swear/affirm that I have sufficient grounds to and do believe that the above-mentioned defendant/person committed the above offense(s) and I have served the defendant/person with this complaint.

Signature of Officer: _Tim Ware_
Officer name1:TIM WARE   Officer ID: 32127
Officer name2:   Officer ID:
Agency Name:LANE COUNTY SHERIFFS OFFICE
Issue Date:08/03/2012

## YOUR COURT APPEARANCE DATE,TIME AND LOCATION ARE
09/04/2012   08:30 AM
Location: LANE CO CIRCUIT COURT
125 E 8TH AVE
EUGENE   OR   97401

---

## DMV Use Only
DD1200096

RECORD AND: ☐ CIRCUIT COURT REGISTER   ☐ JUSTICE COURT DOCKET
          ☐ MUNICIPAL COURT DOCKET
HANDLED BY: ☐ VIOLATIONS BUREAU   ☐ COURT
BASED ON: ☐ WRITTEN SUBMISSION   ☐ APPEARANCE

| DATE | EVENT/NOTES | INITIAL |
|---|---|---|
| | COMPLAINT FILED | |
| | WRITTEN RESPONSE RECEIVED | |
| | ARRAIGNED ☐ MISD. ☐ 161.566 OR | |
| | ☐ VIOL. ☐ 161.568 (REDUCTION) | |
| | SECURITY RELEASE AT: $   RECEIPT NO. | |
| | COURT/JURY TRIAL   (☐ WAIVED) | |
| | CRIMINAL RIGHTS GIVEN | |
| | ATTORNEY:   OSB#:   (☐ WAIVED) | |
| | WARRANT ORDERED   ISSUED: | |
| | DIVERSION AGREEMENT | |
| | CONTINUED TO   REASON: | |
| | ☐ ORS 135.355 CONDITIONAL PLEA | |

THE ATTACHED ADDITIONS TO THIS RECORD/REGISTER ARE INCORPORATED BY REFERENCE, SEE PAGE(S): ☐ 1 (BY_____); ☐ 2 (BY_____);

JUDGMENT OF THE COURT (SUBMIT ABSTRACT COPY UNDER ORS 153.11)

| # | OFF PLEA | RESPONSE/ CHANGE PLEA | FINDING | DETERMINATION | OFFENSE SITE | TYPE | CLASS |
|---|---|---|---|---|---|---|---|
| 1 | G NG NC FTA | | G NG | C A DISM | | V M | A B C D OTH |
| 2 | G NG NC FTA | | G NG | C A DISM | | V M | A B C D OTH |
| 3 | G NG NC FTA | | G NG | C A DISM | | V M | A B C D OTH |

DISPOSITION: ☐ 137.533 DEFERRED SENTENCE   ☐ SENT IMP. SUS.
☐ DR. PRIV. SUSP._____ (TIME) CONV.SPD._____
JAIL:_____
PROBATION/OTHER:_____

THE ATTACHED ADDITIONS TO THIS JUDGMENT ARE INCORPORATED BY REFERENCE, SEE PAGE(S): ☐1 (BY____); ☐2 (BY____); ☐3 (BY____);

| MONEY JUDGMENT MONEY OBLIGATION | OFFENSE 1 IMPOSE SUSPEND | OFFENSE 2 IMPOSE SUSPEND | OFFENSE 3 IMPOSE SUSPEND |
|---|---|---|---|
| FINE | | | |
| COSTS | | | |
| RESTITUTION | | | |
| TOTAL ▶ | | | |

TOTAL AMOUNT TO PAY THAT IS NOT SUSPENDED (FROM OFFENSES 1,2 AND 3 $_____
TERMS OF PAYMENT:_____
☐ ALL MONEYS, INCLUDING SUSPENDED MONEYS, BECOME DUE IMMEDIATELY UNDER ORS 153.090(4) IF NONSUSPENDED MONEYS NOT PAID IN ACCORDANCE WITH TERMS OF PAYMENT.
THE ATTACHED ADDITIONS TO THIS MONEY JUDGMENT ARE INCORPORATED BY REFERENCE, SEE PAGE(S):☐1 (BY_____); ☐ 2 (BY_____);
JUDGMENT CREDITOR:☐STATE OF OREGON ☐OTHER_____
JUDGMENT DEBTOR: ☐DEFENDANT   ☐OTHER_____
DATE:   SIGNATURE OF: ☐ JUDGE (☐ VIOLATIONS CLERK, WHERE ALLOWED)

AUG 17 '12 PM12:58   000024

WIL - OSP - 0026

EXHIBIT C, Page 7 of 8

Citation #: DD1200096

Traffic Type: TRAFFIC/STANDARD

Date: 08/03/2012                    Time: 02:03 PM

Location:
CROW RD & MP 4                      EUGENE

Latitude:                    Longitude:
Tactical Zone:                    Beat: 531
NB: ☒   SB: ☐   EB: ☐   WB: ☐
Highway: ☐   Premise Open to Public: ☐   Other: ☐
Radar: ☐ Serial #:
Laser: ☐ Serial #:
Pace: ☐   Tested: ☐   Other: ☐

Defendant Last Name: WILKENS

Defendant First Name: JUSTIN

Vehicle Plate #: M654339

VIN: ZD4RRTT097S000026

Traffic: N/A
At Intersection: N/A
Visibility: N/A
Road Surface: N/A
Area: N/A
Fish and Wildlife Unit/Stream Code:

Juvenile Information

Parent Last Name:

Parent First Name:

Parent Address:

Parent Phone #:

Template: 026

Officer Notes:
COMPLAINT INFORMATION:(NAME) RECKLESSLY ENGAGED IN
CONDUCT BY (DESCRIBE) WHICH CREATED A SUBSTANTIAL
RISK OF SERIOUS PHYSICAL INJURY TO (NAME).

000025

WIL - OSP - 0027

EXHIBIT C, Page 8 of 8



Department of Justice
*Trial Division*
5/21/2015

*Video Loop of DVD Wilkens Dash Cam*
-Wilkins vs. Edwards-

USDC Case No. 6:14-CV-00907-MC

Call Information

Call Type: OFFICER SAFETY ALERT        Priority: 3 15 MINS        Date: 08/03/2012

Location:  36 SR / 126 SR ;SIUSLAW BANK      Pref:      Apt:
City: LANE    State:    Zip:
CA: 02    Rpt Dist: 2903 Beat: 29

Call Taken By      : 35888
Call Dispatched By : 13369

Report Required : N

Disposition: 8 UNABLE TO LOCATE/GONE ON ARVL
Disposition Remarks:

Caller Information

Call Source: VIA PHONE/PERSON/PUBLIC
Caller: LANE CO   Phone:
Address:

Related Incident Numbers

Police:   Sheriff:   Fire:      EMS:

Incident Times

E911:    Received: 10:32:51 Dispatch: 10:34:20 En Route: 10:34:20
Arrive: 10:52:24    Transport:    INCIDENT:   Cleared: 16:55:00

Unit Information

Pri Unit: 2974 Officers: WETZEL,JOSHUA WAYNE

Unit Times

| Unit ID | CMD | Date/Time | Remarks |
|---------|-----|-----------|---------|
| 2971 | D | 8/3/2012 10:34:20 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2971 | EN | 8/3/2012 10:34:20 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2971 | RT | 8/3/2012 10:37:33 AM | 2 MALES/1 WHI T SHIRT/AUTO WEAPONS/WHI HATCH BACK |
| 2521 | BU | 8/3/2012 10:39:15 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2521 | EN | 8/3/2012 10:39:15 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2531 | BU | 8/3/2012 10:39:15 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2531 | EN | 8/3/2012 10:39:15 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2510 | BU | 8/3/2012 10:39:29 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2510 | EN | 8/3/2012 10:39:29 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2531 | LC | 8/3/2012 10:40:05 AM | ENR CHECK 36 |
| 2521 | LC | 8/3/2012 10:40:09 AM | ENR CHECK 36 |

| 2531 | LC | 8/3/2012 10:40:14 AM | ENR CHECK 126 |
| 2974 | BU | 8/3/2012 10:40:57 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2974 | EN | 8/3/2012 10:40:57 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2531 | LC | 8/3/2012 10:43:18 AM | NELSON MT RD// |
| 2510 | RT | 8/3/2012 10:45:38 AM | LCSO ASSOCIAT VEH / |
| 2411 | BU | 8/3/2012 10:51:25 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2411 | EN | 8/3/2012 10:51:25 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2411 | LC | 8/3/2012 10:51:34 AM | HWY 36 AREA |
| 2974 | RT | 8/3/2012 10:51:41 AM | ON CH 61 |
| 2971 | LC | 8/3/2012 10:52:22 AM | OUT AT BANK |
| 2971 | A | 8/3/2012 10:52:24 AM | OUT AT BANK |
| 2411 | RT | 8/3/2012 11:05:10 AM | =QRS.513FAE |
| 2550 | BU | 8/3/2012 11:15:41 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2550 | EN | 8/3/2012 11:15:41 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2974 | RT | 8/3/2012 11:16:07 AM | CONTACTED 2924 / COMING ON DUTY / WHITAKER CREEK AREA |
| 2924 | BU | 8/3/2012 11:16:14 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2924 | EN | 8/3/2012 11:16:14 AM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2924 | LC | 8/3/2012 11:16:20 AM | WHITAKER CREEK AREA |
| 2510 | RT | 8/3/2012 11:17:57 AM | SET UP DOWNTOWN LORAINE//SIUSLAW RIVER RD |
| 2510 | RT | 8/3/2012 11:31:58 AM | =QRS.QUM834 |
| 2531 | RT | 8/3/2012 11:56:28 AM | RES LAKE CREEK RD//GRY PATCHED UP FORD PSNG VEH |
| 2531 | RT | 8/3/2012 11:56:37 AM | DROVE UP THIS RD//WASN T HATCHBACK / |
| 2974 | RT | 8/3/2012 11:57:33 AM | DAVE CRANSY 541-430-8658 / WEYERHAUSER LUMBER |
| 2974 | RT | 8/3/2012 11:57:43 AM | SEE IF THEY HAVE ANY CREWS WORKING ON C LINE |
| 2521 | RT | 8/3/2012 12:04:04 PM | =QRS.UVX857 |
| 2974 | RT | 8/3/2012 12:24:08 PM | DAVE / WEST END OF C LINE /UNK ANY REASON WHY |
| 2974 | RT | 8/3/2012 12:24:15 PM | GATES WOULD BE OPEN / |
| 2924 | RT | 8/3/2012 12:30:13 PM | ON CH 71 |
| 2570 | BU | 8/3/2012 12:30:25 PM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2570 | EN | 8/3/2012 12:30:25 PM | 36 SR / 126 SR ;SIUSLAW BANK |
| 2570 | LC | 8/3/2012 12:30:31 PM | VENETA/TERRITORIAL AREA |
| 2924 | RT | 8/3/2012 12:35:43 PM | =QRS.RAY565 |
| 2510 | C | 8/3/2012 12:38:51 PM | CT=BOLO |
| 2924 | RT | 8/3/2012 12:42:19 PM | =QRS.225AKK |
| 2531 | RT | 8/3/2012 12:44:01 PM | HEADING BACK TO FLO TO GET GAS |
| 2531 | RP | 8/3/2012 12:44:16 PM | REASSIGN AS PRIMARY UNIT |
| 2971 | RP | 8/3/2012 12:44:16 PM | REASSIGN AS BACKUP UNIT |
| 2531 | C | 8/3/2012 12:44:16 PM | CT=BOLO    DC=21 /Y |
| 2521 | RT | 8/3/2012 12:45:19 PM | BACK E 126W FRM M 24 |
| 2521 | RP | 8/3/2012 12:45:25 PM | REASSIGN AS PRIMARY UNIT |
| 2531 | RP | 8/3/2012 12:45:25 PM | REASSIGN AS BACKUP UNIT |
| 2521 | C | 8/3/2012 12:45:25 PM | CT=BOLO    DC=21 /Y |
| 2411 | RP | 8/3/2012 12:51:10 PM | REASSIGN AS PRIMARY UNIT |
| 2521 | RP | 8/3/2012 12:51:10 PM | REASSIGN AS BACKUP UNIT |
| 2411 | C | 8/3/2012 12:51:10 PM | CT=BOLO    DC=21 /Y |
| 2971 | C | 8/3/2012 12:57:45 PM | CT=BOLO    DC=21 /Y |
| 2411 | RP | 8/3/2012 12:57:45 PM | REASSIGN AS BACKUP UNIT |
| 2971 | RP | 8/3/2012 12:57:45 PM | REASSIGN AS PRIMARY UNIT |
| 2550 | RP | 8/3/2012 1:06:55 PM | REASSIGN AS PRIMARY UNIT |
| 2971 | RP | 8/3/2012 1:06:55 PM | REASSIGN AS BACKUP UNIT |
| 2550 | C | 8/3/2012 1:06:55 PM | CT=BOLO    DC=21 /Y |
| 2974 | RT | 8/3/2012 1:15:54 PM | ON SIUSLAW RD/ENR TO HWY 38/REEDSPORT |
| 2550 | BU | 8/3/2012 1:28:48 PM | WHITAKER CREEK AREA |
| 2550 | EN | 8/3/2012 1:28:48 PM | WHITAKER CREEK AREA |

| 2974 | LC | 8/3/2012 1:32:15 PM | BACK SIDE HWY 38 TO GARDNER// |
|------|-----|---------------------|-------------------------------|
| 2974 | RT | 8/3/2012 1:33:39 PM | NOW ON RSO FREQ / LOUD & CLEAR |
| 2974 | RU | 8/3/2012 1:34:20 PM | REDIRECT TO CA: 03 |
| 2570 | C | 8/3/2012 1:56:01 PM | CT=BOLO |
| 2974 | RT | 8/3/2012 2:18:35 PM | 1238 TOCH L 70 |
| 2974 | RT | 8/3/2012 2:30:32 PM | 1238 BACK TO 02 |
| 2974 | RU | 8/3/2012 2:30:37 PM | REDIRECT TO CA: 02 |
| 2550 | RP | 8/3/2012 2:37:33 PM | REASSIGN AS BACKUP UNIT |
| 2924 | C | 8/3/2012 2:37:33 PM | CT=BOLO    DC=8  /N |
| 2924 | RP | 8/3/2012 2:37:33 PM | REASSIGN AS PRIMARY UNIT |
| 2974 | RP | 8/3/2012 2:37:41 PM | REASSIGN AS PRIMARY UNIT |
| 2924 | RP | 8/3/2012 2:37:41 PM | REASSIGN AS BACKUP UNIT |
| 2974 | C | 8/3/2012 2:37:41 PM | CT=BOLO    DC=8  /N |
| 2550 | C | 8/3/2012 4:55:00 PM | CT=BOLO |

POI


VOI


CAD Narrative

| Date/Time | Remarks |
|-----------|---------|
| 8/3/2012 10:32:01 AM | CT CT VALID: BOLO |
| 8/3/2012 10:32:50 AM | CT LC VALID: 36 SR / 126 SR ;SIUSLAW BANK |
| 8/3/2012 10:32:51 AM | 10756 HWY 126 / CONFIRMED ARMED ROBBERY WITH MACHINE GUNS UNK DIREC OF |
| 8/3/2012 10:32:51 AM | TRAVEL / WHT HATCH BACK / LOCKED BANK / NON INJ |
| 8/3/2012 10:33:22 AM | GO |
| 8/3/2012 10:33:45 AM | 3 AGO / FULL MASKS |
| 8/3/2012 10:33:55 AM | PAINT BALL STYLE BLK IN COLOR |
| 8/3/2012 10:35:27 AM | COUNTY IS ROUTING SOMEONE E |
| 8/3/2012 10:35:34 AM | BLK BACK PACK |
| 8/3/2012 10:35:43 AM | ONE HAD WHT SHIRT |
| 8/3/2012 10:36:21 AM | COUNTY DOES HAVE 2 UNITS ENR |
| 8/3/2012 10:37:29 AM | THEY WERE 2 MALES |
| 8/3/2012 10:37:33 AM | 2 MALES/1 WHI T SHIRT/AUTO WEAPONS/WHI HATCH BACK |
| 8/3/2012 10:38:08 AM | NO SHOTS FIRED / 3 TELLERS AND 1 CUST IN VEH |
| 8/3/2012 10:38:27 AM | NO OTHER INFO ON SUSPS OR VEH |
| 8/3/2012 10:38:40 AM | THIS IS ALL THE INFO THE DISP HAS |
| 8/3/2012 10:39:25 AM | M  REMS:  TRAVEL / WHT HATCH BACK / LOCKED BANK / NON INJ COUNT |
| 8/3/2012 10:39:25 AM | M+ ->    TRAVEL / WHT HATCH BACK / LOCKED BANK / NON INJ |
| 8/3/2012 10:40:41 AM | SHOULD BE 3 TELLERS AND 1 CUST IN THE BANK NOT IN A VEH |
| 8/3/2012 10:43:32 AM | ,LANE CO DET: STATES MAROON DODG CARAVAN AND GREY DODGE CHARGER WERE U |
| 8/3/2012 10:43:32 AM | SED IN BANK ROB IN CRESWELL ON JUNE 6TH, DIFFERENT BANK BUT SAME PAREN |
| 8/3/2012 10:43:32 AM | T COMPANY, |
| 8/3/2012 10:45:38 AM | LCSO ASSOCIAT VEH / |
| 8/3/2012 10:47:16 AM | ,PRIOR ROBBERY WAS JUNE 6TH, |
| 8/3/2012 10:51:41 AM | ON CH 61 |
| 8/3/2012 10:57:31 AM | ,DOUGLAS CO ADVISED, |
| 8/3/2012 11:01:22 AM | ,AIRED TO CH 21 & CH 23, |

| | |
|---|---|
| 8/3/2012 11:02:49 AM | MULT UNITS COPIED, |
| 8/3/2012 11:04:58 AM | **UPDATE PER/DEB LANE CO SO ** SUSP VEH IN ROBBERY 90ISH MODEL |
| 8/3/2012 11:05:03 AM | FORD FIEST WHI IN COLOR W/BLU INTERIOR |
| 8/3/2012 11:05:10 AM | =QRS.513FAE |
| 8/3/2012 11:16:07 AM | CONTACTED 2924 / COMING ON DUTY / WHITAKER CREEK AREA |
| 8/3/2012 11:17:57 AM | SET UP DOWNTOWN LORAINE//SIUSLAW RIVER RD |
| 8/3/2012 11:31:58 AM | =QRS.QUM834 |
| 8/3/2012 11:39:59 AM | **PER DIANE W/LANE AT 1035A TO 1040A HRS TODAYBANK SUPV OBSERVED |
| OLDER | |
| 8/3/2012 11:40:02 AM | 2D MATCHING SUSP VEH**WHI PC EB ON HWY 36 IN CURVES |
| 8/3/2012 11:40:07 AM | NEAR INDIOLA**UNK FOR SURE IF THIS IS SUSP VEH |
| 8/3/2012 11:56:28 AM | RES LAKE CREEK RD//GRY PATCHED UP FORD PSNG VEH |
| 8/3/2012 11:56:37 AM | DROVE UP THIS RD//WASN T HATCHBACK / |
| 8/3/2012 11:57:33 AM | DAVE CRANSY 541-430-8658 / WEYERHAUSER LUMBER |
| 8/3/2012 11:57:43 AM | SEE IF THEY HAVE ANY CREWS WORKING ON C LINE |
| 8/3/2012 12:04:04 PM | =QRS.UVX857 |
| 8/3/2012 12:24:08 PM | DAVE / WEST END OF C LINE /UNK ANY REASON WHY |
| 8/3/2012 12:24:15 PM | GATES WOULD BE OPEN / |
| 8/3/2012 12:30:13 PM | ON CH 71 |
| 8/3/2012 12:35:43 PM | =QRS.RAY565 |
| 8/3/2012 12:42:19 PM | =QRS.225AKK |
| 8/3/2012 12:44:01 PM | HEADING BACK TO FLO TO GET GAS |
| 8/3/2012 12:45:19 PM | BACK E 126W FRM M 24 |
| 8/3/2012 12:45:25 PM | RP CLEARED DISPO CODE D21 |
| 8/3/2012 12:51:10 PM | RP CLEARED DISPO CODE D21 |
| 8/3/2012 12:57:45 PM | RP CLEARED DISPO CODE D21 |
| 8/3/2012 1:06:55 PM | RP CLEARED DISPO CODE D21 |
| 8/3/2012 1:15:54 PM | ON SIUSLAW RD/ENR TO HWY 38/REEDSPORT |
| 8/3/2012 1:33:39 PM | NOW ON RSO FREQ / LOUD & CLEAR |
| 8/3/2012 2:18:35 PM | 1238 TOCH L 70 |
| 8/3/2012 2:30:32 PM | 1238 BACK TO 02 |
| 8/3/2012 2:37:33 PM | RP CLEARED DISPO CODE D21 |
| 8/3/2012 2:37:41 PM | RP CLEARED DISPO CODE D8 |

Call Information

Call Type: DRIVING COMPLAINT    Priority: 2 10 MINS    Date: 08/03/2012

Location:  FLORENCE @ 101 US MP 187.6-191/    Pref:    Apt:
City: LANE    State:    Zip:
CA:  02   Rpt Dist: 2901 Beat: 29

Call Taken By      : 35888
Call Dispatched By : 13369

Report Required : N

Disposition: 8 UNABLE TO LOCATE/GONE ON ARVL
Disposition Remarks:

Caller Information

Call Source: VIA 9-1-1
Caller: LANE CO SO    Phone:
Address:

Related Incident Numbers

Police:   Sheriff:   Fire:      EMS:

Incident Times

E911:     Received: 11:25:05 Dispatch: 11:26:46 En Route: 12:38:53
Arrive:   Transport:    INCIDENT:   Cleared: 14:45:11

Unit Information

Pri Unit: 2924 Officers: FARRAR,LELAND V

Unit Times

| Unit ID | CMD | Date/Time | Remarks |
|---------|-----|-----------|---------|
| 2924 | D | 8/3/2012 11:26:46 AM | FLORENCE @ 101 US MP 187.6-191/ |
| 2510 | D | 8/3/2012 11:26:46 AM | FLORENCE @ 101 US MP 187.6-191/ |
| 2510 | EN | 8/3/2012 12:38:53 PM | FLORENCE @ 101 US MP 187.6-191/ |
| 2510 | C | 8/3/2012 12:38:54 PM | CT=DRIVING  DC=16  /Y |
| 2924 | RP | 8/3/2012 12:38:54 PM | REASSIGN AS BACKUP UNIT |
| 2510 | RP | 8/3/2012 12:38:54 PM | REASSIGN AS PRIMARY UNIT |
| 2924 | EN | 8/3/2012 2:37:36 PM | FLORENCE @ 101 US MP 187.6-191/ |
| 2924 | RP | 8/3/2012 2:45:11 PM | REASSIGN AS PRIMARY UNIT |
| 2510 | RP | 8/3/2012 2:45:11 PM | REASSIGN AS BACKUP UNIT |
| 2924 | C | 8/3/2012 2:45:11 PM | CT=DRIVING  DC=8  /N |

POI

VOI

CAD Narrative

Date/Time          Remarks
8/3/2012 11:24:10 AM    CT CT VALID: DRIVING
8/3/2012 11:24:58 AM    CT LC VALID: FLORENCE @ 101 US MP 187.6-191/
8/3/2012 11:25:05 AM    ***SIGHTING OF VEH POSS SUSP VEH***SB 5 AGO ON 101 FROM FLO / LT COLOR
8/3/2012 11:25:05 AM    SEDAN POSS HATCHBACK W/BLU INERIOR LIKE A FORD FEASTA / HIGH RATE
OF
8/3/2012 11:25:05 AM    SPEED / PASSING UNSAFE / 2ND HAND INFO
8/3/2012 11:25:40 AM    CO HAS NOTIFYED REEDS PORT PD
8/3/2012 11:26:08 AM    *REEDSPORT PD ADVISED BY LANE SO//THEY ARE SETTING UP *
8/3/2012 2:45:11 PM     RP CLEARED DISPO CODE D16



## INDEPENDENT MEDICAL EXAMINATION

## IDENTIFYING INFORMATION

**Name:**      Justin Michael Wilkens          **Claim Number:**  107130-L151645-01

**Date of Injury:**   August 3, 2012

**Date of Examination:**       June 3, 2015

**Location of Examination:**     Eugene, Oregon

**Examiner:**              Scott Kitchel, M.D., Orthopaedic Surgery

## INTRODUCTION

It was my pleasure to perform an independent medial evaluation on Justin Wilkens today.

The claimant was informed that the examination was for evaluative purposes only, intended to address specific injuries or conditions as outlined by the claims manager, and was not intended as a general medical examination.

The claimant was asked at the time of the examination not to engage in any physical maneuvers beyond what he was able to tolerate or which he believed were beyond his limits or which could cause harm or injury.   The claimant was instructed that the evaluation could be stopped at any time and not to allow the evaluation to continue if it caused pain.

This is an Oregon Department of Justice Trial Division medical exam.

### HISTORY OF PRESENT COMPLAINT:

Mr. Wilkens is a 41-year-old right-hand dominant gentleman who was stopped for a traffic violation on August 3, 2012.   At that time when he came to a stop, the law enforcement vehicle which was following him bumped into him at approximately 3 to 5 miles an hour, knocking his motorcycle over and knocking him to the ground.  He says he landed on the ground relatively smoothly and was able to roll out of that.   He indicates following that he had no left shoulder pain.

2501 SW First Avenue ⁑ Suite 400 ⁑ Portland, OR 97201 ⁑ Phone: 888.822.3866 ⁑ Fax: 503.796.0749

EXHIBIT F, Page 1 of 8

Justin Michael Wilkens
Independent Medical Examination

Claim Number: 107130-L151645-01
Date of Examination: June 3, 2015

When he stood up he says the police officer was pointing a gun at him and asking him to get back on the ground.  He did not immediately understand the commands, but when he started to bend and kneel to get back on the ground he indicates the officer kicked him in the left shoulder.  He says he was in some shock and had no immediate pain.  However, when they started to manipulate his left shoulder to put the handcuffs on he began developing left shoulder pain.

That shoulder pain worsened and he was ultimately transported by ambulance to Sacred Heart RiverBend Medical Center.  At the hospital x-rays were done and they told him that he had a left clavicle fracture.  He was referred for follow-up to Dr. Daniel Sheerin.

He saw Dr. Sheerin, who recommended that he undergo open reduction and internal fixation.  He says this was accomplished about two weeks following the injury.

Following that surgery he did not have physical therapy, but allowed it to heal with time.  He says that he returned to Dr. Sheerin in October 2012 and was told that the fracture had healed and he could be released to full activity.

Through the years he has continued to have some discomfort in the shoulder and grinding.  He sought the advice of Dr. Michael Boespflug, his family doctor, in May 2014.  Dr. Boespflug recommended that he follow up with Dr. Sheerin, but he was unable to do this for financial reasons.

He has not had any further treatment on the left shoulder since his final visit with Dr. Sheerin.

His past history is negative for any previous left shoulder injury, surgery, or treatment.

**CHIEF COMPLAINTS/ CURRENT CONDITION:**

Chief Complaint:  Left shoulder pain and discomfort.

Today, he tells me his only problem is pain and discomfort in the left shoulder.  He describes that as a deep, aching type pain.  He would rate it at a 3 on a scale of 0-10.  He notes that it is made worse with activity and shoulder range of motion.  He does get improvement by resting the shoulder.

He says he also has a general sensation of some foreign bodies within the shoulder.

He says he can no longer sleep on his left side.  He also gets some intermittent left hand numbness with repetitive motion of the left shoulder.

Justin Michael Wilkens
Independent Medical Examination

Claim Number: 107130-L151645-01
Date of Examination: June 3, 2015

He has not had any true left arm radicular pain.  He has not had any weakness in the left arm.

**CURRENT WORK STATUS:**

Occupational History:  Mr. Wilkens works as a laborer.  He is not currently working, but says that it is not related to his left shoulder.

**PAST MEDICAL HISTORY:**

| | |
|---|---|
| **Conditions:** | Hypertension. |
| **Operations:** | 1) 1989 left knee surgery.  2) 2008 left foot surgery.  3) 2012 left clavicle surgery. |
| **Allergies:** | None. |
| **Current Medications:** | Lisinopril. |
| **Substance Use:** | He does not take other recreational drugs. |
|    • **Tobacco:** | Mr. Wilkens does not smoke. |
|    • **Alcohol:** | He occasionally drinks alcohol. |

**SOCIOECONOMIC HISTORY:**

| | |
|---|---|
| **Marital Status:** | Mr. Wilkens is single, with no children. |
| **Education:** | Mr. Wilkens has graduated from high school and attended some college. |
| **Military Service:** | Mr. Wilkens has never been in the military. |
| **Hobbies:** | 1) Dogs.  2) Spending time with animals. |

**RECORD REVIEW**

The first medical record available for my review is a September 17, 2008 emergency department note regarding Mr. Wilkens.  It is for evaluation of an injury following a motorcycle accident.  The complaints are of a chin laceration and left ankle pain.  X-rays are done, which show a left foot fracture.  The impression is one of left midfoot fracture

Justin Michael Wilkens                                    Claim Number: 107130-L151645-01
Independent Medical Examination                         Date of Examination: June 3, 2015

involving the navicular with chin laceration, left knee injury, and chest wall contusion. The patient is placed in a splint and have follow-up with the orthopedic service.

On September 17, 2008, two-view x-rays of the left knee are done.  They show evidence of a moderate joint effusion.

On that same date a CT scan is done of the left foot, which shows a comminuted fracture of the tarsal navicular with osteo-compression osteochondral impaction injury.

On that same date, x-rays are done of the left ankle, which were interpreted as being negative.

On September 23, 2008, Mr. Wilkens undergoes open reduction and internal fixation of the left tarsal navicular by Dr. Sheerin. This is accomplished without complication.

The Driver and Motor Vehicle Services report of Justin Wilkens, dated November 17, 2014 is directly reviewed in its entirety.

The Oregon State Police incident report, dated August 16, 2012, regarding Justin Wilkens is reviewed.  In it, it indicates that Mr. Wilkens' motorcycle was bumped from behind by the police vehicle.  The motorcycle fell onto its left side.  Mr. Wilkens landed on the ground in front of the patrol vehicle and quickly got to his feet and faced the patrol car.  The officer indicates he advanced toward Mr. Wilkens and shouted at him to get on the ground.  He indicates he took two steps forward, and using the sole of the boot delivered a kick to his body and again shouted at him to get on the ground.

August 3, 2012, Lane County Circuit Court affidavit of probable cause is reviewed.

The continuation report from the Lane County Sheriff's office is reviewed.

On August 3, 2012, Mr. Wilkens is transported by Eugene Fire & EMS to Sacred Heart RiverBend Hospital.  At RiverBend Hospital he was seen in the emergency department for complaints of left shoulder pain.  X-rays are done of the left shoulder, which show a left clavicle fracture with 2.9 centimeters of displacement.  There is also a possible second rib fracture.

On August 8, 2012, Mr. Wilkens was seen at the Slocum Orthopedic Center by Dr. Daniel Sheerin.  His assessment is one of a displaced mid shaft clavicle fracture with shortening.  He recommends open reduction and internal fixation.

On August 14, 2012, Mr. Wilkens undergoes open reduction and internal fixation of the left clavicle fracture by Dr. Sheerin. This is accomplished without complication.

Justin Michael Wilkens                                  Claim Number: 107130-L151645-01
Independent Medical Examination                         Date of Examination: June 3, 2015

On August 15, 2012, telephone messaging for refill of medications is completed.

On August 22, 2012, Mr. Wilkens was seen in follow-up by Dr. Sheerin.  He was having some wound drainage, but otherwise doing well.  X-rays show good alignment of the internal fixation.

X-ray films of August 22, 2014 are directly reviewed.

On October 3, 2012, Mr. Wilkens was seen in follow-up by Dr. Sheerin.  He seems to be improving.  X-rays are done, which show good alignment.  Dr. Sheerin's impression is one of a healed clavicle fracture.

On May 7, 2014, Mr. Wilkens was seen in follow-up by Dr. Michael Boespflug.  This was for complaints of left shoulder pain.  He is noted to be status post open reduction and internal fixation of the fracture.   He recommends that Mr. Wilkens follow up with Dr. Sheerin.

The United States District Court for the District of Oregon, Eugene Division complaint of Justin Michael Wilkens versus Robert Wayne Edwards, in his individual capacity; The State of Oregon, dated June 5, 2014, is reviewed.

The United States District Court for the District of Oregon, Defendants' Answers and Defenses, dated August 5, 2014 is reviewed.

The United States District Court for the District of Oregon, Plaintiff's Response to Defendants' First Set of Interrogatories to Plaintiff, dated December 22, 2014, is also reviewed.

On April 20, 2015, Heather VanMeter authors a letter to Lauren C. Regan from Justice Law Group listing potential subpoenas in this case.

Medical records related to surgical care at Sacred Heart Medical Center, dated September 17, 2008 for foot surgery are reviewed in their entirety.

Medical records related to open reduction and internal fixation of clavicle fracture, dated August 14, 2012 from Sacred Heart Medical Center are also reviewed in their entirety.

Billing records are reviewed from Sacred Heart Medical Center and Slocum Orthopedic Center.

The deposition of Justin Michael Wilkens is also reviewed in its entirety.

Justin Michael Wilkens
Independent Medical Examination

Claim Number: 107130-L151645-01
Date of Examination: June 3, 2015

## PHYSICAL EXAMINATION

The claimant is right-hand dominant.

Age:            41 years, stated
Height:         6 feet
Weight:         214 pounds

In general, Mr. Wilkens is noted to be a pleasant gentleman who appears his stated age.

Mr. Wilkens arises easily from a chair. He stands erect. His gait pattern is normal. He is able to heel and toe walk.

Physical examination of the left shoulder reveals the skin to be intact. There is a normal shoulder contour. There is no swelling noted. There is a well-healed anterior incision over the clavicle. There is no point tenderness to palpation.

Bilateral shoulder range of motion testing reveals:

| SHOULDER MOTION | RIGHT | LEFT |
| --- | --- | --- |
| FLEXION | 180 degrees | 180 degrees |
| ABDUCTION | 180 degrees | 180 degrees |
| INTERNAL ROTATION | 60 degrees | 60 degrees |
| EXTERNAL ROTATION | 70 degrees | 70 degrees |
| ADDUCTION | 30 degrees | 30 degrees |
| EXTENSION | 45 degrees | 45 degrees |

Motor strength in both upper extremities is 5/5 throughout.

There are no subjective sensory deficits to light touch testing.

There is no atrophy or fasciculations.

The impingement sign is negative. The impingement reinforcement sign is negative. The apprehension sign is negative.

Justin Michael Wilkens                                     Claim Number: 107130-L151645-01
Independent Medical Examination                            Date of Examination: June 3, 2015

There are 2+ and symmetric biceps, triceps, and brachioradialis reflexes.

There are 2+ radial pulses with normal capillary refill.

## DIAGNOSTIC STUDIES

No imaging studies are available for my review.

## DIAGNOSIS AND RELATIONSHIP:

Left clavicle fracture, status post August 14, 2012 open reduction and internal fixation.

## DISCUSSION

I have been able to re-review the video clip which you provided me. Based upon multiple reviews of that video clip, it appears that the injury he had when the bike fell and he landed on the point of his left shoulder is more consistent with the mechanism of a left clavicle fracture than the injury when he was kicked by the officer.

## ANSWERS TO SPECIFIC QUESTIONS FROM THE COVER LETTER

1. *Can you say with any degree of medical probability, what is the etiology of his left clavicle fracture?*

   Based upon my review of the medical records, his physical examination, his history, and the review of the video of the episode, within a degree of medical probability, it is the fall from the motorcycle, landing on the point of his left shoulder, which caused his left clavicle fracture.

Ronald Teed, M.D.
Orthopedic Surgeon

Dictated by: Scott Kitchel, M.D., Orthopaedic Surgery

Justin Michael Wilkens
Independent Medical Examination

Claim Number:  107130-L151645-01
Date of Examination:  June 3, 2015

tx:     etran/rk/am
d:      June 3, 2015
t:      June 4, 2015
dos:    June 3, 2015

If you have any questions, please contact Joni in our Quality Assurance Department 503-290-1501.

**End of Report – Electronic Signature Applied**

EXHIBIT F, Page 8 of 8



| | CHAPTER: 502.7 |
|---|---|
| **Department of State Police** | SUBJECT: HALTING VEHICLES - HIGH-RISK STOP |
| | REVISED: March 8, 1994 |
| | SUPERCEDES: March 15, 1989 |
| | PAGES: 3 |

## POLICY

The inherent risk in effecting a stop is increased when there is a known element of danger to the officer or the public because of the vehicle's occupant(s). In these situations, the officer(s) must exercise additional caution to minimize the potential negative outcomes of such a contact. The guidelines in the chapter may assist in conducting such a stop.

## RELATED LAWS/REFERENCES

Department Manual Chapter 502.7

## RULE

1.  Whenever there is advanced knowledge, or a good reason to suspect that the vehicle which is to be stopped is stolen or contains a fugitive, felon, or other dangerous person, the officer shall immediately inform Regional Dispatch, giving the officer's location, direction of travel, speed, description of the suspect vehicle, including vehicle license, and number of occupants.

2.  Should an officer have to leave the vicinity of the patrol vehicle, it should be secured by locking the doors.

3.  Handcuffs should be applied in all custody arrests, unless circumstances and good judgment dictate otherwise.

4.  Suspects should not be searched until handcuffs are applied, unless the situation will not allow a search prior to application of handcuffs.

5.  Prisoners must be searched before they are transported beyond the point of arrest.

6.  If patrol vehicles are equipped with cages, the cage window will be locked any time a prisoner is placed in the rear seat.

## PROCEDURE

1.  When effecting a high-risk stop, the suspect vehicle should be followed until other officers can assist. The vehicle can then be stopped in a pre-determined area where there will be less chance for the suspect(s) to flee. Maximum protection is then be provided to the officer and the public in the event of gunfire, foot pursuit, or other potential hazards.

2.  In most cases a single officer should not intentionally effect a high-risk stop, although circumstances may dictate that an approach to the suspect(s) be made by an officer not utilizing an assisting officer. An officer should also remain cognizant of the possibility that the suspect(s) may initiate the stop at any time.

3.  An officer will usually have an advantage if the patrol unit is parked 35 to 40 feet from the suspect vehicle, and the officer immediately opens the door and assumes a cover position. The officer should clear the weapon he/she feels necessary and be alert in preventing occupants of the halted vehicle from separating. Vehicle occupants should be ordered to exit the vehicle in a firm, commanding voice and a positive manner, leaving no room for doubt that the officer is in absolute control and intends to see that his/her orders are implicitly and promptly obeyed.

4.  One suggested method of removing felons or dangerous persons from a vehicle is to order all occupants to place their hands on top of their head, interlacing their fingers with palms up, and remain in that position until instructed further. The officer must not rush, and must be certain each command is followed exactly before another command is given.

    A.  Starting with the driver, the occupants should be removed from the vehicle one at a time, and from only one side. The driver should be instructed to take the ignition keys out and slowly step from the vehicle. His/her back should remain toward the officer, and he/she should be ordered to back slowly toward the rear of the vehicle with hands remaining on the head, and to kneel down with ankles crossed, and to remain in that position.

    B.  All other passengers should be removed in the same manner. Sufficient interval between the suspects should be maintained to minimize any attempts at conversation, eye contact, and gestures, and they should be positioned in clear view of the officer.

    C.  The officer should confine his/her remarks to positive, firm orders. Prior to an approach to the suspects, an order commanding any additional occupant(s) to exit the vehicle may help to ensure there is not an unseen or hidden persons in the vehicle.

    D.  After all occupants are out of the vehicle and positioned, the officer can begin the approach to the suspects.

5.  Officers responding to assist another officer who is effecting a high- risk stop should upon arrival notify Regional Dispatch of the status at the scene. The assisting officer will follow directions of the primary officer and will generally be positioned on the right side of the patrol unit being used by the primary officer. The assisting officer will maintain surveillance of the suspect(s) from a cover position until all prisoners are secured. The assisting officer will continue to give proper armed surveillance on the halted vehicle until such time that the primary officer has secured the vehicle.

6.  Officers operating specialty patrol vehicles without cages, such as the Mustang, should not transport unruly prisoners where injury may be inflicted to the officer, or damage caused to the patrol vehicle interior. If the need dictates, a patrol car with a cage should

be summoned.

A. If it is necessary to transport a prisoner in the specialty patrol vehicle after handcuffing, the lap seat belt should be looped at least once around the chain between the cuffs. The buckle should then be drawn to the rear and fastened to the snap ring on the roll bar brace. The lap/shoulder harness can then be placed around the prisoner to provide additional security.

B. Specialty patrol vehicles have been equipped with a five foot length of rope intended for securing the prisoner's legs and feet. The loop should be placed around the prisoner's legs below the knees, and the loose end passed to the right of the passenger seat between the seat and the door sill. The rope should then be tied to the roll bar utilizing any type of quick release knot.