




Ex. 1

Justin Wilkens

72

1      Q.    That's where he kicked you?

2      A.    Correct.  Sorry.  I'm not -- I don't

3  do these things every day.  It's all a little

4  green.

5      Q.    Have you had your deposition taken

6  before?

7      A.    Never.

8      Q.    Have you ever sued anyone before?

9      A.    I sued a landlord once to get my

10  deposit back.

11      Q.    When was that?

12      A.    And it didn't go to -- it didn't go

13  very far.

14      Q.    When was that?

15      A.    That was probably in the -- '97, '98.

16  Maybe.  It's a long time ago.

17      Q.    Where?

18      A.    In Eugene.  It was out in Veneta.  It

19  was where the -- where the house was on Cougar

20  Lane, which is off Crow Road.

21      Q.    Did you have an attorney?

22      A.    Yes.

23      Q.    Who?

24      A.    Lauren.

25      Q.    How long have you known Ms. Regan?

Ex. 6

Justin Wilkens

130

1    to live with that the rest of my life.

2         Q.    Did you trust police officers before?

3         A.    Sure.  We were all raised to trust

4    police officers.

5         Q.    And what caused you -- causes you to

6    be in constant fear of police officers?

7         A.    Well, when I found out that I was

8    getting pulled over, I pulled over, and I got ran

9    into by a police officer and then assaulted.  A

10   police officer lost control of his vehicle and ran

11   into me.  He nearly took my leg off.

12        Q.    Did you have any injury to your leg?

13        A.    No.

14        Q.    So how is it that the officer nearly

15   took your leg off?

16        A.    Because he lost control of his vehicle

17   and hit my motorcycle at about -- I don't know --

18   on a dial clock, twelve o'clock facing forward, he

19   hit me at about 7:30.  And when you have your foot

20   on a peg on a motorcycle that's at about 8:30.  So

21   if he -- he was pretty close to possibly hitting

22   my leg.

23        Q.    He never hit your leg.  Correct?

24        A.    I said -- no.  He never hit my leg.

25   He didn't know what he was going to hit because he

Justin Wilkens

132

```
 1    failed to manage his vehicle in a correct way.

 2         Q.    Do you think he lost his vehicle on

 3    accident or intentionally?

 4         A.    Intentionally.

 5         Q.    Okay.  But a minute ago you just said

 6    you thought it was an accident.

 7         A.    The accident could have been prevented

 8    if he was using his sirens through the full course

 9    of him trying to pull me over for speeding.

10         Q.    How?

11         A.    In one instance, I was going about

12    40 miles an hour, not accelerating, with my helmet

13    on, and he didn't have his sirens on.  It was a

14    perfectly wonderful time for me to hear his

15    sirens.  Just like I did when I was approaching

16    the stoplight, because my motorcycle was not -- I

17    was not -- I didn't have any gas going into the

18    throttle-bodies.

19         Q.    When --

20         A.    So it wasn't running -- it wasn't as

21    loud.  The motorcycle is loud.  If he would have

22    been doing his job correctly I believe that I

23    would have heard his sirens when I wasn't

24    accelerating and this whole situation wouldn't

25    have happened.
```

Ex. 6

Justin Wilkens

133

```
1        Q.    At what point in the pursuit, the
2   high-speed chase, was it that you're saying he
3   should have had his siren on?
4        A.    Right from the get-go.
5        Q.    And you think that if he had his siren
6   on at the beginning --
7        A.    I would have heard it when I slowed
8   down for that car, for the infamous Honda.
9        Q.    Why do you say "infamous Honda"?
10       A.    Well, because that's the car that I
11  thought was behind me the whole time.
12       Q.    Why didn't you notice that that wasn't
13  the car that was behind you?
14       A.    Why didn't I notice that?  Because I
15  was riding on a motorcycle.  You can't turn around
16  100 percent behind you when you're riding a
17  motorcycle.  For one, you don't want to do that
18  because you take your eyes off the road.  The
19  mirror on the motorcycle vibrates.  His car was an
20  undercover car with low-profile lights.
21       Q.    You agree his lights were on?
22       A.    I did not see his lights on until I
23  approached the stoplight, and that's after hearing
24  his siren.  And my motorcycle wasn't vibrating as
25  much and I could see clear through my mirror.  I
```

Ex. 6

Justin Wilkens

134

```
1    had one mirror on my motorcycle.  It was that big.
2    About.
3         Q.    When you say "that big," can you
4    provide an estimate for the court reporter,
5    please?
6         A.    I would say about 2-and-a-half to
7    3 inches diameter.  On my left bar.  Left side of
8    my handlebars.
9         Q.    Is there a right-side mirror?
10        A.    No.  You don't have to have one in
11   Oregon.  You have to have one mirror.
12        Q.    Do you think it would be safer if you
13   had a mirror on the right side?
14        A.    No.  When I drive my motorcycle, I
15   drive defensively and offensively.  I try to keep
16   all traffic away from me as much as possible to
17   alleviate an accident.
18        Q.    Does that include swerving around cars
19   when there's a double yellow line?
20        A.    When they're leaving me to go -- to
21   pass them, yeah.  That's the car I slowed down
22   for, the infamous Honda.
23        Q.    The one you passed when there was a
24   double yellow line?
25        A.    The occupants were waving me forward
```

Ex. 6

Justin Wilkens

135

1    inside the car.

2        Q.    Did you --

3        A.    I thought they had car problems

4    because they were going so slow.  Obviously, they

5    maybe saw the police officer's lights, but there

6    was no siren.

7        Q.    What was your rate of speed at the

8    time you passed the Honda with the double yellow

9    lines?

10       A.    Forty, 45.

11       Q.    What was your rate of speed through

12   the duration of the pursuit that Captain Edwards

13   was behind you?

14       A.    I'm not really sure.

15       Q.    Would you agree that at some point you

16   were going over 100 miles per hour?

17       A.    I'm not sure.  I never looked at my

18   speedometer.

19       Q.    Do you think it's important to know

20   whether you're going the speed limit or over the

21   speed limit?

22       A.    Yes.  But I choose not to take my eyes

23   off the road because of gravel, animals, people,

24   talking on cellphones, someone getting their mail.

25       Q.    How long have you been riding

Ex. 6

Justin Wilkens

137

1    guesstimating on the 40.

2         Q.    Do you have any idea what rate of

3    speed you were going during the time that

4    Captain Edwards was behind you?

5         A.    I have no idea.  I knew there was a

6    car behind me, and, like I said, I try to keep all

7    cars at a distance from me, because of -- I'm

8    trying to alleviate an accident.

9         Q.    Why didn't you notice that it was a

10   police vehicle behind you?

11        A.    Because my mirror was vibrating.

12        Q.    Do you think it's important to know

13   whether emergency vehicles, like police vehicles,

14   are behind you on a motorcycle?

15        A.    Absolutely.

16        Q.    Do you think that's an obligation that

17   a motorcycle rider has?

18        A.    I think it's an obligation of a police

19   officer to use a siren so that whoever he's trying

20   to pull over can hear him.

21        Q.    Do you think that a motorcycle rider

22   has an obligation to make sure that they can tell

23   when emergency vehicles like police officers are

24   behind them?

25        A.    Yeah.

Ex. 6

Justin Wilkens

139

1        A.    Sport touring maybe.  I don't know.

2              (Reporter inquiry.)

3              THE WITNESS:  Aprilia,

4    A-P-R-I-L-I-A.

5    BY MS. VAN METER:

6        Q.    What's the top speed of this

7    motorcycle?

8        A.    I think in the manual it says it will

9    do about 170.

10       Q.    What's the fastest you ever drove the

11   Aprilia on the road?  Excuse me.

12       A.    On -- on a public road?

13       Q.    Anywhere.

14       A.    I've had it well over 100 miles an

15   hour at Portland International Raceway.

16       Q.    How often would you go to Portland

17   International Raceway?

18       A.    That's where I learned how to ride a

19   motorcycle.  Like by a professional.  I've been

20   there a few times.

21       Q.    When was the last time you went to

22   Portland International Raceway?

23       A.    Seven years ago, eight years ago.  I

24   don't know.

25       Q.    And you took the Aprilia motorcycle

Ex. 6

Justin Wilkens

1    there?

2        A.    Uh-huh.

3        Q.    Yes?

4        A.    Uh-huh.

5        Q.    You need to answer out loud.

6        A.    Yes.

7        Q.    And when you took the Aprilia to

8    Portland International Raceway, what was the speed

9    that you got it up to?

10        A.    I don't know.  I didn't look at my

11    speedometer.  That's one of the things they teach

12    you.  It's like why you're not allowed to use a

13    cell phone on the road or text, because you take

14    your eyes off the road.

15        Q.    What's your best estimate of the top

16    speed that you reached at Portland International

17    Raceway on your Aprilia?

18        A.    I don't know.

19        Q.    Is it over 100?

20        A.    I would guess over 100.

21        Q.    Is that your best estimate is over

22    100?

23        A.    That's a guess.  Yeah.

24        Q.    Is that your best estimate?

25        A.    That's my best guess, yes.

Ex. 6

Justin Wilkens

142

1       Q.      Do you exceed the speed limit in order
2    to do that?
3       A.      Sometimes if I have to, yes.
4       Q.      Do you know whether you exceeded the
5    speed limit on August 3rd, 2012?
6       A.      I don't know.
7       Q.      Do you have any estimate of the rate
8    of speed you were going on August 3rd, 2012?
9       A.      No.  I was asked that multiple times
10   after the accident.
11      Q.      Do you think it's important as a
12   motorcycle rider to know whether you're going over
13   or under the speed limit?
14      A.      I usually just flow with traffic and
15   stay away from people.
16      Q.      You were passing vehicles on
17   Crow Road.  Correct?
18      A.      I passed, yes.
19      Q.      So that's not going with vehicles.
20   That's passing them.  Correct?
21      A.      Passing vehicles so I could go through
22   the corners at a higher rate of speed than
23   everybody else does or would normally in a car.
24   You can go faster on a motorcycle in corners.
25      Q.      Why would you want to do that?

Ex. 6

Justin Wilkens

143

1        A.     Because I was going the speed limit.

2   Certain cars can't go 55 around a corner and a

3   motorcycle can.

4        Q.     How do you know you were going the

5   speed limit?

6        A.     I don't.

7        Q.     You just said you were going the speed

8   limit around the corners.

9        A.     I was giving you an example.

10        Q.     How many vehicles did you pass before

11   you reached Highway 126?

12        A.     I passed the undercover Camaro, solid

13   blacked out with black tinted -- illegally tinted

14   windows, and I passed another car in front of

15   that.  And then I passed the infamous Honda after

16   they were waving me to pass them.  Because they

17   were going far below the posted speed limit, I

18   assumed that something was either wrong with their

19   vehicle or they wanted to follow me.

20        Q.     You think the -- Captain Edwards's car

21   had illegally tinted windows?

22        A.     Yeah.

23        Q.     Why do you say that?

24        A.     Because you can't see through them.

25   Usually on a motorcycle, if you're following

Ex. 6

Justin Wilkens

144

1    somebody, you can see their mirror and see if the

2    person in the car is smoking a cigarette, talking

3    on a phone, playing with their radio.  I was

4    never -- I was once behind Officer Edwards and I

5    passed him and I couldn't see in.

6        Q.    After you passed Captain Edwards --

7        A.    It was a beautiful day too.  There was

8    no reason why I shouldn't have been able to see

9    him.

10       Q.    You think your not being able to see

11   him had anything to do with the accident?

12       A.    It had something to do with him making

13   it known that he's a police officer.

14       Q.    You think --

15       A.    I've never seen a Camaro cop car in my

16   life.

17       Q.    You think it's Captain Edwards's fault

18   that you didn't see that he was a police officer?

19       A.    I think it's Oregon State Police's

20   fault for putting a car like that out to protect

21   people and do their job.  He was in a low-profile

22   Camaro with very little lights alerting people

23   that he's trying to pull them over.

24       Q.    If you were obeying the law, why would

25   you be worried about whether you would see police

Ex. 6

Justin Wilkens

1    officers or not?

2        A.    Can you say that again?

3        Q.    If you were obeying the law, why would

4    you be concerned whether you could see into

5    Captain Edwards's vehicle or not?

6        A.    Because I'm looking out for my safety,

7    as I stated before.  Someone could be on the

8    phone, smoking a cigarette, playing with their

9    radio, kissing their girlfriend, adjusting their

10   pants, putting their seatbelt on.  The list goes

11   on and on.

12             When you ride a motorcycle, you have

13   to be completely aware of everything, birds

14   flying, gravel on the road, someone checking their

15   mail.  I've almost ran into coyotes, geese,

16   turkeys, a bear.

17             You take your eyes off the road for

18   one minute and it could kill you.  That's

19   something they trained us in motorcycle training.

20   When you go through Pacific Super Sport Rider

21   classes, you go through three channels of people

22   or of professionalism, you know, like an A, B, and

23   C.  And you graduate to the next one as to how

24   safe you can be or how safe a driver you are.

25             And that is the first thing that they

Ex. 6

Justin Wilkens

146

1    tell you in your first course is to not take your

2    eyes off the road.  So that's how I ride a

3    motorcycle.  I drive defensively.

4         Q.    Where did you get your motorcycle

5    training through?

6         A.    There's a few variety of courses,

7    Portland's -- or Pacific Super Sport Riders.

8    Another one is MotoFit group.

9         Q.    When did you do that training?

10        A.    Like I said, at Portland International

11   Raceway.  That was around eight years ago.  I

12   don't know.

13        Q.    You did it through Pacific Super Sport

14   Riders?

15        A.    Yep.  Well, that was one of them.  You

16   just show up and you get -- you start off on the

17   first group and you're only allowed to go certain

18   speeds, and you're only allowed to pass on certain

19   points.  And the further you progress, the more

20   limitations are taking -- or taken off so you can

21   pass.

22             And, you know, you get in the best

23   group with the guys that have proven their

24   professionalism and then you can graduate into

25   that class.

Ex. 6

Justin Wilkens

147

```
 1          Q.    How long is the class that you took?

 2          A.    Each one usually goes a day to two

 3     days, you know.  You go for the whole day.  Some

 4     guys will be stuck in the C group for weeks

 5     because they just don't figure it out.  Some guys

 6     are going there just to learn how to handle their

 7     motorcycles better.

 8          Q.    How many days of instruction or

 9     training did you have on using your motorcycle?

10          A.    I can't remember.

11          Q.    What's your best estimate of the

12     number of days that you had?

13          A.    I can't remember.

14          Q.    Is it like more than one day?

15          A.    Yeah.

16          Q.    Is it more than two days?

17          A.    Yeah.

18          Q.    Is it more than five days?

19          A.    I don't know.  I can't remember.  That

20     was a long time ago.

21          Q.    It's your best estimate that you had

22     training for riding your motorcycle sometime --

23     some -- somewhere between two and five days total?

24          A.    More than that.  I'm guessing.  I just

25     don't remember.  It was a long time ago.  It was
```

Ex. 6

Justin Wilkens

1    three classes per riding school.

2        Q.    And the riding schools are A, B, and

3    C?

4        A.    Well, yeah.  You don't want to put --

5    there's guys out there that know what they're

6    doing with the guys that don't know what they're

7    doing you can cause an accident, because the guys

8    are going slower than the fast guys.

9        Q.    Did you start off in the C group?

10       A.    Everybody does.

11       Q.    And then you did the number of days,

12   however many you did, and graduated to the

13   B group?

14       A.    The instructors make that decision.

15   Like I said, some guys will stay there for weeks,

16   because the instructors don't feel like they're

17   good enough to move on.

18       Q.    Did you graduate into the B group?

19       A.    I graduated into the top group, the --

20              (Reporter inquiry.)

21              THE WITNESS:  The most mature group,

22   I guess you could say.  Had complete control of

23   their motorcycles, because the instructors do not

24   allow guys -- amateurs to go out there with the

25   fast guys because they can cause an accident.

Ex. 6

Justin Wilkens

149

1    It's the safest place you can learn how to ride a

2    motorcycle.  There's flaggers on all corners.

3    There's paramedics on-site.  If anyone even drops

4    a bolt off their motorcycle they flag the track so

5    that no one hits the bolt and gets in an accident.

6    BY MS. VAN METER:

7        Q.    In your days of instruction in riding

8    your motorcycle, did they teach you that it's

9    important to follow the posted speed limit?

10       A.    My instruction was for on a track

11   where there aren't any posted speed limits.  They

12   only tell you when and when -- when you can pass

13   and when you can't.

14       Q.    Did you have a motorcycle endorsement

15   on your driver's license?

16       A.    Absolutely.

17       Q.    And did you take a course in order to

18   get that?

19       A.    Absolutely.

20       Q.    And did you pass that course?

21       A.    Well, I took the DMV class.  I never

22   went to the class they offer at Lane.  I went to

23   the classes with -- through Pacific Super Sport

24   Riders and MotoFit.

25       Q.    What class did you take to get your

Ex. 6

Justin Wilkens

151

1          A.      Everybody does.

2          Q.      Is that a yes or a no?

3          A.      Yeah.

4                  MS. REGAN:  You've got to listen to

5      her question and answer just her question.  She

6      was asking you at that motorcycle class whether

7      that was part of the instruction.  So don't answer

8      in generals.  Answer to her specific question.

9          A.      I'm just getting confused on like the

10     DMV versus my other motorcycle classes, I guess

11     I've taken, that aren't -- it wasn't a class.  It

12     was like proving to the instructor or whatever

13     that you have control of your vehicle.  Did that

14     help -- does that -- I mean, I guess I'm guessing

15     confused.

16                 MS. VAN METER:  I'll ask another

17     question.

18                 THE WITNESS:  I'm getting confused

19     on what -- if you're asking about the DMV or if

20     you're asking about my instruction -- my

21     instructors at the private tracks or whatever.  I

22     mean --

23     BY MS. VAN METER:

24         Q.      When was the first time you noticed

25     that there was a police car behind you?

Ex. 6

Justin Wilkens

152

```
 1          A.    When I was decelerating and
 2    approaching the stoplight.
 3          Q.    Which stoplight?
 4          A.    Highway 126 and Crow Road.
 5          Q.    Why did it take you so long to notice
 6    there was a police car behind you?
 7          A.    Well, because during the first part of
 8    him being behind me, he didn't have his siren on,
 9    and the second part I have -- my motorcycle's
10    loud.  And my mirror vibrates.
11               Can you answer -- can you ask that
12    question once more, please.
13                    MS. VAN METER:  Can you read it
14    back?
15                    (The question was read back
16                    as follows:)
17                    "QUESTION:  Why did it take you
18            so long to notice there was a police car
19            behind you?"
20          A.    It took a long time because I didn't
21    see a police officer behind me.  I didn't see him,
22    hear him, anything, until I was approaching the
23    stoplight.
24               I did not see any lights.  I did not
25    hear any sirens.  I wish I would have.  I wish he
```

Ex. 6

Justin Wilkens

153

1 would have had his sirens on when I slowed down

2 for this Honda, because this whole situation would

3 have -- we would not be in this situation.

4     When I noticed he was trying to pull

5 me over, I pulled over.  The safest possible spot

6 I could.  I used my turn signal, came to a stop.

7 I put both feet on the ground.  I don't know what

8 else you're supposed to do when you realize you're

9 getting pulled over.  That's what the law told me

10 to do and that's what I did.

11     I was expecting a speeding ticket, not

12 to be run into and kicked.

13 BY MS. VAN METER:

14   Q. Do you think you have any

15 responsibility for the reason that you were pulled

16 over?

17   A. I think the officer didn't do his

18 responsibility of trying to prove to the person he

19 was trying to pull over that he wasn't doing his

20 job.

21   Q. Were you doing your job as a

22 motorcycle rider?

23   A. I pulled over when I noticed he was

24 trying to pull me over.  I was doing my job the

25 way that everybody else does.

Ex. 6

Justin Wilkens

154

1      Q.    Do you believe you did anything to

2   cause you to be pulled over?

3      A.    I passed one car in a spot where I was

4   on that corner, when I approached that corner,

5   coming up on the Camaro.  I've driven that road

6   for many, many, many, many years.  I know that

7   road very well.  I know where the log trucks go

8   slow.  I know where the bikers bike four deep --

9   four wide in the middle of the road.

10          Approaching that corner, you can see

11   almost a mile down the road.  So when I passed the

12   Camaro, I already knew that car that I was coming

13   up on, there was plenty of room and it was safe to

14   pass them, because I could see.  I wasn't -- I

15   wasn't putting anyone in danger.

16          And that's why I slowed down for the

17   Honda in the S-turns, because that was the spot

18   where people -- if you're passing them in there,

19   you're taking unneeded chances.  You're putting

20   people at risk.  And that's why I slowed down.

21      Q.    The vehicles that you passed on

22   August 3rd, 2012, on Crow Road, was it all in

23   places where it was legal to pass?

24      A.    One car I passed.  The second car I

25   passed on a yellow line, even though I knew there

Ex. 6

Justin Wilkens

160

1       A.      Yes.  I've been trying to do that the

2    whole time.

3       Q.      Going back to where we were, do you

4    agree that one of the passes that you made of a

5    vehicle was illegal on August 3rd, 2012?

6       A.      Yes.

7       Q.      Did you do anything else that was

8    illegal?

9       A.      The car that I passed, it was a yellow

10   line, but the occupants were waving me forward.

11   So I'm not sure what I was supposed to do.

12   Anybody else, if there's not a car coming in the

13   oncoming lane, they would pass them as well.

14      Q.      My question was did you do anything

15   else illegal on August 3rd, 2012?

16      A.      I feel like I didn't.

17      Q.      Is that a yes or a no?

18      A.      I feel like I was doing what I was

19   supposed to be doing.  I pulled over when I was

20   alerted to pull over.  I passed the car on a

21   double yellow.  That was -- that was -- I wasn't

22   supposed to do that under the terms of the law.

23      Q.      What were you wearing?

24      A.      A safety jacket and gloves and helmet.

25      Q.      And your gloves attached with Velcro?

Ex. 6

1    guess I'm confused by "couldn't understand who I

2    was when I passed."  Like I was just a person on a

3    motorcycle.  Doesn't matter if I'm black, white,

4    green, or purple, neither male or female.

5          Q.    Do you know why Captain Edwards was

6    patrolling in the area prior to pulling you over?

7          A.    No.  On the paper it said he was

8    looking for a bank robber, and there's no banks

9    around there.

10         Q.    At the time Captain Edwards pulled you

11   over was there any way for him to know whether you

12   were armed or not --

13         A.    No.

14         Q.    -- at the time?

15         A.    He couldn't even get my license plate

16   number.

17         Q.    Why is that?

18         A.    I don't know.

19         Q.    Did you have a license on your

20   motorcycle?

21         A.    Of course.

22         Q.    What size is the license plate on your

23   motorcycle?

24         A.    It's the same size everyone gets on

25   their motorcycle.  I don't know the exact

Justin Wilkens

```
1          A.    I think he didn't take into
2   consideration that my motorcycle's loud and that I
3   didn't see him.
4          Q.    What do you think you did wrong on
5   August 3rd, 2012?
6          A.    I passed somebody on the solid yellow
7   line.
8          Q.    Is that all?
9               MS. REGAN:  Is that all Edwards did
10   wrong she's asking.
11              MS. VAN METER:  No.  I'm asking if
12   that's all he did wrong.
13         A.    Well, I mean, yeah.  I passed --
14   that's what instigated him, I believe, to follow
15   me, because I passed that car on a solid yellow
16   line.
17   BY MS. VAN METER:
18         Q.    My question is, is that all you did
19   wrong on August 3rd, 2012?
20         A.    Yeah.
21         Q.    And then Captain Edwards's car struck
22   the back of your motorcycle.  Correct?
23         A.    Yes.
24         Q.    What rate of speed were you going at
25   the time of this collision?
```

Justin Wilkens

166

1          A.    Stopped.

2          Q.    What rate of speed was Captain Edwards

3    going at the time of the collision?

4          A.    I don't know.  He was behind me.

5          Q.    Did you not see him behind you?

6          A.    Of course I did.  That's why I

7    stopped.

8          Q.    Do you agree that motorcycles can stop

9    faster than cars?

10          A.    They're smaller.  Of course they can.

11          Q.    Did you give Captain Edwards any

12    indication or way to know that you were going to

13    stop?

14          A.    My taillight works just fine and my

15    turn signal.  I don't know how else to pull over

16    when someone's trying to pull you over, when a

17    police officer is.  I mean, what am I supposed to

18    do, drive it in the ditch?  There's nowhere to

19    pull over right there.  There's the white line and

20    then the gravel falls straight down in the ditch.

21          Q.    You agree that there was a dark car

22    that was following you.  Is that right?

23          A.    I could see that there was a car

24    behind me.

25          Q.    You just didn't know it was

Justin Wilkens

1    Captain Edwards?

2          A.    No.  I assumed that it was the Honda,

3    because when I -- just didn't think anyone was

4    behind me.  Except for that Honda.  Because I

5    passed all the cars.

6          Q.    And how long were you riding with this

7    dark car behind you?

8          A.    Probably a couple miles, maybe more.

9          Q.    How many minutes?

10         A.    Less than ten.  By far.  I don't know.

11         Q.    What happens when Captain Edwards's

12   car collided with your motorcycle?

13         A.    It -- the inertia of his vehicle

14   pushed my motorcycle forward and knocked the rear

15   wheel out from underneath it.  And then the

16   motorcycle fell to the left and I jumped out of

17   the way of the motorcycle and rolled forward,

18   something somebody wouldn't expect when they're

19   getting pulled over.

20         Q.    Were you injured?

21         A.    When he hit me?

22         Q.    Yes.

23         A.    No.  I rolled right out of it.  I

24   stood up in amazement, shock.  I was -- most

25   people, when they see police lights, their

Justin Wilkens

168

1   adrenaline kicks on.  It's just how it goes.  And

2   so when I saw that cop behind me with his lights

3   on my adrenaline started pumping and I pulled

4   over.

5            And when I stood up, his siren was

6   blazing, and he was pointing his gun at my head,

7   and I couldn't hear him because I had a helmet on.

8   And the siren was louder than loud and the

9   motorcycle -- the car was practically on top of

10  me.

11       Q.    The car wasn't actually on top of you.

12  Correct?

13       A.    No.

14       Q.    Then what happened?

15       A.    Well, I was in shock.  I stood up.  I

16  expected -- in all honesty, I expected an apology

17  for him hitting me, because I thought it was an

18  accident.  So when I stood up, I was in shock that

19  he was pointing a gun at my head.  And I couldn't

20  hear him.

21       Q.    Then what?

22       A.    So I -- I honestly thought he was

23  pointing -- I couldn't believe he was pointing the

24  gun at me.  So I -- you know, from watching movies

25  and everything else, I slowly started getting down

Ex. 6

Justin Wilkens

1   on the ground, because I assumed that was the best

2   thing to do.

3            So I was putting my hands out, looking

4   down on the ground, like anyone would do if

5   they're trying to get down on their chest.  And as

6   I was doing that, he kicked me while I had my

7   hands up.  And I was trying to get down on the

8   ground.

9        Q.    Why do you think he kicked you?

10       A.    Because he lost his composure.  He

11  didn't think about all the things about why a

12  motorcycle possibly would not hear a police

13  officer or see an undercover black Camaro.

14       Q.    What happened next?

15       A.    After that I went down on the ground

16  and he jabbed his knee into my back I don't know

17  how many times.  He was pretty wound up.  He

18  grabbed my arms forcibly and put them behind my

19  back and handcuffed my hands extremely hard.  Like

20  he was very angry.  He -- he scared me, because he

21  was -- I felt like he wasn't doing his job.

22           I normally don't have guns pointed at

23  my head.  I'm not a violent person.

24       Q.    Then what?

25       A.    After I was in handcuffs, the siren

Ex. 6

Justin Wilkens

1    was still going and he was yelling at me in

2    amazement that I didn't see him.  And I told him

3    very respectfully that I did not see him.  Over

4    and over I said, "Sir, I never saw you, sir."

5    Multiple times.

6              I was not being a threat.  I wasn't --

7    I was just trying to abide by the law and make the

8    situation -- you know, just trying to be the best

9    citizen I could.

10         Q.    What did Captain Edwards say to you?

11         A.    He told me that I looked over my right

12   shoulder multiple times and saw him, which is not

13   true at all.

14         Q.    You saw a dark car?

15         A.    I saw a car in my vibrating mirror.  I

16   thought it was the Honda.

17         Q.    What else did you say to each other?

18         A.    After he had me in handcuffs, he got

19   back in his car and turned the sirens off.  And

20   then he -- it was like 95 degrees out and I asked

21   him to open up my visor on my helmet because it

22   was really hot.  And I couldn't do it because my

23   hands were in handcuffs.

24              And I was in a lot of pain.

25         Q.    Do you --

1  the bones separated.  Is that right?

2        A.    Yeah.

3        Q.    Other than the broken collarbone, did

4  you have any other injuries?

5        A.    Yeah.  He broke ribs.

6        Q.    How many?

7        A.    I think there was at least two.

8        Q.    Same place, next to the collarbone or

9  somewhere else?

10       A.    I'm not exactly sure.

11       Q.    Has anyone diagnosed you with broken

12  ribs?

13       A.    The hospital did after x-rays.  They

14  noticed the marks on my wrist, too, from the

15  handcuffs.

16       Q.    Did you have any injuries from the

17  handcuffs?

18       A.    There were marks on my arms.  They

19  noted them at the hospital.

20       Q.    Were you injured by the handcuffs?

21       A.    I had bruising on my wrists.

22       Q.    How long did that take to go away?

23       A.    I couldn't tell you.  It was the least

24  of my worries.

25       Q.    Was it gone within a week?

Justin Wilkens

1    so when you have your adrenaline pumping through

2    you, I was in shock.  So I'm trying to recollect

3    to the best of my ability.

4         Q.    Do you need more time to answer that

5    question?

6         A.    I'm -- no.  I don't think so.

7         Q.    You don't think you need more time?

8         A.    I believe that I answered your

9    question to the best of my ability.

10        Q.    Have you now fully described all of

11   your interactions and communications with

12   Captain Edwards on August 3rd, 2012?

13        A.    Yeah.

14        Q.    Did you ever pay your citations?

15        A.    They went away.

16        Q.    In what way did they go away?

17        A.    They never -- I never had to go to

18   appear in court.

19        Q.    Did you retain a criminal defense

20   attorney?

21        A.    Yeah.

22        Q.    And you're claiming those bills as

23   damages in this case?

24        A.    Yeah.

25        Q.    And you're claiming the almost $10,000

Robert Edwards

53

1  going wrong with the car, and then they would get
2  it to an outside source to fix those issues.
3     Q.  Okay.  Are officers assigned a
4  particular vehicle that's sort of theirs when
5  they're on shift?
6     A.  Typically, yes.
7     Q.  Okay.  And in August of 2012, did you
8  have a vehicle that was assigned to you?
9     A.  Yes.
10    Q.  And was that the Camaro at issue on
11 August 3rd?
12    A.  No.
13    Q.  Okay.  What was the vehicle that was
14 normally assigned to you?
15    A.  My assigned vehicle was a Dodge
16 Charger.
17    Q.  Okay.  And why -- was there any
18 particular reason that you were assigned to that
19 vehicle, the Dodge Charger?
20    A.  The lieutenant who got the job gets
21 that car.
22    Q.  Okay.
23    A.  It's unmarked.  It's just a blue Dodge
24 Charger.  And that's the one that, when I became
25 lieutenant, was assigned to me.

54

1     Q.  Okay.  Is there something about the
2  rank of lieutenant that is tied to the unmarked
3  vehicle?
4     A.  Yes.
5     Q.  And can you explain what that is?
6     A.  The Charger which I was assigned to as
7  a lieutenant didn't have a cage.  It had cloth
8  back seats.  And the main reason for that is the
9  lieutenant's not very often patrolling.  He'd
10 be more apt to use that vehicle taking a couple
11 sergeants to lunch or going to a meeting and
12 putting the deputy district attorney or the
13 sheriff in his car and going to lunch, going to
14 meetings.
15       So it's more of a commuter transport
16 vehicle versus a traffic enforcement car.
17    Q.  Okay.  So how -- how did you end up in
18 the Camaro on August 3rd?
19    A.  To the best of my recollection, I
20 believe I had some type of -- I left my assigned
21 Charger at home and I drove my personal vehicle to
22 work that day.
23    Q.  Because you normally would take the
24 Charger home with you?
25    A.  Normally I would, yes.

55

1     Q.  Okay.
2     A.  Drove my personal vehicle to work that
3  day I'm assuming because I had a meeting or had to
4  do something or pick my girl up from school or
5  something.
6     Q.  Okay.
7     A.  So I did not have my assigned car.
8     Q.  Okay.  So how did you end up driving
9  the Camaro that day?
10    A.  Something occurred.  I decided I need
11 to go look for some bank robbery suspects, and I
12 grabbed the keys to that car to drive -- two
13 reasons.  It was easily available.  The keys are
14 in the box, in the assigned ADEP box.
15       Two, the location I was going to go to
16 look for these bank robbery suspects was very
17 rural and I wanted to blend in in the parking lot
18 to watch an intersection.  I didn't want to be in
19 a marked unit.
20       (Reporter inquiry.)
21       THE WITNESS:  A -- aggressive
22 driving enforcement program.  ADEP.
23 BY MS. REGAN:
24    Q.  Had you ever driven the Camaro prior
25 to August 3rd?

56

1     A.  Yes.
2     Q.  And with some amount of regularity or
3  what -- how -- what would you say your frequency
4  of driving it was?
5     A.  Once a month maybe.  Once every six
6  weeks.
7     Q.  Okay.  And what was the context or the
8  reason that you would be driving it about once a
9  month?
10    A.  To go out on patrol.
11    Q.  Okay.  So is it accurate to say that
12 when you were performing patrol duties you would
13 use the Camaro?
14    A.  Occasionally.  Not always, but
15 sometimes, yes.
16    Q.  Occasion.  And just for purposes of
17 our record, is there only one Camaro or should we
18 further define that?
19    A.  No.  There's just one.
20    Q.  Okay.  And when you took the Camaro on
21 August 3rd, did you perform any inspection or
22 review of it to ensure that it was in safe working
23 order?
24    A.  I did not.
25    Q.  Okay.  Did you feel like you were

Ex. 7

Robert Edwards

---

**57**

1  familiar with the operations and the way that that
2  car drives — drove?
3      A.  Yes.
4      Q.  Okay.  Have you ever been in that
5  vehicle on any other high-speed situations?
6      A.  Every time we drive it.
7      Q.  Okay.  And explain why that is.
8      A.  When you work a traffic enforcement,
9  and you get somebody going 80, you turn around and
10  catch up to them, you've got to drive 100-plus
11  miles per hour to catch up to them.  So almost on
12  a daily basis when you drive that car, you drive
13  it at high speeds.
14      Q.  Okay.  And does that also hold true
15  for the Charger?
16      A.  Yes.
17      Q.  Okay.  Is there anything different
18  about driving the Camaro than driving the Charger
19  or driving another patrol vehicle?
20      A.  Anything different?  Sure.  There's
21  obviously differences.  They're a different type
22  of car.  I would say your -- your visibility out
23  of the Camaro, especially out of the back, isn't
24  near as good due to the type of wind -- the back
25  window has.  The visibility out of your Charger is

---

**58**

1  better.
2          They do handle a little bit different.
3  They -- you know, power-wise, they're not nearly
4  as powerful as our Chargers.  The Camaro has a V6
5  versus the powerful V8s that our Chargers have.
6      Q.  Okay.  Are there any mod -- other
7  modifications to the Camaro that are used for
8  police work?
9      A.  Typically just a radio, a roll bar,
10  and a bunch of red and blue lights on it.  And a
11  siren.
12      Q.  Okay.  So the tires on the Camaro, are
13  they standard tires for a Camaro?
14      A.  Speed-rated tires, yes.
15      Q.  Okay.  Is there anything modified with
16  regard to the braking system?
17      A.  I don't believe so.
18      Q.  So there's no button inside the
19  vehicle that you press to assist with brake fade
20  or anything like that?
21      A.  No.
22      Q.  Okay.  And do you recall where the
23  lights are located on the Camaro?
24      A.  I believe they are down on the center
25  console.  It's a toggle switch or buttons, but

---

**59**

1  down on the center console.
2      Q.  So kind of where the shift would be?
3      A.  Just forward of that, yes.
4      Q.  And there is -- I think you said a
5  switch or a button that you hit to make them
6  function?
7      A.  That's correct.
8      Q.  Okay.  And what about the siren?
9  Where would the siren button be located?
10      A.  Same location.
11      Q.  Okay.  And where are the actual lights
12  physically located on the outside of the vehicle?
13      A.  In the grille, in the front
14  windshield, and on the outside near the
15  headlights.
16      Q.  Okay.  So the grille, I assume you
17  mean one on each side, sort of near where the
18  headlights would be located?
19      A.  I'd have to look at your pictures to
20  tell exactly where they're at.
21      Q.  You're welcome to.
22      A.  So you've got a red and blue light in
23  the top of the windshield.  You've got red and
24  blue lights in the grille.  You also have red and
25  blue lights down near the spoiler.

---

**60**

1      Q.  And can you be more specific?  Is
2  there one red light and one blue light on each
3  side or how -- can you give me a little more
4  detail if you recall?
5      A.  I don't recall.
6      Q.  Okay.
7      A.  Based on the photos and based on my
8  memory, I -- I haven't seen the front of this car
9  with its lights on in a long time.  So I know you
10  got a red and blue light for sure on the top of
11  the windshield.  I believe you got a -- I think
12  you might have red and blue lights on both sides
13  of the grille, both sides of the Chevy emblem.
14  You also --
15      Q.  Meaning near the center, like on
16  either side of the license plate?
17      A.  No.  On the outside.
18      Q.  Oh, I see.  Okay.
19      A.  Near the headlights.
20      Q.  Okay.
21      A.  You're also going to have headlights,
22  called a wig-wag.  Your headlights are going to be
23  fluctuating on and off also.
24      Q.  Your headlights themselves?
25      A.  The headlights themselves.

---

Ex. 7

1      violation.  You ask for driver's license,

2      registration, insurance.  Make a determination if

3      you want to issue that person a citation and/or

4      verbal warning.  Make your determination.

5            And sometimes check them through LEDS

6      and NCIC for their driving status and wants check.

7      Sometimes not.  And then make your determination

8      to issue the citation or the warning and allow

9      them to be on their way.

10           Q.    Okay.  And so is there a procedure

11     that you radio in to dispatch prior to turning on

12     your lights as you had just described?

13           A.    In a perfect world, yes.  Sometimes

14     you turn your lights on first, get them to slow

15     down, so you can get close enough to see the

16     license plate, and then you can call out the

17     license plate at the same time that they're

18     yielding to the side of the road.

19           Q.    Okay.

20           A.    But either way is fine.

21           Q.    Okay.  And what about the use of a

22     siren in that scenario?  You didn't really mention

23     turning on the siren or using the siren.  Is there

24     any rule or training or policy regarding the use

25     of the siren?

Robert Edwards

1    A.    On a standard traffic stop?

2    Q.    Yes.

3    A.    No need.

4    Q.    No need to use a siren?

5    A.    No.

6    Q.    Okay.  And is there anything -- as

7    you're engaging in a traffic stop, is there any

8    time where a siren would be required?

9    A.    Not that I can think of.

10    Q.    Okay.

11    A.    I'm sure there's a million scenarios

12    maybe, but I can't think of one right now.  For

13    your standard run-of-the-mill traffic stop there's

14    no need to engage your siren.

15    Q.    Okay.  And would that change if you

16    were engaging in a high-speed chase?

17    A.    Yes.

18    Q.    And how would it change?

19    A.    Department policy says you got to have

20    your siren on.

21    Q.    And when would it be -- when would you

22    be required to utilize the siren?

23    A.    When you've made a determination that

24    you're in pursuit of and/or feel that the person

25    is failing to yield, you might be getting -- you

Robert Edwards

1   might get behind a little old lady who doesn't see

2   you.  Might be trying to activate your siren a

3   time or two to get their attention.  They may then

4   pull over, shut your siren off.  Or if they don't

5   stop, continue to fail to yield, and/or attempt to

6   elude, you keep your siren on.

7        Q.    Okay.  So just to make sure that I'm

8   understanding, you are allowed to use high speed

9   yourself in trying to catch up to a speeder

10  without turning on -- without activating the

11  siren?

12       A.    That's correct.

13       Q.    Okay.  And the use of the siren would

14  only be required if you needed a non-suspect

15  vehicle to yield to you, like the old lady

16  scenario you explained, so you would utilize your

17  siren in that circumstance?

18       A.    You could, yes.

19       Q.    Would it be required or it's

20  discretionary?

21       A.    Discretionary.

22       Q.    Okay.  And I believe your testimony

23  also was that if the speeder -- if the target

24  suspect failed to pull over after utilizing the

25  lights, then you would activate the siren.  Is

Robert Edwards

1    vehicle, but you're in pursuit of time trying to

2    get to a house, trying to get to someplace to help

3    somebody, you need to use your siren if you're

4    driving what we would call code 3, which is your

5    lights and siren, if you're trying to get people

6    out of your way to get somewhere quickly.

7         Q.    Okay.

8         A.    Those are the -- you've got to use

9    your siren if you're going to run code 3 or if

10   you're in pursuit of a vehicle.

11        Q.    Okay.  So is code 3 also -- does

12   code 3 include pursuit of a vehicle or are those

13   two distinct areas?  Is pursuit of a vehicle a

14   code 3?

15        A.    Yeah.

16        Q.    Okay.

17        A.    They're one and the same, even though

18   they kind of have different -- you know, contexts.

19   But, yeah, they're one and the same.

20        Q.    Okay.

21        A.    You're in pursuit of a motor vehicle,

22   you've got to have your lights and sirens going.

23        Q.    Okay.  I have a recollection from the

24   record that there was some form of admonishment or

25   something that you received for failing to use

Robert Edwards

133

1  quarter mile, maybe a little more. Maybe up to --
2  trying to catch up to him, trying to get a pace,
3  quarter mile, maybe a little more than that. Half
4  mile.
5      Q.   Okay. So between a quarter mile and a
6  half mile, at the time that you turned on your
7  lights, do you have an approximate distance that
8  you could provide between you and the motorcycle?
9      A.   I don't. I'd have to watch the
10 videotape. I don't recall how far ahead he was at
11 the time I activated my lights.
12     Q.   Okay. And what was your reason for
13 activating your lights at that time?
14     A.   Trying to initiate a traffic stop on
15 him for passing in a no-passing zone and speeding.
16     Q.   Okay. And your vehicle didn't have
17 radar in it. Correct?
18     A.   I believe it did. I believe it does.
19     Q.   Okay. Did you utilize the radar on
20 August 3rd?
21     A.   I did not.
22     Q.   Why?
23     A.   The type of radar we had at that time
24 would have been useless. I -- it only would catch
25 vehicles coming towards me.

134

1      Q.   I see. Okay. How about was there a
2  VASCAR unit in the vehicle?
3      A.   No.
4      Q.   Okay. And what about a LIDAR system?
5      A.   No.
6      Q.   And so was your method for determining
7  excessive speed pacing?
8      A.   Yes.
9      Q.   Okay. And when you mentioned that
10 there was about a quarter mile to a half mile
11 before you turned on your lights, were you
12 attempting or did you actually pace Mr. Wilkens's
13 motorcycle during that time period?
14     A.   I did. I was attempting to get an
15 accurate pace.
16     Q.   Okay. And what was your estimate at
17 that time?
18     A.   I never got an accurate pace. I know
19 I got to 80 miles per hour and he was still
20 pulling away from me. So if I'm going 80, and
21 he's going -- increasing the distance, common
22 sense tells me he's going in excess of 80.
23     Q.   Okay. There was a time period where
24 he came upon a vehicle that was like a
25 dark-colored Honda. Do you recall that vehicle?

135

1  We'll watch the video.
2      A.   Let's watch the video. I don't recall
3  if there was a dark-colored Honda. We -- we end
4  up passing two cars.
5      Q.   Okay.
6      A.   A pickup -- or a small pickup truck, I
7  believe, and then a passenger vehicle.
8      Q.   Do you recall either of those vehicles
9  making some kind of signal to Mr. Wilkens to go
10 around them?
11     A.   I wasn't watching the drivers of the
12 other vehicles at that time, no.
13     Q.   Okay. And at the time that
14 Mr. Wilkens passed the first vehicle, do you
15 recall whether or not there were any other
16 vehicles coming toward him or, you know, was
17 the -- the pass done in a safe manner despite the
18 fact that it may have been a double yellow?
19     A.   I have difficulty saying it was in a
20 safe manner when it's in a no-passing zone, so
21 it's my opinion it was unsafe.
22     Q.   Okay. But there was no oncoming
23 traffic. Correct?
24     A.   That's correct.
25     Q.   And do you recall whether or not the

136

1  motorcycle slowed before passing the first
2  vehicle?
3      A.   I believe it did. We were also into
4  the curves, so I don't know if he slowed to pass
5  it or slowed because we were in curves, but he did
6  slow.
7      Q.   Okay. And with the second vehicle, do
8  you recall him slowing down quite a bit before
9  passing that vehicle?
10     A.   Yes.
11     Q.   Would -- would it be accurate to say
12 that he slowed down between 45 and 55 miles per
13 hour?
14     A.   I believe that would be accurate, yes.
15     Q.   And during that time period, were you
16 able to close the distance between yourself and
17 him?
18     A.   I was.
19     Q.   And were you able to read the license
20 plate number?
21     A.   No.
22     Q.   And why was that?
23     A.   I don't believe I got close enough to
24 read the license plate. And I also believe the
25 license plate was kind of canted upwards, which

Ex. 7

Robert Edwards

137

1 would have made it that much more difficult to
2 read it.
3    Q.   Okay.  Were there any issues with the
4 Camaro's dashboard -- not dashboard -- windshield
5 in terms of your ability to see the license plate?
6    A.   No.
7    Q.   And did you activate your lights prior
8 to Mr. Wilkens passing either of those two
9 vehicles?
10   A.   I'd have to watch the video for sure,
11 but I believe I activated my lights shortly after
12 he passed the first pickup truck.  Because I think
13 I had to turn my lights on to help get the pickup
14 truck out of my way so I could get around him.
15   Q.   Okay.  And do you recall when in the
16 pursuit you then activated your siren?
17   A.   Approximately shortly before or
18 shortly after going around the second vehicle.
19   Q.   Okay.  And the video that we have of
20 this incident doesn't create -- doesn't have any
21 audio.  Is that correct?
22   A.   That's correct.
23   Q.   Do you know why?
24   A.   Because the system at that time, for
25 lack of a better word, was a piece of junk.

138

1    Q.   And it just didn't capture audio or it
2 was malfunctioning?
3    A.   It was malfunctioning.
4    Q.   Okay.
5    A.   The Department of State Police went to
6 a new video camera system.  Actually, during that
7 time we were actually transitioning to a much
8 better, more modern video camera system.
9    Q.   Okay.  Were you aware that the vehicle
10 had a video system in it?
11   A.   Yes.
12   Q.   And was it your understanding that it
13 was or was not functioning?
14   A.   It's my understanding at that time
15 that it wasn't -- it wasn't even working right.
16 Wasn't functioning.
17   Q.   Okay.  And so you didn't necessarily
18 expect that there was video of the pursuit?
19   A.   That's correct.  I did not believe --
20 initially did not believe we had -- I did not
21 think that car's video system was working
22 properly, so I didn't think we had video of this
23 incident.
24   Q.   Okay.  And do you have to hit a button
25 to make the video work or is it something that

139

1 occurs automatically?
2    A.   It occurs automatically.  Well, both.
3 You can manually activate them, but also when you
4 activate your red and blue lights, they'll go back
5 a certain period of time and then start recording.
6    Q.   Do you know how far it will go back?
7    A.   On that system, no.
8    Q.   So you activate your lights and that
9 activates the camera.  But what do you mean it
10 then goes back?  How does it record back in time?
11   A.   It's got a hard drive, which is
12 constantly video-ing, and when the lights or a
13 trigger activates the camera, in this case, the
14 lights and/or the siren, it will go back into the
15 hard drive one, two minutes.  I'm not sure how
16 long this one was set up for.  And then it will
17 start recording the event from there through the
18 rest of the event.
19   Q.   Okay.  So to make sure I'm
20 understanding what you're saying, there is a
21 camera and a hard drive that is recording all the
22 time that the vehicle is moving?
23   A.   That's correct.
24   Q.   And so if you wanted, you could get
25 video for your entire drive off of the hard drive?

140

1 Every -- for every minute that you were driving
2 the vehicle, there's a hard drive of footage of
3 that?
4    A.   That is my understanding, yes.
5    Q.   And then when you activate the lights,
6 what does that do that's different than what was
7 going on previously?
8    A.   I think it takes it from a section of
9 the hard drive, and it will start burning that
10 incident into a different section of the hard
11 drive, which is then accessible to the troopers to
12 make video -- DVDs of their evidence, of their
13 DUIIs or other traffic stops.
14   Q.   Okay.  And is that part of the hard
15 drive what we commonly call in-car video?  Is that
16 what we routinely get in discovery for DUIs and
17 things of that nature?
18   A.   I believe so, yes.
19   Q.   Okay.
20   A.   Well, which portion of it?  Not the
21 hard drive, what is it -- it's constantly on the
22 loop recording.  Typically only supervisors have
23 access to that to pull up misdeeds or
24 complaints --
25   Q.   Okay.

Ex. 7

141

1     A.   -- of things that happen that are
2  maybe be on or off the video itself.
3        So then there's another section of the
4  hard drive, which is where your traffic stops,
5  your DUII arrests, your drug seizures are formed
6  into little categories and sections it out so you
7  can go make copies of those for discovery.
8     Q.   Okay.  And is there anything in the
9  video system that would indicate when you turn on
10  the siren?  I'm assuming that the camera turns on
11  when you turn on the lights.  Is there any way in
12  viewing this video that we can determine when you
13  actually turn on your siren?
14     A.   I believe there should be -- there's a
15  portion that's on audio with the back -- there's
16  two cameras.  There's a camera that shoots out the
17  back and a camera that shoots out the front
18  window.  I'm not super familiar with that
19  particular audio system but -- or, correction,
20  camera system -- but I believe the rear camera
21  portion, for whatever reason, does pick up
22  portions of audio.  And that would -- you would be
23  able to hear a siren on -- on the -- be activated
24  or you would be able to hear it.
25     Q.   Okay.  And so I think the video that

142

1  we have received in discovery is the front camera.
2  Is the back camera also filming out the back of
3  the vehicle as you're driving down the road?
4     A.   Yes.
5     Q.   And so is there back camera footage
6  that is available that would be picking up audio?
7     A.   I believe there would be.
8     Q.   Okay?
9        MR. CAMPBELL:  You should have that.
10  If you don't, let me know.  But we have it.  I've
11  watched it.
12  BY MS. REGAN:
13     Q.   Okay.  And then I'm sorry if I asked
14  this.  I think that your testimony was that you
15  believe you turned the siren on either right
16  before or right after Mr. Wilkens passed the
17  second vehicle.  Is that right?
18     A.   Yes, ma'am.
19     Q.   Okay.  And what do you -- do you have
20  any recollection about that second vehicle?  You
21  know, was it pulling over?  Do you recall a
22  description of it?
23     A.   I don't.
24     Q.   Okay.  And I'm sorry if I asked this,
25  but what was your reason for turning on your siren

143

1  at that particular time period?
2     A.   It was abundantly clear to me that he
3  was attempting to elude me so --
4     Q.   Okay.  All right.
5     A.   So I was transitioning from a traffic
6  stop into a pursuit of a vehicle.
7     Q.   Okay.  And what was your -- explain to
8  me why you believe that he was attempting to elude
9  you at that time.
10     A.   I had had my -- I had had my lights on
11  for a little while.  He already made one bad pass.
12  He passes another vehicle at a high rate of speed.
13  And I believed that was a no-passing zone also.
14  And then accelerating away from me at a very high
15  rate of speed.
16     Q.   Okay.  And that demonstrated that he
17  was eluding you?
18     A.   In my eyes, yes.
19     Q.   Did you make any observation of him
20  looking at you or turning to look at you as -- in
21  your vehicle?
22     A.   It's my opinion, yes.
23     Q.   And what -- what did you observe?
24     A.   I observed what appeared to me glances
25  over his left shoulder.

144

1     Q.   While he was wearing a motorcycle
2  helmet?
3     A.   Yes.
4     Q.   Did you see him raise his whole body
5  and turn himself around?
6     A.   No, ma'am.
7     Q.   Okay.  So if he's wearing a motorcycle
8  helmet with no peripheral vision, how is he able
9  to turn around to see a car directly behind him?
10        MR. CAMPBELL:  Objection.  Assumes
11  facts not in evidence.  And it's argumentative.
12  You can answer if you can.
13     A.   Sure.  (Indicates.)  Just like that.
14  You just turn your head.
15  BY MS. REGAN:
16     Q.   Okay.
17     A.   And look over your shoulder.
18     Q.   So while he's riding a motorcycle, you
19  believe he turned his head like that and looked
20  behind him?
21     A.   I do.
22        MR. CAMPBELL:  Objection.  Asked and
23  answered.  You can answer.
24     A.   I believe so, yes.
25  BY MS. REGAN:

Ex. 7

149

1  at that time?
2      A.  I'm not going to tell you I didn't
3  have adrenaline.  But I wasn't adrenalized.  I
4  mean, you know, they teach us how to breathe
5  through that thing and control it, so I wasn't
6  overly amped up by any means.
7      Q.  Okay.
8      A.  I was trying -- I was focusing on his
9  license plate.  And, again, the license plate was
10 kind of tilted up.  So I had to get close to it
11 to, you know, read it out and get it on -- get it
12 to my dispatch center so they could have that
13 license plate.
14     Q.  And did you -- and I'm sorry if you
15 testified already to this, but as you're focusing
16 on the license plate, you do not notice that he
17 has a blinker on?
18     A.  I did not.
19     Q.  Okay.
20     A.  I was focused on the license plate.
21     Q.  Even though the turn signal would have
22 been right next to the license plate?
23     A.  I didn't recognize if he had a
24 license -- a turn signal on or not.  I don't
25 recall.

150

1      Q.  Okay.  But you certainly were aware
2  that he was slowing down.  Correct?
3      A.  Yes.
4      Q.  And do you recall him putting both
5  feet on the ground prior to you colliding with
6  him?
7      A.  I don't recall that.
8      Q.  Okay.
9      A.  Not saying it didn't happen.  I just
10 don't recall.
11     Q.  So when you are coming to this
12 intersection and he is slowing down, what else
13 could he have done to indicate that he was coming
14 to a stop at the -- at the -- you know, the result
15 of seeing your lights or, you know, recognizing
16 that you were a police car?
17     A.  At that point in time I don't think he
18 could have done anything different.
19     Q.  Okay.
20     A.  He was slowing.  He was slowing down,
21 and that's what I expected him to do, you know,
22 five miles prior to that.
23     Q.  Okay.  So -- and I meant to ask you
24 this earlier.  Were you wearing your hat?  Your
25 patrol hat?

151

1      A.  No.
2      Q.  Or your OSP hat?
3      A.  No.
4      Q.  Okay.  Do you recall the area where he
5  had pulled over where the collision happens?
6      A.  Yes, ma'am.
7      Q.  And do you recall that there was sort
8  of a drop-off to the right-hand side of the road
9  down into like one of those little ditches?
10     A.  The unpaved shoulder?
11     Q.  Yes.
12     A.  The gravel portion, yes.
13     Q.  And do you remember that it's -- it
14 steeply declined into like a drainage area?
15     A.  Directly adjacent from the roadway?
16     Q.  Yes.
17     A.  Well, there would have been a gravel
18 shoulder, then probably into a grassy area, which
19 then slopes down into a neighboring field or
20 something.
21     Q.  Okay.  How many feet do you recall --
22 obviously, I know you're going to estimate this --
23 that Mr. Wilkens slowed as he approached that T?
24 For how many feet had you been applying your
25 brakes, for instance?

152

1      A.  I have no idea.  I really don't.
2      Q.  Okay.  Would it be easier to
3  approximate how many seconds or how many -- how
4  many minutes you would have been slowing down?
5      A.  As we came down the hill at well over
6  100 miles per hour, so obviously I had to get on
7  my brakes fairly early to get some of that speed
8  scrubbed off, I would -- total ball -- you want a
9  ballpark estimate?
10     Q.  Your best estimate.
11     A.  My best estimate.
12         MR. CAMPBELL:  If you don't know, "I
13 don't know" is a fair answer.
14     A.  Yeah.  I don't know.
15 BY MS. REGAN:
16     Q.  Okay.
17     A.  I really don't.  I couldn't tell you.
18     Q.  And I think you just testified, but I
19 want to make sure, at the time that you were
20 approaching the stop, I guess your testimony is
21 that there was a downhill right prior to that --
22 that intersection or that T.
23     A.  Yes, ma'am.
24     Q.  And was your testimony that you --
25 you, you're in the Camaro, were going about

Ex. 7

Robert Edwards

169

1  bit on him. Are you using your knee to push his
2  body further into the ground?
3      A.  Very initial --
4      MR. CAMPBELL: I object to the form
5  of the question. I don't think the video shows
6  that but --
7      (Reporter inquiry.)
8      MR. CAMPBELL: I don't think the
9  video shows that. You can answer.
10     A.  Yeah. When I first make contact with
11 him, I grab his -- his right arm. I do. I put
12 both my knees in the middle of his back or on the
13 right side of his back to help shove him the rest
14 of the way onto the ground. Then I begin to
15 struggle with the gloves and the riding gear to
16 get him handcuffed.
17 BY MS. REGAN:
18     Q.  Okay. And did you perceive him as
19 resisting your efforts to handcuff him?
20     A.  No.
21     Q.  Why didn't you just remove the
22 gloves before handcuffing him?
23     A.  I did.
24     Q.  Okay. So when you say you struggled
25 to handcuff him, what do you mean by that?

170

1      A.  The right hand, I believe, if you
2  watch the video, I -- I sit there in this position
3  with my knees on his back. You can't see him, but
4  my knees are on his back. I'm on -- most of my
5  weight is on the balls of my feet and I am taking
6  his gloves off.
7      Q.  Okay.
8      A.  Off his right hand.
9      Q.  Okay.
10     A.  Then I'm able to get a handcuff on his
11 right wrist. Then I believe somehow I'm either
12 able to pull his jacket sleeve up and I'm able to
13 get him handcuffed with his left hand still --
14 with his glove on.
15     Q.  Okay. And would you agree that you
16 apply the handcuffs in a manner that did not allow
17 for a pinkie distance between his skin and the
18 cuffs? Did you apply the handcuffs tightly?
19     A.  I applied my handcuffs as I've been
20 trained.
21     Q.  Okay.
22     A.  They -- I did not cinch those
23 handcuffs down any tighter than anybody else.
24     Q.  Okay. And then at some point you
25 assist him to his feet by grabbing one of his

171

1  armpits, I believe. Is that right?
2      A.  I read him his Miranda rights and
3  decided to stand him up. Told him to extend his
4  right leg out. Bring his left leg into the --
5  into the inner thigh of his right leg. Then I
6  helped the forward upward motion with his left
7  arm, helped him to his feet.
8      Q.  So where were your arm -- where were
9  your hands located on his body as you were
10 assisting him to his feet?
11     A.  I would imagine one in the midback and
12 probably one under his arm.
13     Q.  Okay. And do you recall how much
14 effort you needed in order to assist him to his
15 feet? Was he deadweight or was he --
16     A.  Oh, absolutely not.
17     Q.  -- on his own getting up?
18     A.  The purpose for having them put their
19 right leg out and bringing their left leg in, it's
20 more of a push onto their knee, and then they're
21 able to help stand themselves up.
22     Q.  Okay. And when he is laying on the
23 ground -- well, let me ask you this.
24     How long is he laying on the ground
25 before you assist him to his feet?

172

1      A.  I would have to watch the video, but
2  an estimation, a few minutes.
3      Q.  Okay. And from the time you handcuff
4  him -- and we'll watch the video in a minute --
5  but you leave the video vantage point for several
6  minutes. What are you doing during that time
7  period?
8      A.  I'm telling my dispatch center that I
9  was just involved in a crash. Telling my dispatch
10 center that I'm code 4. I've got one detained.
11     Q.  Tell me what code 4 means.
12     A.  Everything's okay.
13     Q.  Okay.
14     A.  I'm safe. Suspect is safe.
15 Everybody's okay. Asking -- telling other units
16 where I'm at. Other responding units that are
17 coming to try to assist, telling them where I'm
18 at. And asking for sheriff's office to come and,
19 you know, investigate things.
20     Q.  Okay. And did you make the decision
21 on your own to ask Lane County sheriff to do an
22 outside investigation?
23     A.  I did.
24     Q.  Okay. So your supervisor did not
25 instruct you to do that?

Ex. 7

Robert Edwards

1   Same thing with us.  Not always, but it just looks

2   cleaner.  It looks better if somebody else does

3   the investigation.

4        Q.    And when you say "investigation,"

5   we're talking beyond the crash, then?  You're

6   saying take over the investigation of the suspect

7   as well.  Correct?

8        A.    Mainly the -- the crash investigation,

9   but in this case, yeah, just let them take over

10  the investigation from that point forward.

11       Q.    Okay.  So no one from Lane County

12  Sheriff's Office witnessed Mr. Wilkens violating

13  the law.  Correct?

14       A.    That would be correct.

15       Q.    So them issuing the citations was

16  solely based on your statements to them.  Correct?

17       A.    That's correct.

18       Q.    And have you read the Lane County

19  sheriff officer reports, both Deputy Ware and

20  Deputy Holiman's reports, in this instance?

21       A.    Over two years ago, yes.

22       Q.    Do you recall that the statements you

23  provided to them were reflected accurately in

24  their reports?

25       A.    I'd have to read their reports.  I

Robert Edwards

205

1    the ground all the way. He is handcuffed. And
2    now you've walked away and you haven't said
3    anything else to him like read him his rights or
4    told him why he was being handcuffed or anything
5    like that. Correct?
6              MR. CAMPBELL: Objection. Misstates
7    testimony. You can answer if you can.
8        A. Most of what you're saying is
9    accurate. Multiple verbal commands to get on the
10   ground. But at this point in time I have not read
11   him his rights yet. I have not had any other
12   verbal communication with him other than multiple
13   orders to get on the ground. Once I shut my siren
14   off and I reappear, he's read his Miranda rights
15   and then we have a discussion.
16   BY MS. REGAN:
17       Q. Okay. So when you go back to the --
18   you've now gone back to your vehicle I assume?
19       A. Yes.
20       Q. Okay. And when you get in the
21   vehicle, is that when you turn off the siren?
22       A. Yes, ma'am.
23       Q. Okay. (Video plays.)
24              And now I am turning to the video that
25   is captioned, "Two-hour, zero minutes, 19

206

1    seconds," which basically is a continuation of the
2    prior video.
3              And during this time period, I believe
4    you testified that you are making cell phone calls
5    to dispatch and I think you said your supervisor.
6        A. Just radio --
7        Q. Okay.
8        A. -- right now.
9        Q. Just radio calls?
10       A. I haven't called my supervisor yet.
11       Q. Okay. So right now you're just making
12   radio calls saying code 4?
13       A. Where I'm at. Shutting my siren off.
14       Q. You haven't asked him yet if he's been
15   injured in the collision or anything like that.
16   Correct?
17       A. I don't believe so. Not yet.
18       Q. So do you recall what you're saying to
19   Mr. Wilkens at this time?
20       A. I'm informing him of his -- of his
21   Miranda rights.
22       Q. And what's his response to you reading
23   his Miranda rights?
24       A. Asked him if he understood. And if I
25   recall right, he said, "Yeah."

207

1        Q. Now, do you recall what -- is there
2    anything else that you're saying, or is this still
3    all the rights?
4        A. I asked him if he's okay. Does he
5    need medics. Stuff like that. Starting my --
6        Q. What else?
7        A. Starting my interrogation on, "Why are
8    you running? Why are you running from me?"
9              I look at the -- he says basically, "I
10   didn't know you were a cop."
11             I was pointing out all my red and blue
12   lights, saying, "How could you not know I'm a
13   cop?"
14       Q. Okay. What was his answer to whether
15   he needed medics or whether he was injured?
16       A. At that time he said he did not need
17   medics. He was just a bit shaken up.
18       Q. Okay. Would you agree that it is a
19   very clear, sunny day?
20       A. Yeah. It was a nice day.
21       Q. And are you -- do you recall whether
22   you are driving into the sun or away from the sun?
23   Do you remember what direction this road is --
24       A. The majority of that road runs
25   northbound, so the sun would be one o'clock,

208

1    pretty much overhead.
2        Q. Now, at this time does he tell you
3    that he thought you were the Honda that he had
4    passed?
5        A. At some point in time, he does. I
6    don't recall if it's at this point in time or when
7    we continue our conversation while he's sitting on
8    the hood of the car.
9        Q. Okay.
10       A. But that does take place.
11       Q. And he -- do you recall him telling
12   you that he thought that the car was wanting to
13   race him and so he was trying to put some distance
14   between him and that -- and what he thought was
15   that car wanting to race, something to that
16   effect?
17       A. Something to that effect. That he
18   passed a Honda car near the high school, which
19   would be approximately milepost 1, and that they
20   were racing or something to that effect.
21       Q. Okay. Would you agree that your
22   unmarked vehicle is of similar color to that Honda
23   that he passed?
24       A. I've never seen the Honda that he
25   passed. He says it was gray. If it was gray, it

Ex. 7

Robert Edwards

213

1  for the crash investigation?
2      A.   I guess I weighed the options of
3  taking care of his stuff versus leaving his
4  motorcycle on the side where it can continue to be
5  damaged. I chose to take -- I'd take care of his
6  property.
7      Q.   And what was your understanding of the
8  damage that could be perpetuated if it was left on
9  its side?
10     A.   Just my understanding it's not good
11  for a -- it's not good for motors like that to
12  continue to run if it is running in a situation
13  like that on its side.
14     Q.   Okay.  So is it your testimony that
15  the concern regarding continued damage was to the
16  motor because it was running and on its side or is
17  there some kind of damage that you're aware of
18  that would occur if the motor was off and it's
19  just on its side?
20     A.   I don't recall if the motor was
21  running.  I -- it could have been.  I don't recall
22  if it was or wasn't.  I'm trying to take care of
23  that man's equipment.  Trying to take care of his
24  bike.
25     Q.   Okay.  So whether the motor was on or

214

1  not, it was your understanding that damage would
2  be done to the bike by it being on its side?
3      A.   It's my understanding it's not good
4  for them.
5      Q.   All right.  I think that's probably
6  all for the video I need.
7          The fan will turn off automatically in
8  a second.
9          THE REPORTER:  Thanks.
10  BY MS. REGAN:
11     Q.   From the time that Mr. Wilkens is
12  knocked off the motorcycle to the time that you
13  place handcuffs on him, you can see his hands at
14  all times.  Is that correct?  He makes his hands
15  visible to you at all times?
16     A.   Well, technically, no.  He's laying --
17  he's on his belly.  His hands are here.  Until
18  they're behind his back is when I can see them
19  completely at all times.
20     Q.   Okay.  So Lane County Sheriff's
21  Office, Deputy Ware, issues the citations to
22  Mr. Wilkens, but you would still be the witness if
23  the case had gone to trial.  I don't know if
24  you're technically called the complainant in that
25  situation.  Do you know?

215

1      A.   I don't.
2      Q.   Okay.  Do you know what ultimately
3  happened with those citations?
4      A.   I do not.
5      Q.   Were you aware that they were never
6  filed by the district attorney?
7      A.   Wouldn't surprise me.  I was not
8  aware.
9      Q.   Okay.  Were you aware that Mr. Wilkens
10  was never convicted of any charges as a result of
11  this incident?
12     A.   I'm aware now.
13     Q.   But you weren't throughout the
14  entirety of the last two years?
15     A.   I don't recall, ma'am.  I may have
16  been told and forgot.  I don't recall if he had
17  been prosecuted or not.  I'm assuming he was not
18  prosecuted -- well, I know we didn't go to grand
19  jury and I know I didn't have to get court notice,
20  but it could have been pled out through court.  I
21  wasn't -- I don't recall if I was notified or not.
22     Q.   Okay.  In felony -- when felony
23  citations are issued, would you normally be kept
24  apprised of the court proceedings?
25     A.   No.

216

1      Q.   Okay.
2      A.   No.  The district attorney's office
3  routinely -- routinely -- dismissed felony
4  citations based on manpower issues, and we are
5  never apprised if they proceed, are convicted,
6  plead guilty, or dismissed.  Very, very seldom are
7  we told.
8      Q.   Okay.  And was that still the case
9  back in 2012?
10     A.   Yes.
11     Q.   August of 2012?  Okay.  So you are not
12  aware of why the district attorney's office
13  refused to file any charges against Mr. Wilkens?
14     A.   No.
15     Q.   Okay.  Were you investigated for
16  committing a crime against Mr. Wilkens?
17     A.   Well, an internal investigation was
18  completed.  I was never interviewed and given my
19  Miranda rights.  So I'm not sure if a criminal
20  investigation was completed on me or not.
21     Q.   Okay.
22     A.   I do believe we did take the facts of
23  that case to the district attorney's office for
24  review.  So I'd take that for what it's -- I don't
25  know if I was investigated for a crime or not.

Ex. 7

Robert Edwards

161

1  struck Mr. Wilkens, did you actually feel the
2  impact of the hit?
3      A.  Lightly, yes.
4      Q.  Okay.  Were you watching him and the
5  motorcycle at the time that you made impact with
6  him?
7      A.  Yes.
8      Q.  And so do you -- what do you recall
9  seeing in terms of him and the bike going down?
10     A.  I recall the pushing the bike forward,
11 and it appeared that he was attempting to stay
12 balanced on the bike, but ultimately fell off the
13 bike.
14     Q.  Okay.  And did the motorcycle remain
15 running?
16     A.  I don't recall.
17     Q.  Okay.  And I think you indicated that
18 you were concerned that you were actually going to
19 run over him because of the direction -- he fell
20 in the path of your vehicle.  Is that right?
21     A.  He did.
22     Q.  And do you recall how close you were
23 to actually hitting him with the wheels of the
24 vehicle?
25     A.  Yeah.  It wasn't nearly as close as it

162

1  appeared, based on me sitting, and the hood, and
2  me losing sight of him.  But 10 -- you know,
3  15 feet in front of my patrol vehicle.
4      Q.  Okay.
5      A.  Would be an estimation.
6      Q.  Okay.  And then what do you recall
7  happening after he fell to the ground?
8      A.  I exited my vehicle as quickly as
9  possible, drew my sidearm.
10     Q.  And why did you draw your sidearm at
11 that time?
12     A.  Because this was a high-risk stop.
13     Q.  You had just knocked him off of his
14 bike.  What were -- what were -- what was the
15 concern for your safety at that time?
16     A.  It's unknown.  He's -- he's -- in my
17 opinion, he's demonstrated an extreme attempt to
18 elude my -- elude me.  Why he's eluding me, I
19 don't know.  Maybe he didn't just rob the store in
20 Mapleton, but maybe he just committed a robbery.
21 Maybe the bike is stolen.  Maybe he's a drug
22 dealer.  Maybe he's high on methamphetamine.
23 Maybe -- there's multiple reasons why people run
24 from the police so --
25     Q.  But didn't he just stop on his own

163

1  volition prior to you colliding with him?
2      MR. CAMPBELL:  Objection.
3  Argumentative.  You can answer.
4  BY MS. REGAN:
5      Q.  You can answer.
6      A.  Sorry.  He did.
7      Q.  Okay.  And -- and you've just knocked
8  him to the ground after colliding with his
9  motorcycle and he is on the ground.  So under
10 those circumstances, what would be the serious
11 safety threat to you?  He hasn't pulled a weapon.
12 He hasn't taken an aggressive stance.  What was
13 your rationale for pulling your weapon on him at
14 that time?
15     MR. CAMPBELL:  Object to the form of
16 the question.  You can answer if you can.
17     A.  He was a threat to me.  He's a threat,
18 because he's attempted to elude me over the course
19 of five miles that -- at well over 100 miles per
20 hour so --
21 BY MS. REGAN:
22     Q.  And now he's stopped?
23     A.  So, in my opinion, obviously he's done
24 some type of criminal activity, which he's trying
25 to avoid me, let alone he's committed the class C

164

1  felony of attempt to elude a police officer.  So I
2  can't take the risk of hoping he gets up and gives
3  me a hug.
4      I don't know why he's running, but my
5  experience where -- people run because they're
6  afraid of going to jail or being incarcerated.
7  So, my opinion, he's running for a reason.  I
8  don't know that reason.
9      Q.  Weren't you concerned that you had
10 injured him in the collision?
11     A.  Sure, I was.
12     Q.  And so he stands up on his own.
13 Correct?
14     A.  Yes, ma'am.
15     Q.  And he holds his hands like this.
16 Right?  He's showing you his hands.  Correct?
17 (Indicating.)
18     A.  Correct.
19     Q.  And did you take that as any kind of
20 violent gesture?
21     A.  I did not.
22     Q.  Okay.  And you, I guess -- I mean,
23 you're welcome to testify to this too, but I guess
24 at some point you're telling him to get down on
25 the ground.  Is that right?

Ex. 7

Robert Edwards

165

1    A.   Multiple times, yes.
2    Q.   And why were you asking him to get
3  down on the ground?
4    A.   That's my way of keeping myself, him,
5  and the surrounding people safe. I want to get
6  him on the ground in a pair of handcuffs as
7  quickly as possible.
8    Q.   And would you agree that you had some
9  adrenaline coursing through your body at this
10  time?
11    A.   A heightened level of awareness,
12  little bit of adrenaline. I'm not going to say I
13  don't have any, but yes. I was -- my awareness
14  level was definitely increased.
15    Q.   Okay. And then on the video, it shows
16  him starting to go down on the ground when you
17  appear to kick him in the sternum. Would you
18  agree that that is what the video illustrates?
19    A.   Yes.
20    Q.   And so why were you -- why did you
21  deploy the kick as he was complying with your
22  request?
23    A.   At the time that I had formulated the
24  mental plan to take a step forward and to deliver
25  a front push kick, it takes anywhere from a second

166

1  to a second and a half to make the determination,
2  get the neurons going to get the body in motion,
3  and at that time is when he begins to lower
4  himself, and I had already put that motion into
5  action.
6    Q.   Did you hear him say anything to you
7  prior to you delivering the kick?
8    A.   I did not.
9    Q.   Were you aware that -- I mean, I
10  assume you were aware that he was wearing a
11  motorcycle helmet. Correct?
12    A.   Full-faced, yes.
13    Q.   And would you agree that his hearing
14  is going to be limited as a result of the helmet?
15    A.   I would sure like to think if he's
16  standing from me to the door and I'm yelling at
17  him, he would -- he's got a state trooper with
18  a gun pointed at him pointing to the ground and
19  yelling at him, he would comply.
20    Q.   Okay. And, in fact, he was complying
21  at the time that you kicked him. Correct?
22    A.   He was beginning to at the time the
23  kick was delivered, yes.
24    Q.   Okay. And then after you kick him, he
25  does get down on the ground. Correct? He

167

1  complies with your requests and he gets down on
2  the ground. Right?
3    A.   Partially, yes.
4    Q.   Why do you say partially?
5    A.   He didn't go all the way down onto his
6  belly. He was on his knees and on his forearms.
7    Q.   Okay.
8    A.   He wasn't -- his belly wasn't all the
9  way on the ground.
10    Q.   And was that because of the gear that
11  he had on?
12    A.   I wouldn't think. So I wouldn't think
13  the riding jacket and blue jeans would affect his
14  ability to lay on the ground.
15    Q.   Okay. And once he is down on the
16  ground, the video camera no longer captures video.
17  Correct?
18    A.   No. It continues to capture video.
19    Q.   But you can't see what -- what
20  Mr. Wilkens is doing on the ground from the angle
21  of the video camera. Right?
22    A.   It's obscured from the vehicle, but
23  the video was still running.
24    Q.   Okay. And does your uniform -- well,
25  your uniform at that time, did you have audio?

168

1  Like are you able to be -- are you picking up from
2  radio? You know, is your radio able to capture
3  audio?
4    A.   No, ma'am.
5    Q.   Okay. And is that because you're --
6  you did not have a radio on your uniform at that
7  time?
8    A.   A radio or a mic for the camera?
9    Q.   A mic. Yeah.
10    A.   I did not have a mic.
11    Q.   Okay.
12    A.   Again, I didn't even think the camera
13  system worked.
14    Q.   Okay. Once Mr. Wilkens is down on the
15  ground, what do you do next?
16    A.   Yell at him to put his hands behind
17  his back. Retrieve his right arm. Struggle with
18  his protective riding gloves and jacket in
19  attempts to get him handcuffed.
20    Q.   Okay. And do you utilize your knee in
21  his back at some point?
22    A.   I put my weight on his back. Yes,
23  ma'am.
24    Q.   And did you put some knee -- the video
25  sort of depicts you bouncing up and down a little

Ex. 7

Robert Edwards

185

1  that type of compensation would be made to the
2  victim of the accident?
3       A.   I'm sure it would be a portion of the
4  overall review to determine if it was a situation
5  that we would pay or we wouldn't pay, yes.
6       Q.   And was there anything else -- other
7  than Deputy Ware taking your statements, did they
8  do anything else in the course of this
9  investigation?  Did they measure anything or
10  review video or anything else other than take
11  statements?
12       A.   They took some pictures.  I believe
13  they interviewed Mr. Wilkens.  They spoke with me.
14  I'm not sure what else they may have done, may or
15  may not have done.
16       Q.   Okay.  Were you ever informed that
17  Lane County Sheriff's Office determined that you
18  were at fault for the collision?
19       A.   I don't recall.
20       Q.   Okay.
21            MR. CAMPBELL:  Is this a good time
22  for a quick break?
23            MS. REGAN:  Sure.
24            (Recess:  2:35 p.m. to 2:46 p.m.)
25  BY MS. REGAN:

186

1       Q.   Okay.  We are back on the record.  It
2  is approximately 2:44 p.m.  This is the deposition
3  of Officer Edwards -- I'm sorry, Captain Edwards.
4            And before we turn to the video, I
5  meant to ask you, and Mr. Wilkens reminded me to
6  ask, at the time that the collision happened and
7  Mr. Wilkens falls to the ground and you exit your
8  vehicle, do you recall whether or not you had your
9  siren on or off?
10       A.   It was on.
11       Q.   Okay.  And so when you are speaking
12  with Mr. Wilkens, the siren is still -- while
13  you're giving him the commands, the initial
14  commands to get on the ground, the siren is still
15  activated.  Correct?
16       A.   Yes, ma'am.
17       Q.   Okay.  But you don't recall whether or
18  not the motorcycle was continuing to run.  Is that
19  right?
20       A.   That's correct.  I don't remember if
21  it had stopped running or -- or not.  I picked it
22  up and put it on -- put it back on two wheels, and
23  I don't remember if it was running or not.
24       Q.   Okay.  And I believe you testified
25  that Mr. Wilkens was within 10 feet of the vehicle

187

1  at the time that you were giving him the commands
2  to get down.
3       A.   I thought -- I thought I said 15.
4       Q.   Okay.  So within 10 to 15 feet.  So in
5  pretty close proximity to the siren emanating from
6  your vehicle?
7       A.   Sure.
8       Q.   Okay.  In addition to the interview
9  that Deputy Ware did of you, was there any other
10  law enforcement officer that interviewed you
11  regarding the crash or the use of force?
12       A.   I'm trying to remember if I was
13  interviewed by my supervisor for the interim --
14  the use of force/pursuit review.  I don't recall.
15  I don't recall if I was interviewed or not.
16       Q.   Okay.  And so just to follow up on
17  that, do you have any knowledge of any recordings
18  that are in existence of you being interviewed
19  about this incident?
20       A.   Not that I can recall.
21       Q.   Okay.  I had asked you before the
22  lunch break about a recollection or an incident
23  that I had regarding --
24       A.   Can I interrupt you?
25       Q.   Yeah.

188

1       A.   I think Captain Heider did interview
2  me regarding this incident.  I do not recall if it
3  would have been recorded or not.
4       Q.   Okay.  Do you recall how long after
5  the incident that interview took place?
6       A.   It had to be several weeks.
7       Q.   Okay.  All right.  So remember I was
8  asking you about whether there was any other
9  incident where you had failed to use your siren?
10       A.   Yes, ma'am.
11       Q.   So I pulled up that document during
12  the lunch break, and it was an incident on
13  July 18th of 2014, and it was another motorcycle
14  incident.  It says, "I observed a motorcycle
15  traveling north on -- on Northwest Expressway at a
16  high rate of speed."  Basically it was a
17  motorcycle speeding that ended up going into a
18  residential area and you terminated pursuit of
19  that vehicle.
20       A.   Yes, ma'am.
21       Q.   Does that rec -- does that refresh
22  your recollection?
23       A.   Yes.  I do recall that pursuit now.
24       Q.   Okay.  And in that incident, your
25  supervisors indicated that you had appropriately

Ex. 7

Robert Edwards

---

**169**

1   bit on him. Are you using your knee to push his
2   body further into the ground?
3       A.   Very initial --
4           MR. CAMPBELL: I object to the form
5   of the question. I don't think the video shows
6   that but --
7           (Reporter inquiry.)
8           MR. CAMPBELL: I don't think the
9   video shows that. You can answer.
10      A.   Yeah. When I first make contact with
11  him, I grab his -- his right arm. I do. I put
12  both my knees in the middle of his back or on the
13  right side of his back to help shove him the rest
14  of the way onto the ground. Then I begin to
15  struggle with the gloves and the riding gear to
16  get him handcuffed.
17  BY MS. REGAN:
18      Q.   Okay. And did you perceive him as
19  resisting your efforts to handcuff him?
20      A.   No.
21      Q.   Okay. Why didn't you just remove the
22  gloves before handcuffing him?
23      A.   I did.
24      Q.   Okay. So when you say you struggled
25  to handcuff him, what do you mean by that?

---

**170**

1       A.   The right hand, I believe, if you
2   watch the video, I -- I sit there in this position
3   with my knees on his back. You can't see him, but
4   my knees are on his back. I'm on -- most of my
5   weight is on the balls of my feet and I am taking
6   his gloves off.
7       Q.   Okay.
8       A.   Off his right hand.
9       Q.   Okay.
10      A.   Then I'm able to get a handcuff on his
11  right wrist. Then I believe somehow I'm either
12  able to pull his jacket sleeve up and I'm able to
13  get him handcuffed with his left hand still --
14  with his glove on.
15      Q.   Okay. And would you agree that you
16  apply the handcuffs in a manner that did not allow
17  for a pinkie distance between his skin and the
18  cuffs? Did you apply the handcuffs tightly?
19      A.   I applied my handcuffs as I've been
20  trained.
21      Q.   Okay.
22      A.   They -- I did not cinch those
23  handcuffs down any tighter than anybody else.
24      Q.   Okay. And then at some point you
25  assist him to his feet by grabbing one of his

---

**171**

1   armpits, I believe. Is that right?
2       A.   I read him his Miranda rights and
3   decided to stand him up. Told him to extend his
4   right leg out. Bring his left leg into the --
5   into the inner thigh of his right leg. Then I
6   helped the forward upward motion with his left
7   arm, helped him to his feet.
8       Q.   So where were your arm -- where were
9   your hands located on his body as you were
10  assisting him to his feet?
11      A.   I would imagine one in the midback and
12  probably one under his arm.
13      Q.   Okay. And do you recall how much
14  effort you needed in order to assist him to his
15  feet? Was he deadweight or was he --
16      A.   Oh, absolutely not.
17      Q.   -- on his own getting up?
18      A.   The purpose for having them put their
19  right leg out and bringing their left leg in, it's
20  more of a push onto their knee, and then they're
21  able to help stand themselves up.
22      Q.   Okay. And when he is laying on the
23  ground -- well, let me ask you this.
24          How long is he laying on the ground
25  before you assist him to his feet?

---

**172**

1       A.   I would have to watch the video, but
2   an estimation, a few minutes.
3       Q.   Okay. And from the time you handcuff
4   him -- and we'll watch the video in a minute --
5   but you leave the video vantage point for several
6   minutes. What are you doing during that time
7   period?
8       A.   I'm telling my dispatch center that I
9   was just involved in a crash. Telling my dispatch
10  center that I'm code 4. I've got one detained.
11      Q.   Tell me what code 4 means.
12      A.   Everything's okay.
13      Q.   Okay.
14      A.   I'm safe. Suspect is safe.
15  Everybody's okay. Asking -- telling other units
16  where I'm at. Other responding units that are
17  coming to try to assist, telling them where I'm
18  at. And asking for sheriff's office to come and,
19  you know, investigate things.
20      Q.   Okay. And did you make the decision
21  on your own to ask Lane County sheriff to do an
22  outside investigation?
23      A.   I did.
24      Q.   Okay. So your supervisor did not
25  instruct you to do that?

---

Ex. 7

Robert Edwards

215

1        A.    I don't.

2        Q.    Okay.  Do you know what ultimately

3   happened with those citations?

4        A.    I do not.

5        Q.    Were you aware that they were never

6   filed by the district attorney?

7        A.    Wouldn't surprise me.  I was not

8   aware.

9        Q.    Okay.  Were you aware that Mr. Wilkens

10  was never convicted of any charges as a result of

11  this incident?

12        A.    I'm aware now.

13        Q.    But you weren't throughout the

14  entirety of the last two years?

15        A.    I don't recall, ma'am.  I may have

16  been told and forgot.  I don't recall if he had

17  been prosecuted or not.  I'm assuming he was not

18  prosecuted -- well, I know we didn't go to grand

19  jury and I know I didn't have to get court notice,

20  but it could have been pled out through court.  I

21  wasn't -- I don't recall if I was notified or not.

22        Q.    Okay.  In felony -- when felony

23  citations are issued, would you normally be kept

24  apprised of the court proceedings?

25        A.    No.

Ex. 7

David Peterson

1    actually go out to a flat track at an old airport

2    which is flat, so there is no curves.  And we

3    simulate or have them -- have the students drive

4    under as many conditions as we can simulate as

5    they're going to do in the real world.  Abrupt

6    lane changes, rapid braking, rapid acceleration,

7    cornering.

8              And then, ultimately, we train up to

9    what we call pursuit driving, where they chase

10   each other around the track.  One is the driver,

11   bad guy.  Another one's a -- simulating being the

12   police officer.  And then as they progress, then

13   we have the students chase or pursue instructors.

14             And what we are hoping is they can

15   monitor the platforms of the car so they can feel

16   it.  They can sit in the car while somebody else

17   is driving so they feel -- feel what it's like.

18   They can see what the car in front of them's doing

19   because we're performing the same things on the

20   track.

21             And then as they get better, the

22   speeds increase until sometimes, in the Chargers

23   on the track, we reach speeds of 120 miles an

24   hour.

25        Q.    Okay.  With regard to -- I think you

David Peterson

1    had sort of started trying to explain braking and

2    curves, and I think you had mentioned not to ride

3    the brakes.  But can you kind of elaborate on

4    what -- what is expected or what is good practice

5    with regard to high -- higher speeds and using the

6    brakes on curves?

7        A.    Well, everybody's taught initially --

8    or we explain that if you ride the brakes you have

9    a tendency to make the brakes overheat because

10   they're -- every time there's friction there's

11   going to be heat generated.

12              And we teach a method of braking, when

13   to brake in the corner, prior to the corner, where

14   to brake through the corner, and then if there's

15   any braking after the corner.  So it's kind of a

16   process.

17              So the process is to try to do the

18   majority of your braking and slowing down when the

19   vehicle's in a straight line.  To limit your

20   braking through the curves as much as you can,

21   because it upsets the platform too much, which

22   then takes away traction from the tires.

23              So we teach a manner in how they are

24   to brake hard in a straight line, and then ease

25   off the brakes as they enter into a corner, and

1     then to then go into the acceleration.

2            We explain that the mere fact that the

3     car is going through a corner creates its own

4     brakes.  It does slow vehicles down, because you

5     have what they call rolling friction.  So as the

6     sharper the curve, the tires are not traveling in

7     a straight line.  So as the tires are turning

8     sharper and sharper they're creating friction,

9     which also slows the vehicle down.

10            Q.    Okay.

11            A.    So that's really about it.

12            Q.    Okay.  What are you -- what do you

13     teach or what is the practice with regard to -- I

14     think you either called it fast braking or

15     high-speed braking when you have to come to a

16     stop?

17            A.    Well, the thing about -- what we talk

18     about is the faster you go, the more heat is

19     created with brakes.  So the faster you have to

20     come to a stop or the more that you're using your

21     brakes a lot because you're going fast, you're

22     going to create a lot more heat.

23            When you create more heat it typically

24     can cause some brake fade.  I mean, it ultimately

25     could cause complete brake fade, but that's very,

1    very -- does not happen very often.  And what that

2    does is it just slows your ability to -- or

3    inhibits your ability to stop or slow quite as

4    fast.

5         Q.    Is stopping when brake fade is

6    possible or is occurring, is that something that

7    they practice or that they try to get experience

8    in that controlled setting?

9         A.    Yeah.  We actually have one drill

10   where we -- where we do that.  It's hard to

11   complete it -- it's hard to train like that

12   because what happens is when we practice our

13   high-speed pursuing and being chased or chasing

14   somebody else, we don't let the vehicles come to a

15   stop for very long or we don't bring them down to

16   real, real slow speeds.  We typically tell them to

17   continue rolling to let the brakes cool.

18            So we don't do a lot of like driving

19   super, super fast and then parking the car or

20   coming to a complete stop and letting it set,

21   because there's a lot of heat there.  And the mere

22   fact that you're moving creates air over the

23   brakes and helps cool them.

24            So they get a little bit of training

25   but not a lot.

David Peterson

49

1  rolling log of what's happening with the pursuit
2  that the siren may be turned off and then turned
3  back on.
4          I can also see a time where out in --
5  you're beginning a pursuit.  You know, you're not
6  sure at that point if it is a pursuit or if it's
7  kind of a failed to yield.  There may be a time
8  lag when the -- when the siren doesn't come on
9  immediately.  But as a general rule when you're
10  chasing, it's lights and siren.
11  BY MS. REGAN:
12     Q.    Okay.  And, in general, if you are,
13  you know, attempting to pull over a vehicle, so
14  they're not eluding yet, you know, you're not to
15  that point, but you've put on your lights and
16  they're not pulling over, would you then be
17  required to turn on your siren?
18     A.    Again, I would turn on my siren for a
19  violator.  But I know from what we teach at the
20  academy, at a certain speed, the siren -- the
21  violator can't hear it anyway.  We do -- we show
22  this to new officers.  At a certain speed somebody
23  in a car can't hear a siren.  So the siren is more
24  for letting everybody else out in -- maybe a
25  bicyclist.

50

1     Q.    Oh.
2     A.    Maybe somebody walking.  But the
3  siren -- and I believe the speed, if I'm not
4  mistaken, is about 58 miles per hour.  You can be
5  behind somebody with a siren going, and if they're
6  150 feet in front of you, if I remember the
7  distance, they can't hear the siren.
8          So the siren is not so much -- my
9  understanding -- so much for the person in the
10  car.  It works better in the cities.  It works
11  better when you -- maybe somebody's not paying
12  attention.
13     Q.    Uh-huh.
14     A.    You can hit the siren and then it
15  makes them look around.  But if you're chasing
16  somebody at 80 or 100 miles per hour they can't
17  hear the siren.  The siren is for everybody else.
18     Q.    Okay.  Okay.
19          MR. CAMPBELL:  Can we take a quick
20  break?
21          MS. REGAN:  Well --
22          MR. CAMPBELL:  Are you right in the
23  middle?  Are you going?
24          MS. REGAN:  Yeah.
25          MR. CAMPBELL:  Okay.

51

1  BY MS. REGAN:
2     Q.    So on that note, have you ever seen
3  the Camaro, the ADEP vehicle?
4     A.    I've seen it, yes.
5     Q.    Do you happen to recall how the lights
6  are positioned in that vehicle?
7     A.    No.
8          MS. REGAN:  Okay.  If you want to
9  take a break, I will try to see if I have that
10  photo --
11          MR. CAMPBELL:  Okay.
12          MS. REGAN:  -- that he's looking
13  for.
14          MR..CAMPBELL:  I just mainly need to
15  find a Kleenex box around here.
16          (Recess:  2:05 p.m. to 2:09 p.m.)
17  BY MS. REGAN:
18     Q.    Okay.  I think that you testified
19  earlier that when driving an unmarked vehicle an
20  officer is required to be in uniform.  Is that
21  correct?
22     A.    That's my understanding, yes.
23     Q.    And does uniform include the hat?
24     A.    No.
25     Q.    Okay.

52

1     A.    The hat is -- we're supposed to use
2  our hat under most circumstances.  But the
3  uniform, meaning the marked uniform --
4     Q.    Okay.
5     A.    -- is displaying a badge is the
6  verbiage.
7     Q.    Okay.  So in terms of trying to be
8  more identifiable as a police officer when driving
9  an unmarked vehicle wearing, that state trooper
10  hat would not necessarily be something that they
11  would be trained to be wearing in order to be more
12  visibly a police officer?
13     A.    Well, we have -- we have -- it's my
14  understanding, I don't believe it's in this
15  policy, but we have a policy that we -- if we're
16  conducting traffic stops in a portion of the Motor
17  Vehicle Code, under most circumstances, we're to
18  wear our hat.  There are exceptions.  Officer
19  safety and those type of things.
20          But as a general rule, yes, we do wear
21  our hat on anything, whether driving unmarked or a
22  marked car.
23     Q.    Okay.  And --
24          MR. CAMPBELL:  Let me --
25          (Off-the-record discussion.)

Ex. 8

Scott Hite

**57**

1  come towards me, I can use a strike to kind of
2  reinforce the fact that they need to stay back.
3  And I would, I guess, kind of say that's offensive
4  in nature. I mean, it's defensive in that I'm
5  trying to keep that space away, but it's kind of
6  offensive in nature because all they're
7  necessarily doing is trying to close that gap.
8  And they haven't necessarily launched an attack
9  yet, but I'm trying to stop that from happening.
10          MR. CAMPBELL: And that's just one
11  example. I mean --
12          THE WITNESS: Yes.
13          MR. CAMPBELL: I just wanted to make
14  sure.
15          MS. REGAN: Don't testify, please.
16          MR. CAMPBELL: Yeah.
17  BY MS. REGAN:
18      Q.    Under No. 4 for ranges of combat on
19  page 111.
20      A.    Yes.
21      Q.    It says, "Range 1, kicking
22  techniques." And then in parentheses it says,
23  "Long range." Could you explain to me what that
24  means?
25      A.    These are all kind of relative to

**58**

1  where the threat is in relation to me. So a kick,
2  I can reach out farther. And then as the threat
3  gets closer, then I'm going to have mid-range,
4  which is going to be strikers striking, because I
5  can only strike out this far with my boot, you
6  know, where kicks will come out this far.
7          And then as it gets in closer, it's
8  close quarters. So that's going to be elbows,
9  knees, because, once again, now I can only reach
10  out this far.
11      Q.    Okay. So in using mid-range and
12  long-range, it sounds from your descriptions that
13  mid-range is basically to the extent that an arm
14  can be extended?
15      A.    Yeah.
16      Q.    Whereas long-range might be the length
17  of someone's leg?
18      A.    Yes.
19      Q.    Okay. So the range is literally
20  measured by body parts --
21      A.    Yes.
22      Q.    -- not by feet or --
23      A.    Right.
24      Q.    Okay. Thank you. Turning to page
25  114, No. 6 is entitled "Front snap kick." Can you

**59**

1  describe for me what is a front snap kick?
2      A.    Let me refer to this real quick and
3  read it. (Pause.)
4          The front snap kick is basically a
5  kick striking with the bottom of your foot
6  basically by lifting your -- your leg out, keeping
7  that, you know, slightly bent knee, and then
8  utilizing the power from the knee and, I guess,
9  the hip to kind of kick outwards.
10      Q.    Okay. And when you say the bottom of
11  the foot, are you basically just talking about the
12  flat part of the shoe?
13      A.    Yes.
14      Q.    Like the entire length of someone's
15  foot?
16      A.    Yes.
17      Q.    Versus the ball or the heel?
18      A.    Well, I mean, yeah. You're going to
19  strike with whatever part of that bottom foot that
20  you can hit, whether it's the heel or the toe or,
21  you know, the mid-foot.
22      Q.    Okay. So, for instance, under C,
23  where it says, "Contact should be made using the
24  balls of the feet or the toes," and then in
25  parentheses is says "boots," is that what you were

**60**

1  just describing --
2      A.    Yeah.
3      Q.    -- in terms of the bottom of the foot?
4      A.    Yeah, because my boots are very solid.
5  I mean, that is literally a solid platform.
6  There's not the flex in there to really be able to
7  necessarily hit the ball of the feet.
8          So, yeah, it's just going to be
9  that -- that boot.
10      Q.    Okay. So I guess just to make sure I
11  understand this, when I read this section using
12  the balls of the feet, in my head I imagined that
13  being something less than the full brunt of a flat
14  foot of a boot. But it sounds from your testimony
15  that they are one and the same.
16      A.    Yes.
17      Q.    Okay. And would you agree that the
18  primary target areas are the knees and the groin?
19      A.    For general safety we would like to
20  target those lower areas. The higher up you kick,
21  I guess the more danger there is relative for the
22  officer to do that just because you're going to be
23  a little bit more off-balanced. But, yeah, those
24  are primary targets.
25      Q.    Okay.

Ex. 9

Scott Hite

61

```
1        A.    But there are other targets that are
2   okay as well.
3        Q.    Would a kick to the sternum or
4   clavicle area up near the neck, top of the chest,
5   would that be a primary target area?
6        A.    It's not in the primary target areas,
7   because the primary targets are the knees and the
8   groin.
9        Q.    Okay.  So there'd only be those two.
10  Would it be an acceptable target area?
11       A.    Yes.
12       Q.    And under what circumstances?
13       A.    Under the circumstances in which it's
14  reasonable based on the perceptions of the
15  officer.
16       Q.    Why would it be reasonable to aim for
17  the neck rather than the groin or the knees?
18            MR. CAMPBELL:  Object to the form.
19  You can answer.
20       A.    If I'm -- if I'm justified in using,
21  say, a higher level of force to where I want to
22  affect the throat, then I'm okay to kick for the
23  throat.  If I'm justified in using a lower level,
24  then maybe I would just aim for the knees or the
25  groin.  If I'm kind of, you know, somewhere in the
```

62

```
1   middle then maybe, you know, I kind of range up a
2   little bit higher.
3            It all depends on the effect that I'm
4   trying to get and that's where reasonableness kind
5   of comes into line.  Because if I kick somebody's
6   knee out and blow out their knee that's probably a
7   much higher level of force than if I kick somebody
8   in the abdomen and kind of try to knock them
9   backwards or create space.
10  BY MS. REGAN:
11       Q.    Uh-huh.  And would -- I think you just
12  testified that the higher up into the chest or
13  kicking them in the neck, would that be considered
14  deadly force?
15       A.    Kicking them in the chest, no.  In the
16  neck, you know, maybe.  It depends on how the kick
17  is delivered.  It depends on, you know, what
18  the -- I guess the threat does while that kick is
19  being delivered.  If they kind of duck as I'm
20  kicking I can't necessarily just stop that mid-air
21  where I may hit the throat when that's not the
22  area that I was targeting.
23       Q.    And where the officer was,
24  quote-unquote, targeting would be based on a
25  statement that they provided.  Correct?
```

63

```
1        A.    Yes.
2        Q.    Would deadly force be warranted if a
3   person was stopped for a traffic crime and did not
4   lay down on the ground when commanded to do so?
5            Want me to repeat that?
6        A.    No.  I get the gist of it.
7            MR. CAMPBELL:  Well, don't make
8   assumptions.  If you need more clarification ask
9   her.  Otherwise, just answer the question she's
10  asking.
11       A.    Well, if we're just specifically
12  looking at I stopped you for elude, and you're not
13  getting on the ground and you're just standing
14  there.
15  BY MS. REGAN:
16       Q.    With your hands visible.
17       A.    With your hands visible and you were
18  not doing anything else.
19       Q.    Is deadly force warranted?
20       A.    Under those specific circumstances
21  there, I would say probably not.
22       Q.    Under that scenario, are you, as a use
23  of force instructor, able to tell me what range of
24  use of force would be permissible?
25       A.    So the facts are the elude.  They
```

64

```
1   stopped.  They're just standing there.
2        Q.    Their hands visible.
3        A.    Their hands visible, noncompliant
4   [sic], and nothing else going on.
5        Q.    Yes.
6        A.    Once again, this is, you know, all
7   relative to the perception of the officer at the
8   time, but if you're looking at those very specific
9   generic facts, with nothing else going on, then
10  the display of the firearm, the verbal commands,
11  and then it depends on the officer's comfort
12  level, but I could see an officer utilizing
13  empty-handed custody techniques if they approached
14  rather than created distance, which is a technique
15  to minimize the amount of time they have to
16  respond is also to close that gap to where, yeah,
17  empty-handed custody techniques would be
18  appropriate.
19       Q.    Okay.
20            MR. CAMPBELL:  Can I just ask you to
21  clarify one thing about your answer?  And if you
22  want to take a break, we can.  But I just want to
23  know if you meant when you said "they" -- you
24  said, "they could close the gap," were you talking
25  about the officer or the violator?
```

Ex. 9



**NEWS RELEASE**
LANE COUNTY SHERIFF'S OFFICE
EUGENE POLICE DEPARTMENT



ARRESTED:
- David Ray Taylor, 55, Eugene
- AJ Scott Nelson, 22, Clackamas County
- Mercedes Crabtree, 18, Milwaukie

VICTIM:
- Celestino Gutierrez, age 22, Eugene

DETAILS:

On August 3, 2012, a car linked to a Siuslaw Valley Bank robbery, occurring the same day, in Mapleton was found abandoned in Mapleton.

Lane County Sheriff's Office followed up with an investigation and found it to belonged to Celestino Gutierrez, age 22, of Eugene, who had been reported missing on August 3, 2012.

Investigation led detectives from the Eugene Police Department and the Lane County Sheriff's Office to suspects David Ray Taylor, age 55, of Eugene, A.J. Scott Nelson, age 22, of Clackamas County, and Mercedes Crabtree, age 18, of Milwaukie.

Police arrested Taylor on Wednesday, August 8, 2012, in Eugene on a warrant from another county. He was taken into custody, without incident, by Eugene Police. A smaller, modified SWAT team was used to make the arrest more secure for all parties and Taylor was arrested without resistance.

AJ Scott Nelson and Mercedes Crabtree were both taken into custody on Thursday, August 9, 2012, at separate locations in the Portland area with the assistance of U.S. Marshals as a precaution. These arrests were also made without incident.

The investigation also led law enforcement to the discovery of Gutierrez's body in a remote area of Lane County. The investigation has linked the above suspects to the Siuslaw Bank robbery that occurred in Creswell on June 8, 2012.

No further information or interviews are available at this time.

###

Ex. 10

- KCST
- KCFM
- Local Advertising
- Coverage Area
- Sales Staff



- Home
- Sports
- Information
- Station Promos
- Weather
- About Coast Radio
- Jobs

# Breaking News: Siuslaw Bank in Mapleton Held Up

Bob August 4, 2012 4:33 am Uncategorized



Local News

Ex. 10

Breaking News: Siuslaw Bank in Mapleton Held Up                    http://www.kcfmradio.com/?p=7854

Just before noon this morning, two mean carrying rifles and wearing ski goggles walked into the Siuslaw Bank Mapleton Branch and demanded money. They then left in a white, "90's hatchback". One suspect is described as being between six-foot and six-three with a thin build and wearing a white jumpsuit. The other suspect is slightly shorter, with a heavier build, and was wearing a dark colored jumpsuit with a possible leather vest over it.



Two armed men robbed the Mapleton Branch of Siuslaw Bank just before noon Friday, August 3rd. (Photo courtesy Siuslaw Bank)

Police do not know which direction the men fled and have not suspect information at this time. They're asking anyone with leads to call Sergeant Cliff Harold at541-682-4141.

Siuslaw Bank has not been contacted for comment.

The Lane County Sheriff's Press Release on the incident is below:

| | |
|---|---|
| **CASE NUMBER:** | **12-5387** |
| DATE/TIME OF INCIDENT: | 8/3/12   10:30 AM |
| DATE/TIME OF RELEASE: | 8/3/12   1:00 PM |
| NATURE OF STORY: | Armed Robbery at Siuslaw Bank |
| LOCATION: | Mapleton |
| DETAILS: | |

**The Lane County Sheriff's Office along with Oregon State Police responded to a report of a bank robbery this morning at approximately 10:30 am.  Initial reports indicate that two armed males robbed the Siuslaw Bank in Mapleton on Highway 126.  They fled the bank in a white colored, 90's model 2 door hatchback.  The vehicle is described as having blue interior and appears very beat up looking.**

8/24/15, 1:25 PM

Ex. 10

**Suspect Descriptions:**

**Suspect #1:**    Male, standing approximately 6'0" to 6'3" wearing a white jumpsuit/ coverall. He was described as having a thin build.  Suspect was wearing ski goggles and carrying a long gun.

**Suspect #2:**    Male, slightly shorter than suspect #1 with a heavier build than suspect #1. Suspect was described as wearing a black jumpsuit/ coverall with a black or brown leather vest over the coverall and wearing ski goggles.

**We do not have any suspects in custody and are asking anyone with information to contact**

**Sgt Cliff Harrold with the Lane County Sheriff's Office at 541-682-4141.**

**No further information is available at this time.**

**###**

## Related Posts

- o No Related Post

## Share this Article

- Share on Facebook
- Tweet This!
- Save to delicious
- Digg it!
- Stumble this!

- Subscribe by RSS
- Search

## Weather Cams

Old Town Florence - KVAL Weather Cam
Lane Country - Harbor Vista Web Cam
Reedsport Weather Cam

## Athlete of the Week

*Athlete of the Week*

Watch this space for the regular Athlete of the Week feature presented each week during the school year by Coast Radio, the Siuslaw News and the Sports Club; a group of businesses who

Ex. 10

# Court hears opening statements in Taylor murder trial

Previous
(?tab=gallery&
c=y&img=7)

1 of 8 Photos

Next
(?tab=gallery&
c=y&img=1)

(http://twitter.com/share)

Read the story (/news/local
/255836421.html)
**Court hears opening statements in Taylor murder
trial**



(?tab=gallery&
c=y&img=0)

(?tab=gallery&
c=y&img=7)

Ex. 10

# Court hears opening statements in Taylor murder trial

Previous
(?tab=gallery&
c=y&img=2)

4 of 8 Photos

Next
(?tab=gallery&
=4)

**Read the story (/news/local
/255836421.html)**
Court hears opening statements in Taylor murder
trial



(?tab=gallery&
c=y&img=0)

(?tab=gallery&
c=y&img=7)

(http://twitter.com/share)

Ex. 10



**LANE COUNTY
SHERIFF'S OFFICE**
125 E. 8TH AVENUE
EUGENE, OR 97401
541-682-4150

| CFS EVENT DETAIL |
|---|
| CAD EVENT NUMBER |
| 1208042911 |
| CALL TYPE |
| ELUDE |

## CALLS FOR SERVICE INFORMATION

| AGENCY | CAD EVENT NUMBER | CASE NUMBER | AGENCY NUMBER | DATE AND TIME | CALL TYPE | CALL TYPE EXPLAINED | | FINAL CALL TYPE |
|---|---|---|---|---|---|---|---|---|
| EGS | 1208042911 | 1205393 | | 08/03/2012 12:56 | ELUDE | ELUDING | | |

| LOCATION | APT/SUITE/BOX | CITY | RESPONSE ZONE | RESPONSE AREA |
|---|---|---|---|---|
| CROW RD MP04 | | UNC EUG | | 0004 |

| LOCATION COMMENT |
|---|
| CROW RD MP04 |

| COMMENTS |
|---|
| 19323-8/3/2012 12:56:59 PM-Original Location : CROW RD MP04 |
| 19323-8/3/2012 12:57:22 PM-OSP ATTMP OVERTAKE MC BLUE IN COLOR |
| 19323-8/3/2012 12:57:25 PM-LCSO ENR C3 |
| 19323-8/3/2012 12:58:05 PM-EPD, ROUTED FOR INFO, OSP IN PURSUIT NB ON CROW RD, PASSING MP03 |
| 19323-8/3/2012 12:58:28 PM-PASSING MP1, 90MPH |
| 19323-8/3/2012 12:59:09 PM-LIC/M54309 |
| 19323-8/3/2012 12:59:34 PM-**MISSING A # - LIC AS GIVEN |
| 19323-8/3/2012 12:59:49 PM-MC HAS CRASHED, UNKN LOC |
| 19323-8/3/2012 1:00:18 PM-145 CONTINUING FROM BELTLINE & ROOSEVELT |
| 19323-8/3/2012 1:01:20 PM-C4C - UNITS BACK TO C1 ***LOC IS 11TH/CROW |
| 19323-8/3/2012 1:01:39 PM-C*:**NO INJURIES |
| 19323-8/3/2012 1:02:01 PM-NO INJURIES |
| 2976-8/3/2012 1:02:39 PM-X560 ADVI |
| 19323-8/3/2012 1:04:18 PM-C*:OLN/9105112 |
| 19323-8/3/2012 1:04:33 PM-OLN/9105112 |
| 19323-8/3/2012 1:08:26 PM-|POSS RELATED TO CAD/42905?| |
| 12345-8/3/2012 1:21:07 PM-A145 REQ NON-PREF TOW FOR ELUDE AND NO INS |
| 19323-8/3/2012 1:23:23 PM-MEDICS ON SCENE |
| 19323-8/3/2012 1:37:37 PM-INITIAL TIME OF OSP CAD 1256  CAD/256613 |
| 15979-8/3/2012 2:08:26 PM-|M10 ENR RBH CODE 1| |

| REPORTING PARTY | | AREA CODE | PHONE NUMBER |
|---|---|---|---|
| | | | |
| REPORTING ADDRESS | | | |
| | | | |

| PRIMARY UNIT | DISPOSITION | DISPOSITION COMMENTS | | |
|---|---|---|---|---|
| A531 | REPT | REPORT TAKEN | | |
| E-911 | DISPATCH | ARRIVED | CLEARED | CLOSED |
| | 12:56:59 | 13:05:23 | 17:20:43 | 17:20:43 |

## UNITS STATUS RECORDS

| TIME | UNIT | STATUS | COMMENT | LOCATION | DISPO |
|---|---|---|---|---|---|
| 14:07 | A145 | AV | CONVERTED RECORD | | |
| 17:20 | A531 | AV | CONVERTED RECORD | | REPT |

## LINKED NAMES

| UNIT | REASON | NAME ( OR DL) | DOB |
|---|---|---|---|
| | | WILKERSON, JUSTIN MICHAEL | 03/14/1974 |

## LINKED VEHICLES

| UNIT | REASON | LICENSE NO. | ST | MAKE | YEAR | COLOR |
|---|---|---|---|---|---|---|
| | | M654339 | OR | | | / |
| | | M654339 | OR | | | / |
| | | M654339 | OR | APRI | 2006 | /RED/ |
| | | M54309 | OR | | | / |

## CASE NUMBERS

| CASE NUMBER | AGENCY | UNIT |
|---|---|---|
| 1205393 | EGS | A145 |

Ex. 11

# CONTINUATION REPORT
## LANE COUNTY SHERIFF'S OFFICE

AO/    LCSO Deputy B. Holiman # 145

E/    Digital Photographs taken by Deputy Holiman

W/    Oregon State Police Lieutenant R. Edwards # 260

Related/    Supplemental by Trooper Edwards   OSP Case # 12-256613


## INVESTIGATION:

On 8/3/12 at approx. 1256 hours, I overheard an Oregon State Trooper attempting to overtake a motorcycle northbound on Crow Rd. at over 100 mph. As I started in that direction from the River Rd. area, I heard the Trooper advise that the motorcycle had just passed another vehicle northbound on a corner in a no passing zone. I then heard the trooper advise that he was in pursuit and overheard the emergency siren in the background. The trooper then stated that the vehicle had crashed at the intersection of Crow Rd. and W. 11th St..

Upon arrival, I observed the motorcycle lying on its right side on the shoulder of Crow Rd. on the southeast side of the intersection. The unmarked Oregon State Police vehicle was directly behind the motorcycle and had stopped in the turn lane from northbound Crow Rd. to eastbound W. 11th. The police vehicle had the emergency lights on that I could clearly see coming up to the crash scene. I observed that the police vehicle had minor damage to the front passenger side of the vehicle. The motorcycle had minor damage to the back end. Looking south from the intersection at Crow Rd., there is approx. 250 feet of straight roadway prior to the intersection. I did not observe any brake marks or skid. I observed a male subject sitting on the hood of the police vehicle wearing a motorcycle helmet and in handcuffs. I and Deputy Holiman removed the handcuffs from the motorcycle operator and replaced them with 2 sets of handcuffs that were double locked and checked for tightness. Trooper Edwards asked for Emergency Fire and Safety to respond due to the motorcycle operator complaining of pain in his shoulder.

I contacted Trooper Robert Edwards who advised that he was the driver of the police vehicle. Trooper Edwards requested that I conduct the investigation. I obtained his statement. I then contacted the operator of the motorcycle, Justin Wilkens and obtained his statement after confirming that he had been advised of his Miranda Rights. When asked if he understood his Miranda Rights, Wilkens stated "yes". Deputy Holiman photographed the crash scene. An audible check of the emergency siren on the involved police vehicle was done and determined to be in good working order.

Farwells Towing responded for the motorcycle impound. I issued Wilkens citations in lieu of custody for Attempting to Elude, Reckless Driving and Reckless Endangering. I explained the mandatory court appearance date, time and location to Wilkens. Wilkens elected to ride in the ambulance due to extreme pain in his shoulder.


## STATEMENT:    Robert Edwards

Edwards stated that he was operating his police vehicle northbound on Crow Rd. near Erickson Rd. at approx. 60 mph. The involved motorcycle passed him at a high rate of speed also going northbound. Trooper Edwards activated his emergency lights and attempted to stop the vehicle. The motorcycle was coming up to a left corner that is marked with a caution speed of 45 mph and passed another vehicle as he was entering the corner. There is a solid yellow line going into the corner that the offender had crossed to be able to make the pass. Trooper Edwards then advised that he was in pursuit and activated his siren. In a long straight stretch near mp 2 on Crow Rd., Edwards paced the motorcycle at 120 mph. As the motorcycle slowed for traffic at the

| Reporting Officer<br>Ware    # 531  32127 | I.D.# | Assisting Officer | I.D.# | Date & Time Prepared<br>8/3/12   at  1640 hrs | Approved By | I.D.# |
|---|---|---|---|---|---|---|

Ex. 21
WIL -OSP -0016

# CONTINUATION REPORT
## LANE COUNTY SHERIFF'S OFFICE

PAGE _7_ OF _7_
CASE NUMBER  12-5393

intersection of Crow Rd. and W. 11th, Edwards observed the operator appear to be looking for a spot to get into eastbound traffic.  As Edwards approached the motorcycle, he braked and said that there was immediate "brake fade".  Edwards could not get the vehicle to stop in time and bumped the motorcycle at 3 to 5 mph.  The operator of the vehicle initially stayed upright but the force of the light collision caused him to drop the motorcycle to the ground on its right side.  Trooper Edwards exited his vehicle and the operator jumped up and started walking towards him.  Edwards pushed the subject back and ordered him to the ground where the subject was taken into custody.  Edwards confirmed that his emergency lights and siren had been activated and that the operator of the vehicle had looked back at him 5 to 7 times during the incident.

**STATEMENT:**    Justin Wilkens
    Wilkens stated that he was northbound on Crow Rd. and did pass the Chevrolet Camaro.  Wilkens then passed another vehicle just prior to the corner and said that he may have cut that one a little close and when he finished passing it was in the solid yellow line area.  Wilkens also passed a Honda that looked like it was set up as a street racer and that the occupants had waved him pass.  Wilkens continued and looked back and thought it was still the Honda behind him and that it was just "having fun".  When Wilkens came up to the intersection, he looked back and observed that the Camaro was a police vehicle with its lights on and he knew that he was getting stopped.  Wilkens said that he was looking for a spot to pull over when the police vehicle struck him from behind.
    Wilkens said that he frequently rides motorcycles and is a safe rider but does like to push the vehicles.  Wilkens never did look at his speedometer for safety reasons but thought that he was probably going over the speed limit.  Wilkens claimed that he never saw the emergency lights or heard the siren until he got to the intersection.
    Wilkens appeared to been in a fair amount of pain and stated that he was surprised that he broke his arm just from the trooper helping get him to his feet from the ground.

**FOLLOW-UP:**    NONE

**REFERRAL:**    D.A.'s OFFICE & OSP TROOPER EDWARDS

**DISPOSITION:**    CLEARED BY ARREST

| Reporting Officer        I.D.# | Assisting Officer        I.D.# | Date & Time Prepared | Approved By        I.D.# |
|---|---|---|---|
| Ware    # 531   32127 | | 8/3/12   at  1640 hrs | |



Ex. 11
WIL-OSP-0017

MRN: 02059850  Visit: 31319843  DocType: ED Report

| 05 | ♦ Shoulder Injury / Pain ♦ |
|---|---|

TIME SEEN: 1455 ☐ on arrival    ROOM: 35 ___ EMS Arrival

HISTORIAN: (patient) family medic interpreter_____
___HX / ___EXAM LIMITED BY: dementia sedation encephalopathy

PCP / Specialist_____

## HPI

**chief complaint:** injury / (pain to) R /(L) shoulder arm neck

| onset / duration: | where: |
|---|---|
| just prior to arrival | home school neighbor's |
| today / yesterday | park work (street) |
| —— 3 —— min (hrs) / days ago | |

| severity of pain: | worse / persistent since_____ |
|---|---|
| mild moderate (severe) | pain intermittent / lasting_____ |
| (1/10) 7 | Pt. was wearing helmet |

**context:** fall direct blow dislocated while raising arm
Pt c/o (L) shoulder pain after being rear-ended by
a police car on his motorcycle and pulled off the
grounds by his (L) shoulder while in hand cuffs.
Pt denies all other Sxs. Pt reports he put his → was kicked
hands in the air when he got off bike and then pulled off and

**associated symptoms:** unable to move shoulder the ground,
weakness_____ tingling / numbness which is when
bruising_____ he reports the fx occured.

## ROS

| recent illness_____ | problems urinating_____ |
|---|---|
| fever / chills_____ | headache_____ |
| chest pain_____ | nausea / vomiting_____ |
| shortness of breath_____ | leg / ankle swelling_____ |
| cough productive_____ | rash_____ |
| abdominal pain / injury_____ | anxiety / depression_____ |
| neck / back pain_____ | |
| LNMP___ preg post-menop | ☑all systems neg except as marked |

• NEURO / HEME / MS components also addressed in HPI

## PAST HX   R / L-HANDED

| cardiac disease AMI A-Fib_____ | asthma / COPD_____ |
|---|---|
| diabetes Type 1  Type 2_____ | hepatitis / HIV_____ |
| diet / oral / insulin_____ | prior injury_____ |
| (hypertension)_____ | |

☑old records ordered / reviewed / summary:_____

Tetanus immun. UTD / given in ED_____
Meds:___none / (see nurses note)_____
Allergies: ☑NKDA / see nurses note_____

## SOCIAL HX  smoker_____
drugs (meth / heroin / cocaine / marijuana / dependence)_____
(alcohol) (recent / heavy / occasional / dependence) daily
occupation  Owns a restaurant

## FAMILY HX  cardiac disease
Denies family hx

Page 1 of 2

R:031319843  D: 3Aug2012
T:14:38
WILKENS, Justin M.
14Mar1974   38   M
M:02059850  E    ERD

---

|||||||||| (barcode)    ED Report

☑ Nursing Assessment Reviewed  ☑ Vitals Reviewed_____
V/S Temp 36  HR 103  RR 20  BP 142/92  SPO₂ 100

## PHYSICAL EXAM

**General Appearance** ___ c-collar / backboard ( PTA / in ED )_____
√no acute distress   ___ mild / moderate / severe distress_____
√alert             ___ anxious_____
**SHOULDER**        ___ see diagram
___ nml inspection   (tenderness) soft-tissue (bony)
___ full ROM        (swelling) / ecchymosis
√no dislocation     ___ deformity_____
                    clavicular deformity  AC drop-off
                    anterior fullness
                    limited ROM_____

| held in: | ___ adduction | ___ abduction |
|---|---|---|
| | ___ internal rotation | ___ external rotation |
| limited: | ___ adduction | ___ abduction |
| | ___ internal rotation | ___ external rotation |
| | ___ flexion | ___ extension |

**UPPER EXTREM.**
√uninjured below   ___ see diagram
  shoulder         ___ tenderness  soft-tissue / bony
                   ___ swelling_____
                   √limited elbow ROM
                   ⊕ Abrasions (B) wrists



| T=Tenderness  PtT=Point Tenderness  S=Swelling  E=Ecchymosis  B=Burn |
|---|
| C=Contusion  L=Laceration  A=Abrasion  M=Muscle spasm  PW=Puncture Wound |
| (∅=without  m=mild  med=moderate  sv=severe) |

**NEURO**      ___ sensory / motor deficit_____
___ sensation nml  ___ weak arm abduction (deltoid)_____
___ motor nml     ___ abnml reflexes_____

© 1996 - 2008 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

Sacred Heart Medical Center at RiverBend
Sacred Heart Medical Center, University District
**EMERGENCY PHYSICIAN RECORD**

MRN: 02059850 Visit: 31319843 DocType: ED Report

35

**VASCULAR**
✓no vascular
 compromise
__abnml color / warmth / cap refill____
__brachial pulse deficit____
__radial pulse deficit____

**SKIN**
✓warm, dry
__see diagram____
__diaphoretic / cool / cyanotic____
__decubitus____

**HEAD / ENT**
✓nml inspection
__pharynx nml
__tenderness / swelling____
__ecchymosis____

**NECK / BACK**
✓nml inspection
✓non-tender
✓painless ROM
__tenderness / swelling____
__ecchymosis____
__vertebral point-tenderness____

**RESPIRATORY**
✓chest non-tender
✓no resp. distress
✓breath sound nml
__ecchymosis / abrasions____
__crepitus / subcutaneous emphysema____
__wheezes / rales / rhonchi____

**CVS**
✓heart sounds nml
✓reg. rate & rhythm
__tachycardia / bradycardia____
__irregularly irregular rate____

**ABDOMEN**
✓non-tender
✓no organomegaly
__tenderness____
__guarding____

**LABS, EKG & XRAYS**

| CBC | Chemistries | UA | ETOH |
|---|---|---|---|
| normal except | normal except | normal except | TOX. |
| WBC | Na | | |
| Hgb | K | | PT/PTT |
| Hct | CO2 | HCG | INR |
| Platelets | Gluc | serum / urine | |
| | BUN | POS   NEG | |
| | Creat | | |

EKG __NML__ ☐Interp. by me __Reviewed by me__ Rate____
__NSR__ __nml intervals__ __nml axis__ __nml QRS__ __nml ST/T__

(XRAYS) ☑Interp. by me ☑Reviewed by me ☐Disc'd w/ radiologist
R/L shoulder / clavicle / AC joint
__nml / NAD__ __nml alignment__ / fracture __nml soft tissue__
Clavicular fx
① 2nd rib fx
Other____

**PROGRESS**
Time      unchanged    improved   re-examined
1530 D/w/pt xray results and plan for
radiologist to view xray. Pt will
f/u c̄ orthopedist at Slocum. D/w
pt plan for pain Rx and a sling
and shoulder immobilizer to wear
for comfort/tx.

♦ AMI – EKG / ASA / Thrombolytics / PCI / transfer____
__referred to / discussed with Dr.____ Time:____
__will see patient in:   ED / hospital / office in____ days

☐Counseled patient/family regarding    Additional history from:
lab / rad. test/diagnosis/need for follow-up) family caretaker paramedics
✓Rx given: motrin, Percocet
CRIT CARE TIME (excluding separately billable procedures)____ min

**PROCEDURES**
**REDUCTION OF SHOULDER DISLOCATION**  Time:____
__procedural sedation (see attached sheet)____
__traction / counter traction____
__kocher maneuver____
__weights (____ lbs)____
__scapular manipulation____
__other____

**RECHECK POST-REDUCTION**    Time:____
exam:  neuro/vasc intact____
post reduction Xray:  good alignment   Hill – Sachs deformity____

**OTHER**
sling / shoulder immobilizer / clavicle strap____

**CLINICAL IMPRESSION**

| Contusion____ | AC Separation |
| Laceration____ | Axillary Nerve Palsy |
| Fracture) open / closed) R / L clavicle | Dislocated Shoulder R / L |
| (scapula  humerus head / neck / shaft) | anterior  posterior |
| ♦ Myocardial Infarction - acute | Sprain / Strain |

① 2nd rib fx

DISPOSITION- ☑ home ☐ transferred ☐ AMA ☐ eloped____
Time 1550 ☐ admitted __POA decubitus c̄ UTI (foley)____
CONDITION- ☐ unchanged ☐ improved ☑ stable ☐ worsened____
Care transferred to Dr.____   Time:____

_____ PA / NP_____MD / DO
                                              Resident
                                          Provider #____
____ Defreest
     Attending                            MD / DO
Jenna Partridge              Provider #44378
                                              Scribe
☑ Template Complete  ☐See Addendum (Dictated / Template #____)

Shoulder Injury – 05    Form # ED 005    Rev. 03 / 10    Page 2 of 2    ♦ Quality Measure Initiative

Ex. 14

MRN: 02059850 Visit: 31319843 DocType: ED Chart Forms

ED Chart Forms

A:031319843 D: 3Aug2012
WILKENS, Justin M.
14Mar1974    38  M
M:02059850        ERD
T: 14:38

Chief Complaint

(L) Shoulder Pain p̄
assaulted by
Buchanan

| | Walk | Carried | W/C | Ambulance |

Triage Time: _____

Triage Class:  1  2  3  4  5

Pain Score  0 1 2 3 ... 9 10

PCP: Doespring

Specialist: _____

Refered by Dr: _____

Resides at: _____

Discharge time: 1642

InPt Admit time: _____

Transferred to: _____

walk  w/c  carried
self  fam/friends  police
not seen  eloped  AMA
SCF  social services
Cahoots  taxi  ambulance

Triage Vital Signs

| | T | P | R | BP | POX | WT |
|---|---|---|---|---|---|---|
| | 36 | 103 | 20 | 142/92 | 100 LA | kgs |

Fall Risk Yes No Unable

ETOH Drug Yes No Unable

DV Screen Yes No Unable

TB Yes No Unable Resp Iso

Oxygen ___ L   Blood in Lab
Suction   Saline Lock
Suture Set   Cath Urine
Monitor: _____
CBG: ___   RT Protocol
Blood draw by RN/TECH: _____
Urine Dip: _____
Urine Preg: Pos. Neg.
EKG
PANELS Cath Alert CP CSF
Hip Fx Pneumonia Psych
Resus (RapidPoint) Sepsis
Stroke Alert Thrombolytics
TIA Trauma Other: _____
BLOOD BANK Hold TypeScreen
Crossmatch ___ units: _____
BLOOD ABG Ammonia BNP
CBCautodiff CK Total CMP
D-dimer Other: _____
HCG qual quant Lactate
Lipase MBA Monospot
PT/INR PTT Rh
Troponin x1 3hr serial
TSH Other: _____
URIN midstream minicath foley
UAw/microcultIF Urine DAS
C&S/SWABS: Affirm, vag
Blood x # ___ C&S (site) ___
GC/Chlam Influenza DFA
Rapid Strep RSV Urine
IMAGING (indication: _____)
CT Abd/Pelvis w. CT Head w/o
CTA Head/Neck CT KUB
CT (site) ___ w. w/o
CXR-1 CXR-2 HipXR L R
MRI ___ w. w/o
US (site) ___
Xray (site) (L) Shoulder
Xray (site) _____

Meds/ Doses (Pharmacy: _____)

Tx PTA

Allergies   NKA

Rx pad med rec  Coumadin  No meds
Med list printed

ED Pain Protocol   ED Nausea and Vomiting Protocol

1545  Shoulder immobilizer
whichever is most comfortable
Per Sloan ortho this will be called
for appt. Percocet 2 tabs PO Motrin
800 mg PO
Refused 2nd Percocet

MCA → hit by police car 12:45 pm
"Shoulder pain"
541-554-7175
PMH- Ø HTN
SH- Restaurant owner Davis Steak House
FH Ø

Impression:
(L) clavicle fx.  (L) 2nd rib fx

F-Up/Transfer MD ___ Consult MD ___ Admit MD ___

RN Signature _____  MD Signature  DeFreest  1A378
EMR#

SS722  8.3.12  1642    8/3/12
EMR#  Date  Time    Date  Time  Dictation #

Sacred Heart Medical Center
ED Clinical Service Record
1 of 1
white - HRS    yellow - pharmacy    pink - physician office

22116 (04/02/12)

Patient identification

Ex. 14

MRN: 02059850  Visit: 31319843  DocType: ED Chart Forms

ED Chart Form

| VITAL SIGNS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TIME | BLOOD PRESSURE | PULSE | RESP | PAIN SCORE | PUPILS R | L | LOC | |
| 1500 | 130/89 | 89 | 16 | | 95 | RA | | |
| 1530 | 122/102 | 93 | 16 | | 96 | RA | | |
| 1600 | | 99 | 16 | | 100 | RA | | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |
| 6. | | | | | | | | |
| 7. | | | | | | | | |
| 8. | | | | | | | | |
| 9. | | | | | | | | |
| 10. | | | | | | | | |
| 11. | | | | | | | | |

| TIME | Tetanus Status: | Temp: |
|---|---|---|
| | Allergies: /Meds | |

Pt bibu CC — ⓛ shoulder pain
ⓡ being cuffed by police, &
lifted up by his arms, pt
states "I felt cracking."
CMS intact distally. Denies
N/I to finger. pt. in
Consulted for x ray &
pain control.
513  Rue@PS. pt to x-ray —
522  back to RM.
1642  pt a.o.x.4, shoulder immobilizer
placed, discharge instructions
given with script, verbalized
understanding, pt amb out
with friend

| MEDICATIONS | | | | |
|---|---|---|---|---|
| Time | Dose | Route | Site | Initials |
| 1553 | Percocet 5/325 ī | PO | | |
| 1558 | Motrin 800 mg | PO | | |

| IV FLUIDS | | | | | | | |
|---|---|---|---|---|---|---|---|
| SOLUTION SITE | IV # | AMT STARTED | TIME STARTED Initials | AMT RECEIVED | TIME STOP Initials | | |

| OUTPUT | | | | |
|---|---|---|---|---|
| URINE | TOTAL | NG/EMESIS | TOTAL | |

| INITIAL | SIGNATURE | EMR# | DATE | TIME |
|---|---|---|---|---|
| cnf | tetanionen | 55727 | 8.3 | 1642 |
| jb | Buchanan | 11242 | 8/3 | |

A:031319843  D: 3Aug2012
T:14:38
WILKENS, Justin M.
14Mar1974   39   M
M:02059950       E     ERD

Sacred Heart Medical Center
Emergency Department Flow Sheet
1 of 1

667 (11/21/11)

Ex. 14

Wilkens-MJ

~~WILKANS~~, JUSTIN    05/07/14
DOB: 03/14/74    Age: 40    Wt: 208    Ht: 72"    BMI: 28    BP: 122/82
CC:    Presents for left shoulder pain.
S:    The patient has been having pain in the left shoulder since injury which was sustained on
08/03/12 during an arrest for a traffic stop. The patient notes that he was injured by the police officer
who arrested him. He actually brings a video of the arrest which was obtained from the Oregon State
police officer's surveillance camera, which he plays for me. During the stop he noted that the police
officers vehicle ran into the back of his motorcycle after he had stopped knocking him to the ground.
As he stands up the police officer orders him to the ground and kicks him in the left shoulder with his
right foot, which the patient believes caused the clavicle fracture. He has been handcuffed and notes
that as he was pulled from the ground by the left shoulder had significant pain. The patient has an
attorney who is helping him with a claim against the Oregon State police. He was seen by Dr.
Daniel Sherrin for orthopedic evaluation and underwent an open reduction and internal fixation of
the left mid clavicle fracture with placement of plate and screws. He continues to have ongoing pain
in the left shoulder, worse with reaching above his head or behind his back, as well as some crepitus
and pain with internal and external rotation over the acromial area. The patient has questions
regarding whether the plate and screws should be removed, or what his expectation should be as far
as ongoing pain and suffering as they are trying to work out a settlement with the state. His attorney
is Lauren Regan who is helping him with his claim. He does not believe that he had an ultrasound or
MRI scan of the left shoulder following the injury.
O:    GENERAL: A pleasant, soft spoken, physically fit appearing male. SHOULDER: Left
clavicle area with fairly long incisional scar which follows almost the entire length of the left
clavicle. There are no palpable screws or hardware underlying the incision. There is no crepitans
over the clavicle which range of motion. There is mild crepitans over the acromial clavicular area,
as well as some reaching behind his head and behind his back. Internal and external rotation appears
intact strength wise. Sensory motor exam is intact.
A/P:    1. Status post left shoulder injury with mid clavicle fracture, status post ORIF. 1. Long
discussion regarding his injury as well as circumstances. It is recommended that he followup with
Dr. Sheerin for discussion of any recommendations for further care such as removal of hardware. He
will also discuss possibility of ultrasound or MRI scan of the shoulder to rule out rotator cuff tear
which may have occurred occultly and not recognized due to his fracture. 2. He is to followup here
as needed. Carbon copy of chart note to go to Lauren Regan, Attorney at Law.
Michael Boespflug, M.D./lh    MB

5-16-14    Records faxed to Slocum    they will appt w/pt · pt aware ~ GA

Ex. 15